IN THE CIRCUIT COURT FOR
BALTIMORE CITY, MARYLAND

| | |
|---|---|
| **Christopher Sharp,**<br>4938 Stone Shop Circle<br>Owings Mills, MD 21117<br><br>       Plaintiff,<br><br>  vs.<br><br>**Baltimore City Police Department,**<br>601 East Fayette Street<br>Baltimore, MD 21211-2908<br><br>**Frederick H. Bealefeld, III,**<br>in his official capacity as commissioner<br>of the Baltimore City Police Department,<br>601 East Fayette Street<br>Baltimore, MD 21211-2908<br><br>**Unknown Police Officers Nos. 1, 2 and 3,**<br>in both their personal capacities and their<br>official capacities as officers of the<br>Baltimore City Police Department,<br>601 East Fayette Street<br>Baltimore, MD 21211-2908<br><br>       Defendants. | Civil Action No. _____<br><br>**Complaint**<br><br>**Jury Trial Demanded** |

Plaintiff Christopher Sharp, for his complaint against the defendants named above, avers

on knowledge, information, and belief:

## NATURE OF THE CASE

1.     This is a civil rights action challenging as unconstitutional the Baltimore City Police Department's warrantless arrest and detention of plaintiff Christopher Sharp, as well as the seizure and destruction of Mr. Sharp's property, premised upon Mr. Sharp's exercise of his rights under the federal and Maryland constitutions to document the conduct of City police officers performing their public duties in a public place.

2.     In May 2010, while attending the 135th running of the Preakness, plaintiff used his cell-phone camera to video and audio record the arrest and beating of an acquaintance at Pimlico Race Course. Officers of the Baltimore Police Department stopped him, seized his cell phone, and detained him while one officer left the area with the phone. After the officers returned the phone, Mr. Sharp discovered that the officers had deleted video of the arrest and all other videos that had been stored on the device, including numerous videos of his young son and other personal events.

3.     Citizens have the right, protected under the First Amendment to the United States Constitution, and Article 40 of the Maryland Declaration of Rights, to document the public performance of government officials, including police officers, through photography as well as audio and video recording. Neither federal nor Maryland law prohibits this activity, yet law-enforcement officers in the State of Maryland—specifically including Baltimore City police officers —routinely threaten to arrest or punish civilians who document police activity, using the Maryland Wiretap Act and related, inapplicable infractions to back up these threats.

4.      This case involves just such a misapplication of the Maryland Wiretap Act by Baltimore City police officers: they unlawfully detained a young man who had used his cell phone to record a public interaction between police and one of his friends; demanded that he surrender his cell phone; and deleted *all* videos from that cell phone, regardless of their content.

5.      By destroying these videos —even if purporting to act under the Maryland Wiretap Act — the officers violated Mr. Sharp's rights guaranteed by the United States Constitution, the Maryland Declaration of Rights, and several common-law rights. This civil-rights action seeks declaratory and injunctive relief as well as monetary damages to remedy these violations.

**PARTIES**

6.      Plaintiff Christopher Sharp is a 37-year-old resident of Baltimore County and the State of Maryland. He is a person within the meaning of the constitutions of the United States and the State of Maryland. As explained below, Mr. Sharp has been injured and risks further harm as a result of the defendants' illegal acts and omissions.

7.      Defendant Baltimore City Police Department is a government agency. The City Council holds hearings on Police Department policy and sets the Police Department budget. It is a "person" as that term is defined in 42 U.S.C. § 1983.

8.      Frederick W. Bealefeld, III, is the commissioner of the Baltimore Police Department. He is the chief law-enforcement officer of the Baltimore City Police Department, appointed by the Mayor of Baltimore, with the advice and consent of the City Council. As Police Commissioner, Mr. Bealefeld exercises final policy-making authority for the Police Department, establishing the duties, conduct, and discipline of officers and other employees, and establishing policies regarding screening, hiring, training, monitoring, and supervision of subordinates. He is a person within the meaning of in 42 U.S.C. § 1983, acting at all relevant times under color of state law. Commissioner Bealefeld is sued in his official capacity.

9.      Unknown Police Officers Nos. 1, 2, and 3 are police officers employed by the Baltimore City Police Department. They are "persons" as that term is defined in 42 U.S.C. § 1983, and at all relevant times were acting under color of state law. They are sued in both their personal and official capacities.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this case because Mr. Sharp seeks more than $5,000 in damages.

11.     This Court has personal jurisdiction over the Baltimore City Police Department because it is an entity located within the State of Maryland.

12.     This Court has personal jurisdiction over Unknown Police Officers Nos. 1, 2, and 3 as well as Commissioner Bealefeld because:

a.      Their tortious acts and omissions occurred in Maryland and injured Mr. Sharp there as well; and

b.    At the time of those acts and omissions, these defendants were all

employed within Maryland, and thus were performing a character of work or service

within Maryland.

13.    Venue is proper in this Court because the causes of action arose in the City of

Baltimore.

## PRE-SUIT REQUIREMENTS

14.    Mr. Sharp has satisfied the prerequisites to suit specified by the Maryland Tort

Claims Act, Md. Code Ann., State Gov't (SG) § 12-106, and the Local Government Tort Claims

Act, Md. Code Ann., Cts. & Jud. Proc. (CJ) § 5-304, for each claim in this complaint to which

these laws apply.

15.    Mr. Sharp sent notice of his claims to the Baltimore City Solicitor and the

Maryland State Treasurer by certified mail, return receipt requested, on September 8, 2010.

a.    The Baltimore City Solicitor did not respond within six months of

receiving Mr. Sharp's claim and has not responded to date.

b.    The Maryland State Treasurer rejected Mr. Sharp's claim by letter dated

September 10, 2010.

## FACTUAL ALLEGATIONS

**A.     Government Accountability and the Right to Record Official Conduct**

16.     While most police officers perform their duties in a lawful manner, some police officers abuse their authority. In many cases, the only evidence of what happened during an encounter between police officers and civilians — including whether police officers and/or civilians behaved lawfully — is the conflicting testimony of police officers and civilians.  In such cases, video and audio recordings of police-civilian encounters can provide critical evidence that is not otherwise available.

17.     Indeed, on many occasions in the last decade, audio/ video recordings made by civilians of police-civilian encounters have helped to resolve testimonial disputes about alleged police misconduct. Sometimes these audio/video recordings have tended to disprove allegations of police misconduct, and sometimes they have tended to prove allegations of police misconduct.

18.     Federal, state, and local law enforcement agencies have deployed tens of thousands of audio/video recording devices for purposes of documenting certain interactions between police officers and civilians. For example, many police squad cars are equipped with audio/video recording devices that document traffic stops. One law enforcement purpose of these audio/video recording devices is to deter and detect police misconduct, and another is to disprove false accusations of police misconduct.

19.     The right to gather, receive and record information is grounded in the Free Speech Clause of the First Amendment. This right is further grounded in:

6

       a.     the Petition Clause of the First Amendment, if the purpose of gathering, receiving, or recording the information is to use it to petition government for redress of grievances; and

       b.     the Free Press Clause of the First Amendment, if the purpose of gathering, receiving, or recording the information is to publish or disseminate it to other people.

20.    This First Amendment right to gather, receive, and record information includes the right to video and audio record police officers in the circumstances described herein.

**B.**    **Baltimore City Police Have Engaged in a Pattern Or Practice of Misapplication of the Maryland Wiretap Act to Prevent Citizens Like Christopher Sharp from Recording Official Conduct.**

21.    The Baltimore City Police Department maintains a policy, practice, or custom that guides police officers who discover that their oral communications made in public regarding official business have been recorded.

22.    The policy, practice, or custom advises police officers that they may unlawfully detain the subjects, seize the devices used for recording, improperly search the phones, and delete the recordings.

23.    Acting under this policy, practice, or custom in numerous recent instances, officers of the Department have menaced citizens who were recording officers performing their official duties in public. Examples include the following:

       a.     In February 2008, a video recording surfaced that showed an officer berating a teenager for skateboarding in the Inner Harbor. At the end of the recording, the officer turned to the individual who was recording the incident and threatened him for making the recording.

b.      As a crowd gathered following an arrest outside Power Plant Live in
October 2008, police officers seized cell phones from individuals in the crowd and, as
one officer recalled during a deposition related to the incident, began throwing the phones
to the ground. As articulated by the deposed officer, officers were seizing phones because
members of the crowd were recording the incident for later posting on YouTube and
similar Web sites.

c.      During the 2010 Preakness at which Mr. Sharp's recordings were
destroyed, another individual was threatened for recording the aftermath of the arrest. An
officer instructed the individual to cease his recording, stating, "It's illegal for you tape
anybody's voice or anything else—it's against the law in the State of Maryland."

d.      In January 2010, Baltimore City Police officers entered the "I Don't Know
Bar," located at 1453 Light Street in Baltimore City, and arrested Kieron McNelis for
taking a picture of a police arrest being conducted outside the bar.  Kieron McNelis was
released several hours later without being charged with any crime.

e.      In April 2010, Walter Carpenter was loading a truck at his business on
Baker Street when he noticed two Baltimore City Police officers forcibly arresting two
men across the street.  Mr. Carpenter took out his cell phone and recorded what he
believed was unnecessarily forceful police conduct.  Upon refusal to terminate his
recording, Mr. Carpenter was arrested for disorderly conduct and resisting arrest.

f.      In November 2010, at a small protest outside the Baltimore Waterfront
Marriott, an officer told a woman recording him that, "I'm not giving you permission to
tape me or take my picture." When the woman argued that such taping was not illegal,
the officer waved his finger at her and repeated his words.

8

C.    **Facts Concerning Christopher Sharp Individually**

24.    Every May, tens of thousands of spectators attend the Preakness held at Pimlico Race Course in northwest Baltimore. Horse races are run all day long, with the Triple Crown race, the Preakness Stakes, held in the late afternoon.

25.    Mr. Sharp attended the 135th Preakness held on May 15, 2010. Mr. Sharp was initially joined by two friends, Mark Dudek and Anna Chyzhova.

26.    Mr. Sharp, Mr. Dudek, and Ms. Chyzhova watched the races from seats in the grandstand located along the track's homestretch.

27.    After the final race of the day, Mr. Sharp entered the first floor of the Clubhouse facility, which is part of the large grandstand at Pimlico.

28.    At the Clubhouse, he met a third friend, Kelli O'Neal.

29.    While in the Clubhouse, Mr. Sharp observed Ms. Chyzhova being forcibly arrested by officers of the Baltimore Police Department. He got the attention of Mr. Dudek and suggested Dudek might want to intervene. Mr. Sharp then recorded video and audio of the incident on his cell-phone camera.

30.    Pimlico's website advises that the items expressly permitted in the Clubhouse include "Cellular Phones, Cameras (up to 35mm), Camcorders and Binoculars."

31.    Fixed security cameras in the Clubhouse also recorded video of the incident. At least one other person in the Clubhouse also recorded video and audio of the incident, and later posted this video on YouTube.

32.     When Mr. Dudek attempted to stop an officer from beating Ms. Chyzhova, he was arrested. He was later acquitted; his defense was supported in part by video of the incident recorded by Pimlico's security cameras, described in Paragraph 30, above.

33.     Several dozen other people in the Clubhouse also witnessed the incident.

34.     Unknown Police Officer No. 1, who had seen Mr. Sharp recording with his cell phone, approached Mr. Sharp and repeatedly instructed him to surrender the phone to the police and told Mr. Sharp to remain quiet. Mr. Sharp politely declined the requests to surrender the phone.

35.     Two other officers also approached Mr. Sharp and demanded that he surrender the cell phone to the police, but Mr. Sharp still declined.

36.     Yet another officer then approached Mr. Sharp and told him the police needed to review his videos and possibly make a copy of them to be used as evidence. That officer, who is identified as the defendant Unknown Police Officer No. 2, further demanded that Mr. Sharp give him the phone.

37.     Intimidated by the barrage of demands and fearing arrest if he continued to refuse them, Mr. Sharp reluctantly surrendered his phone to Officer No. 2.

38.     Officer No. 2 ordered Ms. O'Neal to leave the Clubhouse; she complied with his demand.

39.     Officer No. 2 ordered Mr. Sharp to remain in the Clubhouse with another police officer guarding him. The other police officer, who is identified as the defendant Unknown Police Officer No. 3, did not explain to Mr. Sharp why he was detaining him or for how long the detention would last.

40.     Officer No. 2 left the Clubhouse with Mr. Sharp's cell phone.

41.     While Mr. Sharp was detained by Officer No. 3, he was unable to obtain an explanation or justification for his detention from that officer or from other police officers at the scene—even after repeated requests.

42.     Officer No. 1 told Mr. Sharp that if he would keep quiet, Officer No. 1 would answer Mr. Sharp's questions. But then, apparently not satisfied with plaintiff's level of silence, Officer No. 1 turned around and walked away instead, leaving plaintiff in continued distress and fear of arrest.

43.     Officer No. 3 informed Mr. Sharp only that, "they'll probably just erase it and give it back," suggesting that this was a common practice for Baltimore police officers.

44.     Eventually, Officer No. 2 returned to the Clubhouse with Mr. Sharp's cell phone and ordered him to leave the premises.

45.     Before Mr. Sharp could leave the Clubhouse, another police officer requested Mr. Sharp's government-issued identification and took notes from the identification before returning it.

46.     As he left the Clubhouse at Pimlico, Mr. Sharp discovered that all of the videos on his phone, including two recordings of the beating and arrest of Ms. Chyzhova, had been erased. The phone also had been reset so that it permitted only emergency calls to be made.

47.     The videos deleted by the police officers included not only the recordings that Mr. Sharp had made of the beating and arrest of Ms. Chyzhova, but also twenty or more other recordings, including recordings of his young son at sports events and parties and other recordings with great sentimental value.

48.     Throughout this entire incident at the Preakness, Officers Nos. 1, 2, and 3 were on duty as employees of the Baltimore Police Department.

49.     The Baltimore Police Department and Commissioner Bealefeld exert substantial control over the policies and practices that govern the actions of individual officers in the Baltimore Police Department.

50.     In exercising such control, the Baltimore Police Department and Commissioner Bealefeld have gathered knowledge of, or in fact created by implication or express instruction, a policy, practice, or custom within the Department to violate the constitutional rights of citizens by allowing the seizure of any devices used for the recording of officers in public places and by giving permission to delete the recordings.

51.     In addition to losing irreplaceable videos, Mr. Sharp's suffered significant emotional trauma, humiliation, and distress as a result of his mistreatment by the Baltimore police.

12

52.     The Maryland Wiretap Act, Annotated Code of Maryland, Courts & Judicial Proceedings Article ("CJ") § 10-402, states in part that it is "unlawful for any person to willfully intercept . . . any wire, oral, or electronic communication . . . ."

53.     The Maryland Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." CJ § 10-401(3).

54.     The Maryland Wiretap Act defines "oral communication" as "any conversation or words spoken to or by a person *in private conversation*." CJ § 10-401(3) (emphasis added).

55.     By its express terms, the Maryland Wiretap Act bars nonconsensual recording of oral communications only when the individual has a reasonable expectation of privacy in the recorded communications.

56.     Law-enforcement officers conducting official business in a public place, such as the public area of the Clubhouse at Pimlico during the Preakness, lack a reasonable expectation of privacy in their statements made during the course of that business.

## CLAIMS

### Count I
**Section 1983 claim for violation of Mr. Sharp's free-speech rights, guaranteed by the First and Fourteenth Amendments**
(All Defendants)

57.     Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

58.     Mr. Sharp asserts this claim against each defendant, including Officers Nos. 1, 2, and 3 in both their official and personal capacities.

13

59.     Observing and recording public police activities, without interfering with those duties, is a legitimate means of gathering information for public dissemination and is therefore speech protected by the First Amendment to the United States Constitution.

60.     By detaining Mr. Sharp, seizing his cell phone, and deleting videos on the phone, Officers Nos. 1, 2, and 3 retaliated against Mr. Sharp for his speech protected by the First Amendment.

61.     Officers Nos. 1, 2, and 3 acted under the Baltimore City Police Department's policy, practice or custom when they detained Mr. Sharp in the Clubhouse, seized his cell phone, searched the phone, and deleted videos stored on the device.

62.     The Police Department and Commissioner Bealefeld caused these constitutional violations by implementing, following, or failing to remedy a policy, practice, or custom that encouraged the restriction of individual's rights protected by the First Amendment. Moreover, in the absence of judicial intervention here, these defendants will continue to cause similar constitutional violations by implementing, following, or failing to remedy the illegal pattern or practice in the future.

63.     Even if they were not acting in accordance with an official policy or practice of the Baltimore Police Department, Officers Nos. 1, 2, and 3 nonetheless violated Mr. Sharp's rights guaranteed by the First Amendment when they detained him, seized his cell phone, searched its contents, and deleted videos from the device.

64.     As a result of the defendants' retaliation against Mr. Sharp's constitutionally protected speech, Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

65.     Mr. Sharp has continued to make audio and video recordings of his son in public, but because Mr. Sharp now believes that officers of the Baltimore Police Department, and other police departments in Maryland, apply the Maryland Wiretap Act's prohibitions or other inappropriate charges to constitutionally protected recordings, Mr. Sharp has refrained from making other audio and video recordings in the presence of police officers.

66.     Mr. Sharp's speech protected by the First Amendment has therefore been chilled by the defendants' policy of barring audio recordings of police officers performing official duties in public.

### Count II
### Violation of Mr. Sharp's free-speech rights guaranteed by Article 40
(Defendant Officers 1, 2 and 3)

67.     Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

68.     Mr. Sharp asserts this claim against each defendant.

69.     The freedoms protected by Article 40 of the Maryland Declaration of Rights includes the freedoms guaranteed by the First Amendment to the United States Constitution.

70.     By detaining Mr. Sharp, seizing his cell phone, and deleting videos on the phone, Officers Nos. 1, 2, and 3 retaliated against Mr. Sharp for his speech protected by Article 40.

71.     The Baltimore Police Department and Commissioner Bealefeld have enacted or
perpetuated a policy, practice, or custom that encouraged such unconstitutional retaliation. The
Baltimore Police Department and Commissioner Bealefeld have done so through explicit or
implicit instruction to the officers within the Baltimore Police Department, or have acquired
knowledge of such a policy, practice, or custom and have not prevented its exercise.

72.     As a result of the defendants' retaliation against Mr. Sharp's constitutionally
protected speech, Mr. Sharp suffered damages including emotional trauma, humiliation, distress,
and damage to personal property.

73.     Mr. Sharp's speech protected by Article 40 has been chilled by the defendants'
policy of applying the Maryland Wiretap Act to audio recordings of police officers performing
official duties in public.

### Count III
**Section 1983 claim for violation of Mr. Sharp's freedom from unreasonable searches and
seizures guaranteed by the Fourth and Fourteenth Amendments**
(All Defendants)

74.     Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this
complaint.

75.     Mr. Sharp asserts this claim against each defendant, including Officers Nos. 1, 2,
and 3 in both their official and personal capacities.

76.     The Fourth Amendment to the United States Constitution protects Mr. Sharp
against unreasonable searches and seizures.

77.     Acting without a warrant, Officers Nos. 1, 2, and 3 detained Mr. Sharp and seized
his cell phone.

78.     Still acting without a warrant, Officer No. 2 searched Mr. Sharp's phone and deleted videos stored on the device.

79.     Because the officers had no warrant or recognized justification for their warrantless search and seizure of Mr. Sharp's cell phone and the videos stored on the device, the officers' actions violated Mr. Sharp's rights guaranteed by the Fourth Amendment to be free from unreasonable searches and seizures

80.     The Baltimore Police Department and Commissioner Bealefeld caused these constitutional violations by enacting or perpetuating a policy, practice, or custom that encouraged or allowed officers to improperly seize and destroy personal property without a warrant.

81.     As a result of the defendants' violation of Mr. Sharp's right to be free from unreasonable searches and seizures, Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

82.     Mr. Sharp has continued to make audio and video recordings of his son in public, but because Mr. Sharp now believes that officers of the Baltimore Police Department, and other police departments in Maryland, apply the Maryland Wiretap Act's prohibitions to recordings not covered by the Act, Mr. Sharp believes he will again be subject to unjustified harassment, detentions, searches, or seizures if he video tapes in the presence of police officers in the future.

**Count IV**
**Violation of Mr. Sharp's right guaranteed by the Fourteenth Amendment to be free from**
**deprivation of property without due process**
(All Defendants)

83.     Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

84. Mr. Sharp asserts this claim against each defendant.

85. The Fourteenth Amendment of the United States Constitution protects Mr. Sharp against deprivation of his property by state or local governments without notice and an opportunity to be heard.

86. The Baltimore Police Department and Commissioner Bealefeld enacted or perpetuated a policy, practice, or custom that authorizes the seizure and destruction of personal property without notice or an opportunity to be heard.

87. Officers Nos. 1, 2, and 3 permanently deprived Mr. Sharp of his personal property when they deleted videos from Mr. Sharp's cell phone.

88. Mr. Sharp was afforded no opportunity to contest these deletions before they occurred.

89. All defendants thus violated Mr. Sharp's right to pre-deprivation process guaranteed by the Fourteenth Amendment of the United States Constitution.

90. As a result of the defendants' violation of Mr. Sharp's property, Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

**Count V**
**Violation of Mr. Sharp's freedom from unreasonable searches and seizures guaranteed by**
**Article 26**
(Defendant Officers 1, 2 and 3)

91. Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

92.   Mr. Sharp asserts this claim against each defendant, including Officers Nos. 1, 2, and 3 in both their official and personal capacities.

93.   Article 26 of the Maryland Declaration of Rights protects the same freedoms guaranteed by the Fourth Amendment to the United States Constitution.

94.   Because the officers had no warrant or recognized justification for their warrantless search and seizure of Mr. Sharp's cell phone and the videos stored on the device, the officers' actions violated Mr. Sharp's right guaranteed by Article 26 to be free from unreasonable searches and seizures

95.   The actions of the Baltimore Police Department and Commissioner Bealefeld caused these constitutional violations by enacting or perpetuating a policy, practice, or custom that encouraged officers to improperly seize and destroy personal property without a warrant.

96.   As a result of the defendants' violation of Mr. Sharp's right to be free from unreasonable searches and seizures, Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

**Count VI**
**Violation of Mr. Sharp's right guaranteed by Article 24 to be free from deprivation of property without due process**
(Defendant Officers 1, 2 and 3)

97.   Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

98.   Mr. Sharp asserts this claim against Officers Nos. 1, 2, and 3.

99.     Article 24 of the Maryland Declaration of Rights protects the same freedoms guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

100.    Article 24 protects Mr. Sharp against deprivation of his property without notice and an opportunity to be heard.

101.    Officers Nos. 1, 2, and 3 permanently deprived Mr. Sharp of his personal property when they deleted videos from Mr. Sharp's cell phone.

102.    Mr. Sharp was afforded no opportunity to contest these deletions before they occurred.

103.    Officers Nos. 1, 2, and 3 thus violated Mr. Sharp's right to pre-deprivation process guaranteed by Article 24 of the Maryland Declaration of Rights.

104.    As a result of the defendants' violation of Mr. Sharp's to property , Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

### Count VII
### False imprisonment
(Defendant Officers 1, 2 and 3)

105.    Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

106.    Mr. Sharp asserts this claim against Officers Nos. 1, 2, and 3.

107.    Officers Nos. 1, 2, and 3, through their statements and acts, intimidated Mr. Sharp into remaining in the Clubhouse under the officers' control and into surrendering his cell phone for search.

108.    The officers' repeated demands after Mr. Sharp had watched officers beat and arrest Ms. Chyzhova, and arrest Mr. Dudek after he tried to assist Ms. Chyzhova, left Mr. Sharp fearful that he also would be arrested if he did not comply with the officers' demands.

109.    The officers' implicit threat of arrest or use of other force compelled Mr. Sharp to remain with an officer, where he did not want to be. A reasonable person would not have felt free to leave the Clubhouse or to refuse the officers' demands to surrender the cell phone.

110.    The officers' implied threat of arrest lacked any legal justification and was therefore an impermissible restraint of Mr. Sharp's liberty.

111.    As a result of the defendants' tortious acts, Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

**Count VIII**
**Conversion**
(Defendant Officers 1, 2 and 3)

112.    Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

113.    Mr. Sharp asserts this claim against Officers Nos. 1, 2, and 3.

114.    Officers Nos. 1, 2, and 3 destroyed Mr. Sharp's personal property when they deleted videos from Mr. Sharp's cell phone.

115.    Mr. Sharp did not grant the officers permission to delete his videos.

21

116.   No provision of law authorized the officers to delete Mr. Sharp's videos.

117.   By deleting the videos, the officers wrongfully assumed possession of them, or used or exercised ownership over them, without Mr. Sharp's authorization.

118.   Officers Nos. 1, 2, and 3 acted with intent to injure Mr. Sharp, with ill will or spite towards him, with evil or fraudulent motives, or with knowledge that they were violating his property rights.

119.   As a result of the defendants' tortious acts, Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

### Count IX
### Invasion of privacy
(Defendant Officers 1, 2 and 3)

120.   Mr. Sharp incorporates the allegations made in Paragraphs 1 to 51 of this complaint.

121.   Mr. Sharp asserts this claim against Officers Nos. 1, 2, and 3.

122.   Mr. Sharp had an expectation of privacy in the contents of his cell phone.

123.   By seizing Mr. Sharp's cell phone and searching its contents, Officers Nos. 1, 2, and 3 intruded on that privacy.

124.   The officers' intrusion would be highly offensive to a reasonable person.

125.   Officers Nos. 1, 2, and 3 acted with intent to injure Mr. Sharp, with ill will or spite towards him, with evil or fraudulent motives, or with knowledge that they were violating his rights to privacy in the contents of his cell phone.

126.   As a result of the defendants' tortious acts, Mr. Sharp suffered damages including emotional trauma, humiliation, distress, and damage to personal property.

## JURY DEMAND

Mr. Sharp respectfully requests a jury trial.

## PRAYER FOR RELIEF

Mr. Sharp respectfully requests the following relief:

a.     Declaratory judgment that:

(1)     Mr. Sharp's recordings at the Preakness were acts of speech protected by the First Amendment to the United States Constitution because they were recordings of on-duty police officers' acts and statements that were made in public and that concerned official police activities;

(2)     The Maryland Wiretap Act does not make it unlawful to engage in this act of speech; and

(3)     When Officers Nos. 1, 2, and 3 retaliated against Mr. Sharp's speech by detaining him, seizing his cell phone, and deleting videos on the phone, they infringed upon his right to free speech guaranteed by the First Amendment and Article 40 of the Maryland Declaration of Rights, as well as and his right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment and Article 26;

    b.      A permanent injunction that bars the defendants and employees of the Baltimore Police Department from retaliating against or otherwise punishing anyone who makes audio recordings of police officers performing official duties in public; and

    c.      Compensatory damages for the emotional trauma, humiliation, distress, and damage to personal property that Mr. Sharp suffered from the acts of Officers Nos. 1, 2, and 3.

    (1)      These acts were carried out under the auspices of a policy or practice of the Baltimore Police Department and Commissioner Bealefeld. Thus, for the violations of Mr. Sharp's federal constitutional rights, Mr. Sharp seeks damages against the Baltimore Police Department and against Officers Nos. 1, 2, and 3 as well as Commissioner Bealefeld in their official capacities; damages sought are joint and several, in an amount to be determined at trial;

    (2)      In the alternative, for the violations of Mr. Sharp's federal constitutional rights, Mr. Sharp seeks damages against Officers Nos. 1, 2, and 3 in their personal capacities; damages sought are joint and several, in an amount to be determined at trial.

    (3)      For the violations of Mr. Sharp's state-constitutional and common-law rights, Mr. Sharp seeks damages from Officers Nos. 1, 2, and 3, jointly and severally liable, in an amount to be determined at trial.

    d.      In accordance with 42 U.S.C. § 1988, an award for costs, expenses, and attorneys' fees; and

    e.      Any other relief as this honorable Court may deem just and deserving.

Respectfully submitted,

This 29th day of August, 2011          By: _____

**Mary E. Borja**
 mborja@wileyrein.com
**Benjamin Kohr**
 bkohr@wileyrein.com
Wiley Rein LLP
1776 K Street, NW
Washington, D.C. 20006
202-719-7000 (phone)
202-719-7049 (fax)

*Of Counsel*

**Deborah A. Jeon**
 jeon@aclu-md.org
American Civil Liberties Union of Maryland
3600 Clipper Mill Road
Suite 350
Baltimore, MD 21211
410-889-8555 (phone)
410-366-7838 (fax)

**Richard A. Simpson**
 rsimpson@wileyrein.com
**Craig Smith**
 csmith@wileyrein.com
Wiley Rein LLP
1776 K Street, NW
Washington, D.C. 20006
202-719-7000 (phone)
202-719-7049 (fax)

*Counsel for Plaintiff Christopher Sharp*

**Rule 1-313 Certifications**

I, Richard A. Simpson, certify, under Rule 1-313, that I am admitted to practice law in the State of Maryland.

## CERTIFICATE OF SERVICE

I, Craig Smith, certify that on August 29, 2011, I served the attached complaint by U.S. mail upon the following defendants:

Baltimore Police Department,
c/o 242 W. 29th Street
Baltimore, MD 21211-2908

Frederick H. Bealefeld, III,
c/o 242 W. 29th Street
Baltimore, MD 21211-2908

26