IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTOPHER SHARP,

Plaintiff,

vs.

BALTIMORE CITY POLICE
DEPARTMENT, *et al.*

Defendants.

Civil Action No. 11-cv-02888-CCB

## Declaration of Mary E. Borja
## Pursuant to Fed. R. Civ. P. 56(d)

1.      My name is Mary E. Borja.  I am a partner with the law firm of Wiley Rein LLP,

co-counsel for Plaintiff Christopher Sharp in this action.  I am over the age of eighteen and

competent to testify to the matters that are the subject of this declaration.

2.      I submit this declaration pursuant to Rule 56(d) of the Federal Rules of Civil

Procedure in connection with Plaintiff Christopher Sharp's Opposition to Defendants' Motion to

Dismiss or for Summary Judgment.  This declaration is based on personal knowledge and my

review of documents and filings relevant to this action.

3.      The Baltimore City Police Department ("BPD") and Commissioner Anthony W.

Batts (collectively, the "Police Department") seek summary judgment on Sharp's claims for

relief under 42 U.S.C. § 1983.

4.      The Police Department asserts that it has implemented a policy, General Order J-

16, that moots Sharp's request for injunctive relief.  The Police Department has provided Sharp

and this Court a copy of General Order J-16, which purports to direct BPD officers who observe

that they are being recorded by citizens. The Police Department has not provided Sharp with any other information concerning BPD's policy, practice, or custom concerning the rights of citizens to record the activities of police who are performing official duties in public places, other than what is set forth in support of its motion to dismiss and for summary judgment. Discovery into this topic has not yet commenced.

5.     To oppose the Police Department's motion for summary judgment on the "policy, practice, or custom" element of Sharp's *Monell* claim, *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), Sharp needs discovery. Likewise, Sharp needs discovery to oppose the Police Department's contention that its adoption of General Order J-16 moots Sharp's requests for declaratory and injunctive relief. Furthermore, numerous genuine material issues of fact relevant to the legal issues that Sharp raised in his opposition to the Police Department's motion remain, precluding any award of summary judgement.

6.     Information regarding the Police Department's policies and practices are within its control and not available to Sharp without discovery. Sharp thus requires testimonial and documentary discovery to present additional facts essential to his opposition to the Police Department's motion. In particular, Sharp needs discovery of, among other topics:

(a)     The documents referred to by the Police Department in its motion for summary judgment, including General Order J-16;

(b)     Any training or communications concerning General Order J-16;

(c)     The policies, practices, and customs of BPD officers before and after the issuance of General Order J-16;

(d)     Incidents in which BPD officers retaliated against citizens who have recorded police officers;

(e)     The knowledge of BPD supervisors and administrators of reported and other incidents;

(f)     Actions taken by BPD supervisors and administrators in response to these incidents; and

(g)     The knowledge of the BPD Commissioner and reaction to these incidents.

7.     This information that Sharp seeks to discover is essential to opposing the Police Department's summary judgment motion. For example, Sharp cannot determine how, if at all, the General Order has reduced his risk of suffering the same injury caused by future actions of BPD officers. Sharp also has not been afforded an opportunity to discover materials and testimony that would bear on the nature or efficacy of the training referred to in the Police Department's motion.

8.     The evidence now available demonstrates that since the General Order's promulgation in November 2011, there have been public reports of at least three incidents in which BPD officers retaliated against citizens who recorded officers performing their duties in public. Attached to this declaration as Exhibits 1-A through 1-C are true and correct copies of the following documents:

(a)     1-A: Justin Fenton, *In Federal Hill, Citizens Allowed to Record Police – But Then There's Loitering* . ., Balt. Sun, Feb. 11, 2012, http://goo.gl/bt0N0I;

(b)     1-B: Online posting of news report: Joy Leopla, *City Officer Suspended* (Fox45 News, March 21, 2012); and

(c)     1-C: Complaint filed in *Smith v. Baltimore City Police Department, et al.*, 13-cv-01352-MJG (alleging assault and false arrest by BPD officers of citizen recording the officers).

9.     Sharp cannot learn all of the relevant details about these incidents, or obtain evidence about them in admissible form, without discovery. Moreover, Sharp cannot determine whether the Police Department has knowledge of other such incidents without discovery.

10.     More generally, summary judgment of Sharp's claims for relief is also inappropriate because Sharp has not yet had the opportunity to conduct discovery into the

policies, practices, and customs of BPD officers at the time of the 2010 Preakness.  The Court

previously deferred discovery into the topic.

11.     Attached as Exhibits 1-D through 1-G are true and correct copies of transcript

excerpts from the following depositions that have been taken in this case and were not attached

to the Police Department's pending motion for summary judgment:

       (a)     1-D: Dep. of Christopher Sharp (April 24, 2012);

       (b)     1-E: Dep. of Christopher Sharp (Aug. 27, 2012);

       (c)     1-F: Dep. of Willie Coleman (Mar. 21, 2013); and

       (d)     1-F: Dep. of Robert Vinci (Mar. 21, 2013).

I declare under penalty of perjury, as required by 28 U.S.C. § 1746, that the foregoing

statement is true and correct.


Executed on August 5, 2013                    _____

                                          Mary E. Borja

# EXHIBIT 1-A

www.baltimoresun.com/news/maryland/crime/blog/bal-in-federal-hill-citizens-allowed-to-record-
police-but-then-theres-loitering-20120211,0,3706866.story

# baltimoresun.com

## In Federal Hill, citizens allowed to record police - but then there's loitering..

By Justin Fenton, The Baltimore Sun

1:35 PM EST, February 11, 2012



*[Note: The above video is embedded from Scott Cover's YouTube page]*

When tech enterpreneur Scott Cover happened upon a group of Baltimore Police standing over a handcuffed man near Cross Street market early Saturday, he pulled out his camera phone and started recording. Earlier in the day, he'd seen news reports of the Police Department affirming citizens' right to record officers performing their duties in public, and thought what was happening might - who knows - make for interesting video.

It's a scene that plays out regularly on Cross Street in Federal Hill as officers try to disperse late-night crowds. The officers will tell you that the patrons - with or without cameras - refuse to leave, and that everyone within earshot is an armchair expert on police techniques and seconds away from potentially inciting a riot. The bargoers will say the cops are often unnecessarily rude and aggressive, and don't want to be watched or filmed being unnecessarily rude and aggressive.

The officers on Saturday got Cover to stop filming, not by telling him to cease recording or seizing his camera. They told him he was loitering, and that he had to move along or risk arrest.

It's a caveat - some might say loophole - in the new general order publicly trotted out by police on Friday, three days before they're due in court to argue in a lawsuit brought by the ACLU that they are properly addressing citizen's right to record.

The new rule says that citizens have an "absolute right" to photograph or video record the enforcement actions taking place in public view. The chief legal counsel for the agency called it "an extension of the citizen's right to see. [An officer] wouldn't go up to a citizen at a crime scene and tell them to close their eyes, so the officer can't tell them they can't film."

But the rules also says that the person recording may not "violate any section of any law, ordinance, code or criminal article" - such as loitering - while doing so. The officers on Cross Street seemed aware of that fine print.

The police union says the officers acted appropriately and professionally; the ACLU says it shows there's more work to be done. "I think the inescapable takeaway is that the new policy,a nd any training that might have been conducted on the policy, have not been effective at changing the custom and practice of the BPD with respect to citizens' rights to record," said Deborah Jeon, of the Maryland ACLU.

Cover, a 30-year-old who recently moved to the city, said he was walking home when he saw about six officers standing over a hooded man who was handcuffed in front of the Eight by Ten club, near Magerk's. In the video, an officer who notices him seems aware but indifferent, saying, "Get some good footage, man. Get some good footage." But that draws the attention of a supervisor, who tells him to "take a walk."  Another says he is loitering.

"You guys do know you have a standing order to allow people to record?" Cover says.

"Nobody took your phone away, you can record all you want," another officer responds, as they push him up the street. After he walks up the street about 20 feet, four of the officers leave the man that is being arrested and approach him as he backpedals, one holding handcuffs.

"You've been asked to leave, how many times?" the supervisor says, then asks for his identification.

Cover said he recognizes that some people try to antagonize police and "push their buttons," but he said he was just recording on a whim. He said he wasn't looking for trouble and thinks police handled it wrong.

"It's kind of like the Streisand effect," he said. "If they let me stand there, I probably would have got bored after 30 seconds and walked home, thinking I watched some poor schmuck get arrested."

Union president Robert F. Cherry said the officers did nothing wrong, and the new policy is flawed if it were to find them at fault.

"Long before cameras or phones or videotaping, when you're making an arrest, you want to make sure you watch what's going on around you," Cherry said. "I don't think they did anything wrong asking him to move along. They were professional, and told the individual he was being moved because he is loitering and not because he is videotaping."

"Our officers did everything by the book and should be commended for the way they handled the situation while remaining professional," he said.

He noted another video that surfaced about a month ago, where an officer is punched and tackled by a man while making an arrest. That, he said, shows that people who crowd around officers carrying out their duties are a potential danger.

But Deborah Jeon, of the Maryland ACLU, said the situation was under control and officers had no reason to shoo Cover away.

"There appears to be no crowd, and the man recording did nothing to distract police from their duties, or to cause a problem of any kind," Jeon said in an e-mail. "He was not hindering police in any discernible way.  He was aware of the new policy ... and politely cited it as a reason police should not threaten to arrest him because he was recording them.  And yet, the officers shooed him away and threatened to arrest him if he did not stop recording and leave the scene."

Anthony Guglielmi, the Police Department's chief spokesman, said he could not comment about whether the officers acted appropriately but said the department was aware of the video and was reviewing it.

Cover says he tried to make a complaint - as it turned out, the shift supervisor was one of the officers who pushed him from the scene - and would like an explanation and apology from the department.

Copyright © 2013, The Baltimore Sun

# EXHIBIT 1-B

FOX 45
WBFF BALTIMORE

Video Arcade    Contact Us    Hey! It's Half Off!    Text Alerts    Mobile

HOME    NEWS    WEATHER    SPORTS    COMMUNITY    CONTESTS    ENTERTAINMENT    STATION INFO    IN THE LOOP

Stay Connected:  

**HOT TOPICS:**  SpotCrime  •  Maryland Gas Tax  •  B'More Healthy Expo  •  Same-Sex Marriage  •  Pump Patrol

Search Site    GO

**FOX45 NEWS**

TOP STORIES
SUPER COMMITTEE
SAVE LOCAL TV
SCHOOL CLOSINGS
VOTE 2012
COVER STORY
INTERACTIVE RADAR
FIGHTING BACK
FOX NEWS HEADLINES
NEWS LINKS
POLITICAL PULSE
RAW NEWS
SEE IT, SHOOT IT, SEND IT
TRAFFIC EDGE
WASTE WATCH
MORNING NEWS

**READ**

BUSINESS NEWS
CONSUMER NEWS
FOX45 MORNING NEWS
FUGITIVE FILES
GET THIS
INTERNATIONAL NEWS
MARYLAND NEWS
NATIONAL NEWS
NEWS LINKS
PUMP PATROL
QUESTION OF THE DAY
SCHOOL CLOSINGS
SCIENCE & TECH NEWS
TODAY IN HISTORY
TRAFFIC EDGE
YOUR VOICE

**ADVERTISEMENT**

## FOX45 TOP STORIES VIDEO

Play again ▶

Like 44    Tweet 1    0

A City Officer has been suspended after a confrontation with a woman over a cell phone recording.

It's disturbing video that attorneys for the ACLU describe as an abuse of power by police. The incident happened last night after a woman decided to start recording a traffic stop made by City Police in Cherry Hill.

Just last month, the Police Department announced a new policy that allows residents to videotape officers without fear of arrest.

Wednesday, March 21 2012, 11:00 PM EDT

### FOX45 LOCAL NEWS

**Gaithersburg man charged with cigarette smuggling**
*March 22, 2012 13:45 GMT*

%reldate(2012-03-22T13:36:55)

FREDERICK, Md. (AP) -- Frederick City Police say they have charged a Gaithersburg man at a traffic stop led to their discovery of marijuana and untaxed cigarettes.

The Frederick News-Post (http://bit.ly/GPNuIa ) reports that officers also found that 28-year-old Abdul Osman was driving on a suspended license when they stopped him for a broken tail light Wednesday evening in the 1000 block of West Patrick Street.

They say their investigation uncovered a small amount of marijuana and 50 cartons of cigarettes with Virginia tax stamps.

It is a felony to import more than two packs of cigarettes per person into Maryland.

Osman was being held at the Frederick County jail in lieu of $12,500 bail. He is charged with driving while suspended; possession of marijuana and paraphernalia; and transporting untaxed cigarettes.

Information from: The Frederick (Md.) News-Post, http://www.fredericknewspost.com

## VIDEO LIST

- City Officer Suspended-Joy Lepola
- Water Bill Hearing-Karen Parks
- Flush Tax Approved-John Rydell
- Mitt Romney in Maryland-Keith Daniels
- City Budget Released-Melinda Roeder
- Report Released in Firefighter Death
- Million Hoodie March Underway for FL Teen
- Man Arrested in Hammer Attack on Mother
- Suspect in Jewish School Shooting in France, Still Won't Surrender
- Violent Night in Baltimore
- Waste Watch: Computers Recycled-Jeff Barnd

## MARYLAND HEADLINES

- Gaithersburg man charged with cigarette smuggling
- Maryland to add 667 area code this weekend
- Maryland first-responders ask drivers to move over
- Loudoun gets 30-day extension for Dulles decision
- Md. comptroller to visit Prince George's school
- Del. lawmakers eye bill on voting by felons
- Science, care preserve DC's original cherry trees
- House to consider amendments to budget
- New air service coming to Hagerstown, Md.
- Bill requiring helmets for moped riders in Senate

59°

**AP NEWS**



Jennifer Lawrence Turns Heads

**GET THIS**

**MODERN PIN-UPS**

TAMPA, Fla. (AP) -- Meet Kelly Ackley -- pin-up model.

More

**BUSINESS NEWS**

**US stocks close mixed**

NEW YORK (AP) -- Stocks finished Wednesday's trading session in mixed fashion.

More

**CONSUMER INFO**

**More US drilling didn't drop gas price**

WASHINGTON (AP) -- A statistical analysis over 36 years suggests that more domestic oil drilling is not the answer to high gasoline prices.
The analysis of monthly, inflation-adjusted gasoline prices and U. ...

More

**SCIENCE/TECH NEWS**

**IN THE NEWS: MARINES TELL SERGEANT CRITICAL OF OBAMA TO STOP**

SAN DIEGO (AP) -- There is such a thing as free speech.

More

Fast Credit Repair

Share    Search    Like us    Print    FOXBaltimore



# EXHIBIT 1-C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

MAKIA SMITH                                    *
5604 McClean Boulevard, Apt. D
Baltimore, Maryland 21214                      *

            Plaintiff               *

v.                                             *      CASE NO.:   1:13-cv-1352

BALTIMORE CITY POLICE DEPARTMENT               *
601 E. Fayette Street
Baltimore, Maryland 21201-2928                 *

    Serve On:                                *

    Commissioner Anthony W. Batts            *
    601 E. Fayette Street
    Baltimore, Maryland 21201-2928           *

and                                            *

ANTHONY W. BATTS                               *
In his official capacity as Commissioner
of The Baltimore City Police Department        *
601 E. Fayette Street
Baltimore, Maryland 21201-2928                 *

and                                            *

OFFICER NATHAN CHURCH                           *
In both his official and individual capacity
as an officer of the                           *
Baltimore City Police Department
1900 Argonne Drive                             *
Baltimore, Maryland 21218
                                               *
and                                            *

OFFICER WILLIAM PILKERTON, JR.
In both his official and individual capacity*
as an officer of the

Baltimore City Police Department          *
1900 Argonne Drive
Baltimore, Maryland 21218                 *

and                                       *

OFFICER NATHAN ULMER                      *
In both his official and individual capacity
as an officer of the                      *
Baltimore City Police Department
1900 Argonne Drive                        *
Baltimore, Maryland 21218
                                          *
and
                                          *
OFFICER KENNETH CAMPBELL
In both his official and individual capacity*
as an officer of the
Baltimore City Police Department          *
1900 Argonne Drive
Baltimore, Maryland 21218                 *

         **Defendants**                   *

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Makia Smith, sues Defendants Baltimore City Police Department ("BCPD"), Commissioner Anthony W. Batts ("Commissioner"), in his official capacity as Commissioner of the Baltimore City Police Department, and Officers Nathan Church ("Church"), William Pilkerton, Jr. ("Pilkerton"), Nathan Ulmer ("Ulmer") and Kenneth Campbell ("Campbell") (each individually an "Officer" and collectively the "Officers"), in the Officers' official and individual capacities.

## I.
## NATURE OF THE ACTION

1.      This is an action for violation by members of the BCPD of the rights guaranteed a citizen of the United States and the state of Maryland under the Constitution of the United States and the Maryland Declaration of Rights including claims brought under 42 U.S.C. § 1983 for violation of Plaintiff's free-speech rights under the First and Fourteenth Amendments, and Article 40 of the Maryland Declaration of Rights; right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments and Article 26; right to be free from deprivation of property without due process under the Fourteenth Amendment and Article 24; for false imprisonment; conversion; battery; and intentional infliction of emotional distress. More particularly, Plaintiff attempted to film with her telephone-camera, from her car on a public street, police officers beating a minor near the side of a public thoroughfare in Baltimore City when traffic was stopped.  Plaintiff was confronted by the Officers, her telephone-camera was seized and destroyed by the Officers, and she was then assaulted and arrested by the Officers, all in the presence of her two year old daughter who was in the back seat of Plaintiff's car.  Officer Church, the first of the Officers to approach Plaintiff did so on the run yelling, "You want to film something bitch? Film this!"  All of the numerous charges brought against Plaintiff that resulted from her arrest were *nolle prosequi*, including those brought for second degree assault, willfully disobeying a lawful order, obstruction of free passage on a roadway, interference in an arrest, and failure to display her license.

## II.
## THE PARTIES

2.      Plaintiff, Makia Smith, is a citizen of Maryland with a residence at 5604 McClean Boulevard, Apt. D, Baltimore, Maryland 21214.   She is a person within the meaning of the Maryland Declaration of Rights and the Constitution of the United States and has been injured by the Defendants.

3.      That at all times relevant to this Complaint, Officer Church was a duly authorized agent, servant and employee of BCPD, working from the Northeast District. Officer Church is sued in his official and individual capacity.

4.      That at all times relevant to this Complaint, Officer Pilkerton was a duly authorized agent, servant and employee of BCPD, working from the Northeast District. Officer Pilkerton is sued in his official and individual capacity.

5.      That at all times relevant to this Complaint, Officer Ulmer was a duly authorized agent, servant and employee of BCPD, working from the Northeast District. Officer Ulmer is sued in his official and individual capacity.

6.      That at all times relevant to this Complaint, Officer Campbell was a duly authorized agent, servant and employee of BCPD, working from the Northeast District. Officer Campbell is sued in his official and individual capacity.

7.      The Officers are persons as defined by 42 U.S.C. § 1983, and at all times relevant were acting under color of state law.

8.      BCPD is a government agency.  The Baltimore City Council holds hearings on police department policy and establishes BCPD's budget.  BCPD is a "person" as defined in 42 U.S.C. § 1983.

9.      Anthony W. Batts is the Commissioner of BCPD, and its chief law enforcement officer.  He is appointed by the Mayor of Baltimore under the advice and consent of the Baltimore City Council.  The Commissioner, in his capacity as such, exercises final policy making authority for BCPD, establishes the duties, standards of conduct, and discipline of officers.  He establishes policies regarding hiring, screening, training, monitoring, supervision and discipline of officers employed by BCPD.  He is a person pursuant to 42 U.S.C. § 1983, and has acted at all times relevant under color of state law, and is joined in this Complaint in his official capacity.  Much has been reported in local newspapers about the activities of members of BCPD resulting in settlements and awards, and the Commissioner is either aware, or should be aware of these matters.

### III.
### JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(3), providing for original jurisdiction in suits authorized by 42 U.S.C. § 1983.  Jurisdiction is also available under 28 U.S.C. § 1331 because this action arises under 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments to the Constitution of the United States.  This Court has supplemental jurisdiction over the common law and state constitutional claims under 28 U.S.C. § 1367(a).

11.     This Court has personal jurisdiction over BCPD as it is an entity located and engaged in activities in Maryland.

12.     This Court has personal jurisdiction over the Commissioner and the Officers because all acts and omissions complained of occurred in Baltimore, Maryland; and because the Commissioner and the Officers were employed in Maryland.

13.     Venue is proper in this Court because the causes of action arise out of actions that occurred in Baltimore, Maryland.

**IV.**
**PRE-SUIT REQUIREMENTS**

14.     Plaintiff has satisfied the prerequisites to suit specified by the Maryland Tort Claims Act, Md. Code Ann., State Gov't (SG) § 12-106, and the Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. (CJ) § 5-304, for each claim in this complaint to which these laws apply.

15.     Plaintiff sent notice of her claims to the Baltimore City Solicitor and the Maryland State Treasurer by certified mail, return receipt requested, on March 18, 2012.

> a. The Baltimore City Solicitor did not respond within six months of receiving Plaintiff's claim and has not responded to date.

> b. The Maryland State Treasurer rejected Plaintiff's claim by letter dated April 24, 2012.

**V.**
**FACTS COMMON TO ALL COUNTS**

16.     This case involves events that transpired on March 8, 2012, when Plaintiff was beaten and arrested by the Officers while she was photographing police officers from her car as they beat a person near Harford Road.

17.    All of the complained-of acts of the Officers were illegal, and violated Plaintiff's constitutional rights.

18.    On March 8, 2012, Plaintiff was on her way home, driving her car on Harford Road at approximately 4:00 p.m. with her two year old daughter in the back seat.

19.    Traffic became heavy and then stopped near the 2800 block of Harford Road; Plaintiff came to a complete stop in her vehicle.

20.    While stopped in traffic, Plaintiff observed multiple police officers engaged in what appeared to be the beating of a young male, and his arrest, near the side of the roadway.  Traffic was stopped and Plaintiff took out her telephone-camera, opened her car door, and stood on the door sill of her car and began to photograph the beating and arrest of the juvenile on her telephone-camera.  While she photographed the police officers beating the youngster, she remained on her door sill in the public roadway, and in no way interfered with the activities of the police or the flow or movements of traffic.

21.    Officer Church saw Plaintiff filming the beating and ran at her.  He scared her and she sat back in her vehicle.  As he ran at her, he yelled, "You want to film something bitch? Film this!"

22.    Officer Church reached into Plaintiff's car and grabbed her telephone-camera out of her hand, threw it to the ground and destroyed it by smashing it with his foot.

23.    Officer Church pulled Plaintiff out of her car by her hair and beat her. Officers Pilkerton, Ulmer, and Campbell then ran to Plaintiff's car and joined Officer

Church in beating Plaintiff and arrested her using excessive force. At all times described

herein, Plaintiff's two year old daughter witnessed her mother's beating and arrest by

the Officers as did others.

24.     Physical abuse and arrest of Plaintiff being insufficient punishment for

filming the Officers, they taunted Plaintiff with the threat that her two year old child

would be transported to Social Services following her arrest.  The Officers would not call

Plaintiff's mother, despite Plaintiff's pleas that they do so, so Plaintiff's mother could

take custody of her granddaughter.

25.     Plaintiff sought the help of a witness to assist in allowing her daughter to

stay at the scene until the Plaintiff's mother could be notified and retrieve Plaintiff's

child. The Officers, despite the pleas of Plaintiff, refused to call Plaintiff's mother.

Instead, the Officers tormented Plaintiff by telling her that her daughter would be taken

from her and sent to Social Services. Seeing Plaintiff's distressful reaction to these

tormenting threats, they continued.

26.     Plaintiff had not acted in any manner that justified her beating or arrest;

she was merely exercising her constitutionally protected right of filming public officials

engaged in their jobs from and on a public location. She was not interfering with the

functions of the Officers.

27.     Plaintiff was transported to Central Booking and Intake Facility, was

charged with assaulting Officer Church in the second degree; resisting/interfering with

arrest; failing to display a license on demand; willfully disobeying a lawful order of the

police; and causing a vehicle to obstruct a free vehicle passage of a roadway. She was incarcerated.

28.    Plaintiff was forced to hire an attorney to defend her against these illegal criminal and traffic charges and incurred expenses in doing so, including the time and expense of recovering Plaintiff's vehicle, which had been towed.

29.    Twice Officer Church failed to appear for Plaintiff's trial. On January 3, 2013, a disposition of *nolle prosequi* was entered for all of the criminal and traffic charges filed by Officer Church against Plaintiff.

30.    Plaintiff was arrested without legal justification or probable cause. Her personal property was intentionally destroyed in order to delete evidence of the beating of the suspect by the police. She was subjected to an unnecessary and unconstitutional use of force. And, she was tormented and unjustly arrested by the Officers, because she filmed police officers beating a suspect.

31.    As a result of the unconstitutional use of force by the Officers, Plaintiff received multiple injuries about her face, neck and body that required her to seek medical treatment at Good Samaritan Hospital.

32.    BCPD and the Commissioner exert substantial control over the policies and practices that govern the actions of individual officers in BCPD, including the Officers and their supervisors.

33.    In exercising such control, BCPD and the Commissioner have gathered knowledge of, or created by implication or express instruction, a policy, practice, or custom within BCPD to violate the constitutional rights of citizens by allowing the

seizure of devices used for the recording of officers in public places and by giving permission to delete data or destroy the devices, as well as the engagement of members of BCPD in acts of unjustified violence and false imprisonment against the citizens of Baltimore in violation of their constitutional rights.

34.    There have been numerous examples in recent years of the BCPD intimidating citizens and/or confiscating cameras or other recording devices belonging to citizens who recorded law enforcement officials performing their official duties in public.

## COUNT I
## SECTION 1983 CLAIM FOR VIOLATION OF PLAINTIFF'S FREE SPEECH RIGHTS, GUARANTEED BY THE FIRST AND FOURTEENTH AMENDMENTS
### (All Defendants)

35.    Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

36.    Observing and recording public police activities, by citizens without interfering with those duties, is a legitimate means of gathering information of public concern for public dissemination and is therefore speech protected by the First Amendment to the United States Constitution.

37.    By beating and arresting Plaintiff and destroying her telephone-camera while Plaintiff photographed police officers beating a suspect in a public place, and from a public place, the Officers retaliated against Plaintiff for exercising speech protected by the First Amendment, and they destroyed the evidence of the police activity.

38.    The Officers acted under the BCPD's policy, practice or custom when they seized Plaintiff's telephone-camera, destroyed the device and data contained therein, used excessive force and arrested Plaintiff without legal provocation or cause.

39.    BCPD and the Commissioner caused or condoned these constitutional violations by implementing, following, or failing to remedy a policy, practice, or custom that encouraged the restriction of individual's rights protected by the First Amendment. Moreover, in the absence of judicial intervention here, the Defendants will continue to cause similar constitutional violations by implementing, following, or failing to remedy the illegal pattern or practice in the future.

40.    Even if they were not acting in accordance with an official policy or practice of BCPD, the Officers violated Plaintiff's rights guaranteed by the First Amendment when they detained her, seized her telephone-camera, destroyed it, assaulted and arrested her.

41.    As a result of Defendants' retaliation against Plaintiff's exercise of her constitutionally protected speech, Plaintiff suffered damages including emotional trauma, humiliation, distress, damage to personal property, assault and restraint of her liberty by arrest.

42.    While Plaintiff has a constitutionally protected right to film members of BCPD engaged in the performance of official duties in public places, without interference, she will not do so for fear of retaliation.

43.    Plaintiff's speech protected by the First Amendment, and applicable to the states through the Fourteenth Amendment, has therefore been chilled by Defendants'

explicit or implicit policy of barring recordings by citizens of police officers performing official duties in public.

## COUNT II
## VIOLATION OF PLAINTIFF'S FREE SPEECH RIGHTS
## GUARANTEED BY ARTICLE 40
### (Against The Officers)

44.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

45.     Plaintiff asserts this claim against The Officers.

46.     The freedoms protected by Article 40 of the Maryland Declaration of Rights includes the freedoms guaranteed by the First Amendment to the United States Constitution.

47.     By detaining, arresting and beating Plaintiff, and by seizing her telephone-camera and destroying it, the Officers retaliated against Plaintiff for her speech protected by Article 40, and prevented her from exercising said rights.

48.     BCPD and the Commissioner enacted or perpetuated a policy, practice, or custom that encouraged such unconstitutional retaliation.  BCPD and the Commissioner have done so through explicit or implicit instruction to the officers within BCPD, or have acquired knowledge of such a policy, practice, or custom and have not prevented its exercise.

49.     As a result of the Officers' retaliation against Plaintiff's constitutionally protected speech, Plaintiff suffered damages including emotional trauma, humiliation, distress and damage to person and personal property and loss of liberty.

50.     Plaintiff's speech protected by Article 40 has been chilled by the Defendants' policy of destroying recording devices, beating, and falsely imprisoning those who take photographs of members of the BCPD performing official duties in public places.

### COUNT III
### SECTION 1983 CLAIM FOR VIOLATION OF PLAINTIFF'S FREEDOM FROM UNREASONABLE SEARCHES AND SEIZURES GUARANTEED BY THE FOURTH AND FOURTEENTH AMENDMENTS
### (All Defendants)

51.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

52.     The Fourth Amendment to the United States Constitution is intended to protect Plaintiff against unreasonable searches and seizures by the federal government and, through incorporation by way of the Fourteenth Amendment, the states.

53.     The Officers unlawfully detained, assaulted and arrested Plaintiff and seized and destroyed her telephone-camera and the data contained therein.

54.     The Officers had no warrant or recognized justification for their warrantless search and seizure of Plaintiff's telephone-camera and the destruction of it and data stored on the device, and their actions violated Plaintiff's rights guaranteed by the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures.

55.     BCPD and the Commissioner caused these constitutional violations by enacting or perpetuating a policy, practice, or custom that encouraged or allowed

officers to improperly seize and destroy personal property without a warrant in violation of the rights of citizens.

56.     As a result of the Defendants' violation of Plaintiff's right to be free from unreasonable searches and seizures, Plaintiff suffered damages including emotional trauma, humiliation, distress, damage to personal property and assault and arrest.

**COUNT IV**
**SECTION 1983 CLAIM FOR VIOLATION OF PLAINTIFF'S RIGHTS GUARANTEED BY THE FOURTEENTH AMENDMENT TO BE FREE FROM DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS**
**(Against All Defendants)**

57.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

58.     The Fourteenth Amendment of the United States Constitution protects Plaintiff against deprivation of her property by state or local governments without notice and an opportunity to be heard.

59.     The Officers permanently deprived Plaintiff of her personal property when they seized and purposefully destroyed her telephone-camera and all of the data therein contained.

60.     Plaintiff was afforded no opportunity to challenge the seizure and destruction of her telephone-camera and the data therein contained before the Officers took action.

61.     All Defendants violated Plaintiff's right to pre-deprivation process guaranteed by the Fourteenth Amendment of the United States Constitution.

62.     As a result of Defendants' aforesaid actions, Plaintiff suffered damages, including emotional trauma, humiliation, distress and damage to personal property.

## COUNT V
## VIOLATION OF PLAINTIFF'S FREEDOM FROM UNREASONABLE SEARCHES AND SEIZURES GUARANTEED BY ARTICLE 26
### (Against The Officers)

63.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

64.     Article 26 of the Maryland Declaration of Rights protects the same freedoms guaranteed by the Fourth Amendment to the United State Constitution.

65.     The Officers had no warrant or recognized justification for their warrantless search, seizure and destruction of Plaintiff's telephone-camera and the data stored therein, their actions violated Plaintiff's rights guaranteed by Article 26 to be free from unreasonable searches and seizures.

66.     As a result of the Defendants' actions, Plaintiff suffered damages including emotional trauma, humiliation, distress and damage to personal property.

## COUNT VI
## VIOLATION OF PLAINTIFF'S RIGHT GUARANTEED BY ARTICLE 24 TO BE FREE FROM DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS
### (Against The Officers)

67.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

68.     Article 24 of the Maryland Declaration of Rights protects the same freedoms guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

69.    Article 24 protects Plaintiff against deprivation of her property without notice and an opportunity to be heard.

70.    The Officers permanently deprived Plaintiff of her personal property when they destroyed her telephone-camera and the data contained therein.

71.    The Officers had no warrant or recognized justification for their warrantless search, seizure and destruction of Plaintiff's telephone-camera and the data stored therein, their actions violated Plaintiff's rights guaranteed by Article 24 to be free from deprivation of property without due process.

72.    Plaintiff was afforded no opportunity to contest these actions before they occurred.

73.    The Officers thus violated Plaintiff's right to pre-deprivation process guaranteed by Article 24 of the Maryland Declaration of Rights.

74.    As a result of the aforesaid violations, Plaintiff suffered damages including emotional trauma, humiliation, distress and damage to personal property.

**COUNT VII**
**CONVERSION**
**(Against The Officers)**

75.    Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

76.    The Officers seized and destroyed Plaintiff's personal property, her telephone-camera, and the data contained therein.

77.    Plaintiff did not consent to this seizure and destruction of her personal property.

78.     The Officers were not authorized by law to seize and destroy Plaintiff's telephone-camera and the data therein contained; they did so simply to destroy evidence of police actions in connection with the beating of the suspect that Plaintiff filmed, and to discourage other citizens from lawfully filming members of BCPD engaged in their duties in public places.

79.     The Officers acted with intent to injure Plaintiff, with ill will or spite towards her, with evil or fraudulent motive, or with knowledge that they were violating her property rights.

80.     As a result of the Officers' tortious acts, Plaintiff suffered damages including emotional trauma, humiliation, distress and destruction of personal property.

## COUNT VIII
## BATTERY
### (Against The Officers)

81.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

82.     The Officers physically assaulted Plaintiff during the course of the incident described herein; they grabbed her hair, wrenched her violently from her car and beat her.

83.     The Officers engaged in intentional acts of unlawful contact with Plaintiff such that she sustained serious and permanent injuries.  Moreover, the Officers utilized unreasonable, unlawful and excessive force during the course of the incident described herein.

84.    Plaintiff did not consent to the described contact by the Officers, nor did Plaintiff in any way provoke, contribute to, or in any way present any cause for the Officers to act as they did, including the physical conduct they visited upon her.

85.    The conduct of the Officers was without legal justification and was improperly motivated by ill will and actual malice, the desire to destroy Plaintiff's telephone-camera, and the data contained therein related to the photographs she took of police officers beating a suspect, and to send a message to the citizens of the community that BCPD will not tolerate the filming of a member of the BCPD by a citizen.

86.    As a result of the battery perpetrated by the Officers, Plaintiff sustained significant physical, emotional and mental injuries. Plaintiff received multiple injuries about her face, neck and body that required her to seek medical treatment at Good Samaritan Hospital.

87.    As a direct and proximate consequence of the Officers' actions, Plaintiff was deprived of her liberty, caused to suffer permanent physical, emotional and mental injuries, caused to lose time from her employment, and has suffered, and will continue to suffer, economic loss due to sums of money spent to alleviate the injuries and damages that were inflicted by the Officers.

## COUNT IX
## FALSE ARREST
### (Against The Officers)

88.    Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

89.    The Officers had no legal or rational reason to believe Plaintiff had engaged in any crime and were without probable cause to detain her.   Plaintiff was, nevertheless, detained, arrested by the Officers, confined to a police car, transported to Central Booking, charged and incarcerated.

90.    The charges were advanced by Officer Church, illegally and with improper motive to punish Plaintiff for filming police activities, as aforesaid, given the fact that Plaintiff had not acted in the manner stated by Defendant Church.

91.    Despite his actions, and the charges against Plaintiff that Officer Church affirmed under the penalties of perjury, he twice failed to appear as a witness at her trial, likely because he did not want to further perjure himself, this time in the presence of a judge. All charges against Plaintiff have been dismissed.

92.    The arrest perpetrated by the Officers was without warrant, without legal or logical justification, and without probable cause necessary to support a lawful arrest.

93.    The Officers' conduct demonstrates their ill will, improper motive, and actual malice, all as aforesaid.

94.    As a direct and proximate consequence of the Officers' actions, Plaintiff was deprived of her liberty, caused to suffer permanent physical, emotional and mental injuries, caused to lose time from her employment, and has suffered, and will continue to suffer, economic loss due to sums of money spent to alleviate the injuries and damages that were inflicted by the Officers. Plaintiff received multiple injuries about her face, neck and body that required her to seek medical treatment at Good Samaritan Hospital.

## COUNT X
## FALSE IMPRISONMENT
### (Against The Officers)

95.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

96.     The Officers falsely imprisoned Plaintiff throughout the course of the events described herein.  These instances of false imprisonment include, but are not limited to, the occasion where the Plaintiff was first confronted by the Officers; confined in her vehicle during the course of an illegal confrontation; pulled from her vehicle by the Officers; assaulted within her vehicle by the Officers; assaulted outside of her vehicle by the Officers; placed in the back of a police vehicle by the Officers; transported to Central Booking & Intake Facility without cause; charged with crimes; and detained against her will.

97.     The actions of the Officers caused Plaintiff to be unlawfully deprived of her liberty, unable to escape an unlawful and unconstitutional attack, and incapable of seeking necessary medical attention.  This action also deprived her of the company of her two year old daughter and caused her to suffer mental anguish not knowing that her daughter would be cared for and not allowed to call her mother to take custody of her child.

98.     As a result of the unlawful conduct described herein, Plaintiff was detained against her will and sustained the significant injuries and damages described in this Complaint.

99.     The Officers' actions demonstrate ill will, improper motivation, evil purpose and/or actual malice for the reasons heretofore stated.

## COUNT XI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against The Officers)

100.    Plaintiff repeats and realleges each of the allegations made in paragraphs 1 to 34 as if fully set forth herein.

101.    Officer Church ran at the Plaintiff in a threatening manner while verbally assaulting her, causing Plaintiff to be in fear of injury. Defendant's conduct was extreme and outrageous, and caused the Plaintiff emotional distress of a severe nature.

102.    The Officers pulled Plaintiff from her vehicle, threw her to the ground, and beat her in front of several community members and her two year old child.  Officer Church and the other Officers taunted Plaintiff regarding custody of her two year old child and told Plaintiff her two year old child would be transported to social services. This conduct was particularly shocking to the Plaintiff who had not engaged in criminal conduct, and terrorized Plaintiff who thought she would lose her child.

103.    The Officers' conduct was intentional and reckless, and done in retribution for Plaintiff's photographing fellow BCPD officer conduct from and to a public place.  It was intended by them to punish Plaintiff for her actions.

104.    The foregoing conduct of the Officers, who acted together, was extreme, outrageous and beyond the bounds of decency in society.

105.    As a result of the aforesaid conduct and actions, Plaintiff has suffered and will continue to suffer severe and extreme emotional distress, including fear for her

daughter's safety, which distress has manifested itself, for example, by way of headaches, lack of sleep, fatigue, listlessness and nightmares.

WHEREFORE, Plaintiff respectfully requests that this Court grant to her the following relief:

A.      Declaratory judgment that:

1.      Plaintiff's photographing of the Officers was an act of speech protected by the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights because they were made of on-duty BCPD police officers' acts that occurred in public, concerned official police activities and did not interfere with official duties;

2.      The Officers retaliated against Plaintiff's speech by detaining her, assaulting her, destroying her telephone-camera and the data therein, and infringed upon her right to free speech guaranteed by the First Amendment and Article 40 of the Maryland Declaration of Rights, and her right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment and Article 26;

B.      A permanent injunction that bars the Officers and other officers of the BCPD from retaliating against or otherwise punishing people who take photographs or make other recordings of BCPD police officers performing official duties in public; and

C.      With regard to the emotional trauma, humiliation, distress, bodily injury and damage to personal property that Plaintiff suffered from the acts of the Defendants, Plaintiff claims damages as follows:

1.     As to the acts carried out under the auspices of a policy or practice of BCPD and the Commissioner resulting in violations of Plaintiff's federal constitutional rights, Plaintiff seeks compensatory damages against BCPD, the Commissioner and the Officers in their official capacities, jointly and several, in an amount to be determined at trial, but not less than Five Hundred Thousand Dollars ($500,000).

2.     As to the acts resulting in violations of Plaintiff's federal constitutional rights, Plaintiff seeks compensatory and punitive damages against the Officers in their individual capacities, jointly and several, in an amount to be determined at trial, but not less than Five Hundred Thousand Dollars ($500,000).

3.     As to the acts resulting in violations of Plaintiff's state constitutional and common law rights, Plaintiff seeks compensatory and punitive damages from the Officers, jointly and severally, in an amount to be determined at trial, but not less than Five Hundred Thousand Dollars ($500,000).

D.     In accordance with 42 U.S.C. § 1988, an award for costs, expenses, and attorneys' fees; and

E.     Any other relief as this Court may deem just and deserving.

Respectfully submitted,

__May 8, 2013__
Date

_/s/ James B. Astrachan_____
James B. Astrachan, Bar No. 03566

_/s/ Christopher J. Lyon_____
Christopher J. Lyon, Bar No. 27443
ASTRACHAN GUNST THOMAS, P.C.
217 East Redwood Street, Suite 2100
Baltimore, Maryland 21202
Telephone:  410.783.3550
Facsimile:  410.783.3530
jastrachan@agtlawyers.com
clyon@agtlawyers.com

_/s/ Lawrence S. Greenberg_____
Lawrence S. Greenberg, Bar No. 23642
GREENBERG LAW OFFICE
6 E. Biddle Street
Baltimore, Maryland 21202
Telephone: 410.539.5250
Facsimile: 410.625.7891
larry@greenberglawyers.com

_Attorneys for Plaintiff_

## JURY DEMAND

Plaintiff respectfully requests a jury trial.

_/s/ James B. Astrachan_____
James B. Astrachan

# EXHIBIT 1-D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)


CHRISTOPHER SHARP,           *
                             *
          Plaintiff,         *
                             *   Case Number:
     v.                      *
                             *   1:11-cv-02888-BEL
BALTIMORE POLICE             *
DEPARTMENT, et al.,          *
                             *
          Defendants.        *

          * * * * * * * * *


          Pursuant to Notice, the videotape

deposition of CHRISTOPHER SHARP was taken on

Tuesday, April 24, 2012, commencing at 6:15 p.m.,

at the Office of Legal Affairs of the Baltimore

City Police Department, 601 E. Fayette Street, 5th

Floor, Baltimore, Maryland 21202, Richard D. Baker,

Jr., Notary Public.


Reported by:

Richard D. Baker, Jr.

Page 29

1   Q   Who is Sergeant or Officer Besley?
2   A   That gentleman is, again, a police
3   officer who identified himself to me, to the best
4   that I can remember, as Sergeant Beasley or Besley.
5   He is the officer who came up when I was really
6   struggling with the other officers, because I felt
7   that they didn't have a right to be doing to me
8   what they were.
9   Q   I got that, but let me, let me -- and
10  I'm only -- I'm not trying to be rude, Mr. Sharp,
11  but we only have an hour, so I just want to kind of
12  focus you in on some kind of really point
13  questions, and then you can elaborate towards the
14  end.  Okay?
15  A   Sure.
16  Q   But looking at paragraph 4 again and
17  looking at unknown officer 2, who is an African
18  American male, mid 30s, approximately 5-10,
19  six-foot tall, medium complexion, close-cropped
20  hair, and a neatly trimmed mustache.  Is this
21  Sergeant Beasley?

Page 30

1   A   That is the person whom I -- who came up
2   to me, yes.
3   Q   Yes.  And in your declaration, why
4   didn't you put his name, or why is he identified as
5   an unknown person when he identified himself to
6   you?
7   A   I'm not sure how far I should go with
8   this question because --
9   Q   Just answer it.
10  A   Could you repeat the question?
11  Q   Yes.  Paragraph 4, which represents your
12  declaration under oath as to the identity of
13  unknown officer number 2 --
14  A   Uh-huh.
15  Q   -- and what you described in terms of
16  your complaint, what you're describing here now,
17  are the activities alleged to have occurred or
18  happened from officer, unknown officer 2.
19  A   Yes.
20  Q   And you just testified that Sergeant
21  Beasley or Besley, or however he pronounces it,

Page 31

1   represents officer number 2?
2   A   Yes.
3   Q   Okay.  And so were you aware that
4   officer, unknown officer number 2 and Sergeant
5   Beasley were one and the same?
6       MS. BORJA:  Objection to the form.
7       MR. SMITH:  You can answer.
8   A   That is the name that I recall him
9   giving me.
10  Q   I understand.  So it's fair to say,
11  then, for paragraph 4, unknown officer 2, we're
12  going to identify him as a officer or sergeant --
13  are you sure of the rank?  Let me strike that
14  question.  Are you sure of the rank of the
15  individual who approached you?
16  A   I'm sure that's what he told me.
17  Q   Okay.  Was there any indicia based on --
18  remember his uniform.  Did you see stripes on his
19  arm, by any chance?
20  A   I wasn't looking for things like that.
21  Q   That's fine.  So your understanding of

Page 32

1   his rank was based on how he introduced himself?
2   A   On what he told me.
3   Q   Got you.  And for the record, we're
4   clear that unknown officer 2, the officer who
5   allegedly took your phone and viewed the video, is
6   Sergeant Beasley or an Officer Beasley?
7   A   Again, it's -- yeah, it's unknown
8   number 2 who did that, yes.
9   Q   Okay.  Now let's go to paragraph 5, and
10  that's unknown officer 3.
11  A   Uh-huh.
12  Q   Right.  You see that again as an African
13  American male, 40 to 45, six-one, six-three, medium
14  to light complexion, and he also had prominent pock
15  marks on his face, is that correct, to your
16  recollection?
17  A   I hate to say it, but yeah, there was --
18  I have a little bit, too.
19  Q   That's fine.  That's fine.
20      Okay.  Now tell me about his uniform.
21  A   He was wearing a blue uniform.

Page 33

1    Q    Similar to what you described in
2  officer, unknown officer 1?
3    A    It was his -- the number 3 was blue top
4  for sure.
5    Q    So the shirt was blue?
6    A    I think pants were dark also, yeah.
7    Q    As I asked you before, do you recall
8  seeing any insignia on the arm, sleeve?
9    A    No.
10   Q    And how about the nameplate?
11   A    Again, no.
12   Q    Okay.  And how about a badge?
13   A    No.
14   Q    Or a badge number?
15   A    No.
16   Q    Was he wearing his hat?
17   A    Yes.
18   Q    Okay.  And --
19   A    I think so.
20   Q    -- how long, if you can recall, was
21  officer 3 in your presence?

Page 34

1    A    I don't know when officer 3 initially
2  kind of joined the group, if you will, but officer
3  number 3 is the gentleman who I had to stay with
4  when unknown officer number 2 left with my phone.
5  So I spent -- out of the whole incident, he was
6  probably the longest with me.
7    Q    Okay.
8    A    He didn't speak to me as much as the
9  other guys did, but he was there.
10   Q    So give me -- just like you did with
11  officer 3, give me a guesstimation of how long all
12  combined that time frame would have been.
13   A    For number 3?
14   Q    For number 3, yes, sir.
15   A    At least 10 minutes I would say.  I
16  mean, he was there for the whole time I was being,
17  I was being held basically.  He was the officer who
18  I had to stay with.
19   Q    Okay.  And how long did the entire
20  incident take?
21   A    It took quite a while.  10 to 15

Page 35

1  minutes.
2    Q    Okay.  And now using the incident, you
3  are aware of -- and I'm just going to say Anna so I
4  don't botch her last name, but I'm speaking
5  about --
6    A    I don't know how to pronounce it either.
7  I don't know how to pronounce it either.
8    Q    Yeah.  Chyzhova.  Chyzhova.  But the
9  young lady who was involved in the arrest earlier
10  on, how soon after that incident were you first
11  approached by officer, unknown officer 1?
12       MR. SMITH:  Objection.  Vague.  You can
13  answer.
14   A    Well, if I could just take a minute to
15  explain what had happened.
16   Q    Uh-huh.
17   A    And I know you have an hour.  I'll give
18  you an extra minute.
19   Q    Okay.
20   A    There was the initial incident with the
21  police officers and her.  It kind of died down for

Page 36

1  a second.
2    Q    Let me just, let me just -- and again,
3  please don't take this as being rude.  I really
4  need to get into some specific things.  As your
5  counsel said, this is really about the identity.
6    A    Right.
7    Q    So what I'm just trying to determine,
8  you know, is if you could just give me a time frame
9  in which when you were recording, whatever time
10  that was, and the officer approached you, and use
11  the arrest as kind of a backstop and say, well, by
12  the time her arrest occurred, how long before that
13  interaction occurred.
14   A    That's what I was --
15       MR. SMITH:  Objection.  Vague.  Go
16  ahead.
17   A    That's what I was trying to do,
18  actually.
19   Q    Okay.
20   A    Just so I can get -- just so I have
21  everything straight in my head as far as what

# EXHIBIT 1-E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)


CHRISTOPHER SHARP,          *
                            *
          Plaintiff,        *
                            *      Case Number:
     v.                     *
                            *      1:11-cv-02888-BEL
BALTIMORE POLICE            *
DEPARTMENT, et al.,         *
                            *
          Defendants.       *

          * * * * * * * * *


          Pursuant to Notice, the videotaped

deposition of CHRISTOPHER SHARP was taken on

Monday, August 27, 2012, commencing at 2:34 p.m.,

at the American Civil Liberties Union of Maryland,

3600 Clipper Mill Road, Suite 350, Baltimore,

Maryland 21211, before Paul Cannon, Videographer,

and Richard D. Baker, Jr., Notary Public.



Reported by:

Richard D. Baker, Jr.

Page 137

1 heavyset dude.

2    Q   Heavyset. African American, Caucasian,

3 Latino?

4    A   No. African American, a bigger guy.

5    Q   Uh-huh.

6    A   Round, you know.

7    Q   Right. Do you know whether he was

8 security, Baltimore police?

9    A   He was dressed the same as the other

10 officers.

11    Q   But you don't know whether those

12 officers were Baltimore police or security either,

13 correct?

14    A   I do know they were.

15    Q   You do?

16    A   Yeah.

17    Q   Oh, well, let's table Ms. O'Neill and

18 let's spend a minute on that.

19     So you know that since the last time we

20 spoke back in April 24th, sometime in March we

21 started producing photographs --

Page 138

1    A   Yes.

2    Q   -- of police officers. And we've been

3 subsequently -- based upon your inability to

4 recognize anyone in the first batch, we sent more.

5 And at least the last time we met you said, hey, I

6 had an opportunity to look through those and I

7 wasn't rushed and, you know, at that point you

8 could not identify anyone. Do you recall that

9 conversation?

10    A   Yes.

11    Q   Okay. And so it's been a long time

12 since we've talked and you looked at other

13 pictures. Do you have the identity of an officer

14 to share with me today that you identified from

15 those pictures?

16    A   No.

17    Q   I thought you just said you do know it's

18 a Baltimore police officer.

19    A   Yeah. I know that because of the --

20 because they were all dressed the same. I mean,

21 I'm not -- I mean, if you're talking about reading

Page 139

1 someone's badge number or insignia or whatever that

2 stuff is called, --

3    Q   Uh-huh.

4    A   -- I didn't read that.

5    Q   Right. You said that under oath last

6 time you didn't do that.

7    A   Yes. But they were, they were all

8 dressed as what I would consider a police officer

9 to be dressed as.

10    Q   Okay. But you know there are other

11 uniforms -- in fact, you worked at Pimlico and

12 there's other people who were dressed as law

13 enforcement individuals at that location, right?

14 We're clear on that, right?

15     MS. BORJA: Objection to form. Leading.

16    Q   You can answer.

17     MS. BORJA: Also assumes facts not in

18 evidence.

19    A   Yes.

20    Q   And you know this because of your

21 previous dealings with Pimlico, right? You said to

Page 140

1 me you knew they had security and police?

2    A   Yes, plainclothes, people.

3    Q   Right. Absolutely. Okay. So now

4 having looked at -- as a matter of fact, let's just

5 be a little -- let's step back for a second. Have

6 you looked at any pictures recently?

7    A   Yes.

8    Q   Okay. And when was the last time you

9 looked at photographs?

10    A   A week or so ago.

11    Q   A week or so?

12    A   Two weeks ago maybe.

13    Q   Two weeks ago?

14    A   Yeah, somewhere in there.

15    Q   Okay. And were you informed at the time

16 you were looking at -- well, strike that question.

17     In the last rendition of photographs

18 that you reviewed, did you realize that there were

19 men and women in this, in the photo spread?

20    A   In the second set you --

21    Q   The second, right.

Page 141

1     A   Yes.
2     Q   Okay.  And so you said the second one.
3   So how many have you gotten all together, do you
4   remember?
5     A   I've gotten one, but I looked at one
6   before that.
7     Q   Right.  So you looked at the one prior
8   to meeting with me.  You talked about that one.
9   That's when you said Mr. Smith met with you at your
10   house and --
11     A   Yes.
12     Q   -- at a restaurant, right?
13     A   Yes.
14     Q   That's one time.
15     A   Yes.
16     Q   And then there's a subsequent time that
17   you looked at?
18     A   The ones that I believe your office or
19   you sent.
20     Q   And did you do it the same method,
21   Mr. Smith came to your house or to a restaurant?

Page 142

1     A   No.  I have a CD.
2     Q   Okay.
3     A   So I can look at it when I have time.
4   It's actually quite time consuming.
5     Q   I'm sure.  But have you made time to
6   look at it, though?
7     A   Yes.
8     Q   Okay.  And so if you had to at least
9   give a round estimate, I don't want you to be
10   pinpointed to the minute, but how much time have
11   you spent reviewing those photographs?
12     A   If you add it all up it's, I mean, hours
13   of it.  I don't know the exact number of pictures.
14   Some pictures, you know, with the mouse you can
15   just click right through because you know it wasn't
16   a white woman.
17     Q   Right.
18     A   So you can click right through that, the
19   next one, or a guy who has, you know, a bunch of
20   facial hair, so you can click through it.  And I
21   don't -- I can't tell you the number exactly, but

Page 143

1   it's in the hundreds of pictures.
2     Q   That's all I was asking, the time frame,
3   if you had a guesstimate.  Two hours, four hours,
4   seven hours?
5     A   I would say at least four or five hours.
6     Q   Okay.  So from --
7     A   At least that.
8     Q   From all the pictures you reviewed from
9   dating back to March 29, give or take, to today,
10   would you be comfortable saying that the total
11   amount you've looked at or you spent looking at
12   photographs would equal four hours, five hours?
13     A   I think, oh, I think it would probably
14   be more than that.
15     Q   You mean more like --
16     A   If I include the first ones, especially
17   the first time.
18     Q   Right.  So give me your total
19   expenditure of time for reviewing these
20   photographs.
21     A   I need you to understand this is kind of

Page 144

1   a rough estimate.
2     Q   Yeah.
3     A   I wasn't keeping track.
4     Q   I understand.
5     A   It's hard to do, so I'll look at it kind
6   of casually as I'm doing -- you know, as I'm at
7   home.
8     Q   Uh-huh.
9     A   Six to eight hours.
10     Q   Okay.  Fair enough.  And of that six to
11   eight hours, you've been unable to identify any
12   officers out of the three that you described, or
13   even the fourth one maybe that you said that you
14   flagged down, you've not been able to identify any
15   of those individuals?
16     A   That is correct, although I wasn't
17   looking for the fourth one.  But, yes, you're
18   right, the three.
19     Q   The first three?
20     A   Yes.
21     Q   Okay.  When did you advise your counsel

Page 145

1  that you could not identify any of the photographs?
2      MS. BORJA: Objection. It's
3  attorney/client privilege.
4      MR. GRIMES: Attorney/client privilege
5  about his identification of photos?
6      MS. BORJA: Well, you're asking about
7  the content of communications with counsel. If you
8  want to ask about the dates of communication with
9  counsel, but you're asking him to confirm the
10  content of the communication with counsel.
11      MR. GRIMES: Okay. I'll --
12      Can you read back the question, Richard?
13  I thought I said when did you contact counsel.
14      (The reporter read the record as requested.)
15      MS. BORJA: You're suggesting the
16  content of the communication with counsel, which
17  may or may not be accurate. But in order for this
18  witness to say whether your characterization of his
19  communication to counsel is accurate, he would have
20  to tell you what his communication with the counsel
21  was.

Page 146

1      So this witness can answer when he's
2  spoken to counsel, but --
3      MR. GRIMES: That was the question. Why
4  are you doing this? I asked that question. He
5  just read it back. I just asked him when. I
6  didn't have him to verify or certify or talk
7  about --
8      MS. BORJA: You're asking him to agree
9  that this specific conversation, this description
10  is correct.
11      MR. GRIMES: No. He said he couldn't
12  identify anyone on the photos, and I just asked him
13  when did he divulge that to counsel. That's all I
14  said.
15      MS. BORJA: I disagree. I believe
16  you're asking him to confirm not just when, but to
17  characterize his communication with counsel.
18      BY MR. GRIMES:
19      Q  Mr. Sharp, don't characterize your
20  communication with counsel. Just tell me when you
21  finished looking at the pictures and told your

Page 147

1  counsel that you couldn't identify them.
2      MS. BORJA: You can answer when you
3  finished looking at pictures and you can answer
4  when you've spoke to counsel. But I'm instructing
5  you not to explain or agree or disagree with how
6  Mr. Grimes is characterizing our conversations or
7  any conversations you had with other attorneys.
8      MR. GRIMES: Mary, again, that is so
9  improper. You know that you cannot stop and talk
10  to your witness in the middle of a deposition and
11  tell him what to say. You can tell him not to
12  answer an improper question when I ask it.
13      You can't presuppose I'm asking
14  something that the record has already shown. He
15  read back what I said. And you're extrapolating
16  from a very boilerplate question my intent. I've
17  now corrected the question to make sure Mr. Sharp
18  understands I'm not telling him to ask -- or asking
19  him to tell me anything about your subsequent
20  conversations.
21      He said he could not identify the

Page 148

1  photographs. I asked him when he communicated that
2  to counsel. That's it. He doesn't have to answer
3  anything --
4      BY MR. GRIMES:
5      Q  Mr. Sharp, just so you're clear, I don't
6  want you to answer anything about what you said to
7  your counsel or what counsel said back to you once
8  you said you couldn't identify. Just that finished
9  looking, told them I finished looking, I don't see
10  the person. Okay. Are we clear? Do you
11  understand the question?
12      A  Yes.
13      MS. BORJA: And I continue to disagree
14  with your characterization --
15      MR. GRIMES: Your objection is noted.
16      MS. BORJA: -- of your question.
17      MR. GRIMES: Your objection is noted.
18      MS. BORJA: I'm advising the witness
19  that he's not to divulge the content of what we
20  communicated --
21      MR. GRIMES: I'm not asking that

Page 149

1  question, though, Mary.  You can't presuppose what
2  I'm going to ask before I ask it.  Let me ask that
3  and then you object and then you tell him don't
4  answer.  That's all I'm asking right now.
5      I'm asking him a very vanilla question.
6  I said when you finished looking at the documents,
7  when did you call your counsel and say that I'm
8  finished looking and I haven't seen anyone in this
9  batch that you gave me?
10     MS. BORJA:  Counsel, to be clear, it is
11 fair grounds to ask him when he finished looking at
12 the pictures.  It is fair grounds to say when did
13 he call his counsel.
14     It is not fair grounds, the next part of
15 your question, to ask him when he said X, Y and Z.
16 The content of that communication that you're
17 suggesting as part of your question you're asking
18 him to confirm.
19     MR. GRIMES:  No, I'm not, Mary.
20     MS. BORJA:  I disagree.
21     MR. GRIMES:  Okay.  But you said that 20

Page 150

1  times.  What more do you --
2      MS. BORJA:  But you keep asking him to
3  divulge attorney/client communications.
4      MR. GRIMES:  I'm not.  Because he said
5  that he could not identify -- those are his words
6  that are outside of the communication with his
7  counsel.  He said what he did, which is the purpose
8  of a deposition.
9      So he can answer what he did and he can
10 answer when he communicated what he did to counsel.
11 He cannot talk about the dynamics of the
12 conversation, but he most certainly can say I
13 called on Friday and I told them I could not
14 identify --
15     MS. BORJA:  And I told them X.  That's
16 the problem.  You're asking him to confirm I told
17 my lawyers X.  You're not entitled to that.
18     BY MR. GRIMES:
19 Q   Sir, you've heard what your counsel
20 believes is the standard somewhere.  And you've
21 also heard my question several times.  So again I'm

Page 151

1  going to say, following the advice of your counsel,
2  please do not divulge any contents of the
3  conversation back and forth between you and your
4  counsel.
5      You have -- and let's just take it step
6  by step.  You would agree that you viewed video or
7  photographs on a CD, correct?
8  A   Yes.
9  Q   And your purpose for reviewing those
10 photographs is an attempt to try to identify the
11 individuals that you believe were involved in an
12 incident that you describe happened to you on
13 May 15, 2010, correct?
14 A   Yes.
15 Q   And until this time, I mean to date,
16 dating way back to sometime in March, you have not
17 been able to identify any individual that is
18 present on those CDs; is that correct?
19 A   Yes.
20 Q   Okay.  And when did you advise your
21 client, I mean your counsel that you were -- your

Page 152

1  status of reviewing the contents of those CDs?
2  A   Well, like I said to you just a little
3  bit earlier, the last time I looked at the CD was
4  somewhere --
5  Q   A couple weeks ago, uh-huh.
6  A   I'm sorry.
7      MS. BORJA:  He wants to know when you
8  talked to your lawyers.
9      MR. GRIMES:  Not when you talked to your
10 lawyers.  That's not my question.  And I don't need
11 you to answer.  He can ask me if he doesn't
12 understand.
13     MS. BORJA:  Well, then I don't
14 understand.  Are you asking for the timing of when
15 he talked to the lawyers, or are you asking for the
16 content of when he -- of what he said to his
17 lawyers?  Because the timing is fine.
18     I'm assuming you're asking for a
19 question within the scope --
20     MR. GRIMES:  But you don't have to
21 assume.  I'm asking it like 15 times over and over

Page 153

1   again. You don't have to assume.
2       BY MR. GRIMES:
3       Q   Sir, when did you contact your counsel
4   to say I'm finished looking at the videos -- I mean
5   the photographs?
6       A   I was actually planning to continue to
7   look.
8       Q   I understand that. But you understand
9   that there is a time frame in which you're supposed
10   to be completing looking at these photographs,
11   correct, or do you not? Maybe a better question.
12   Are you aware that you're supposed to be looking at
13   these photographs in an attempt to try to identify
14   these unknown officers?
15       A   Oh, I know that, yes.
16       Q   Okay. And did you think you had
17   infinite time or you could just look at them
18   forever? Okay. So --
19       A   No, I don't want to look at them
20   forever.
21       Q   I'm sure you don't. So you knew that

Page 154

1   there was some time frame or I'm assuming you knew
2   that you had an obligation to try to identify these
3   folks; is that fair to say?
4       A   Yes.
5       Q   And so you've been doing your part,
6   which is on your, in your spare time when you have
7   a chance, trying to look at them, look at them
8   again, making sure that the people who you say this
9   is not that person, you looked at them, you studied
10   it, and you moved on to the next person; is that
11   fair to say?
12       A   Yes.
13       Q   Okay. And so after doing that, whatever
14   the process entailed and however long it took you,
15   you've now come to the end of that process, at
16   least right now, and you have been unable to
17   identify the individuals that you say you
18   encountered on that day; is that fair to say?
19       MS. BORJA: Let me object to the extent
20   that that's vague, because you talk about the end
21   of the process --

Page 155

1       MR. GRIMES: Speaking objection again.
2   It's vague. Okay.
3       BY MR. GRIMES:
4       Q   Do you understand the question?
5       MS. BORJA: Let me make the foundation
6   because --
7       MR. GRIMES: You don't have to make the
8   foundation, Ms. Borja. You made --
9       MS. BORJA: I think your question is
10   misleading, and let me explain why. Another disk
11   of documents was produced to the ACLU's office on
12   Friday.
13       MR. GRIMES: And I'm getting to that. I
14   wasn't asking -- that's what I'm saying. You're
15   trying to predetermine where I'm going with my
16   questions. If you just wait and object as is
17   contemporaneous to what I'm saying as opposed to
18   trying to figure out where I'm going.
19       I'll ask him that. I know that there
20   was just a resent disclosure. That's why I'm
21   trying to walk you through what he did.

Page 156

1       MS. BORJA: You're asking about the end
2   of the process as if all documents produced by the
3   BPD have been seen by this witness. And I think
4   your question is --
5       MR. GRIMES: Well, he's going to get to
6   that.
7       MS. BORJA: -- leading to that.
8       MR. GRIMES: He's going to get to that.
9   I'm going to ask him what he did. I'm asking --
10       MS. BORJA: Then your question is
11   misleading.
12       MR. GRIMES: To you. We're talking.
13   He's answering the question. I don't have to make
14   you understand it, counselor. The purpose is the
15   deponent has to understand the question and answer
16   to the best of his ability. You make it seem like
17   I have some obligation to make sure you understand
18   what's being asked. I don't. I just have to make
19   sure that the deponent does.
20       MS. BORJA: I don't think the deponent
21   does, based on your question.

Page 157

1      MR. GRIMES:  Well, why don't you let him
2  say that.  I've already given the instruction that
3  if he doesn't understand -- and he's been doing a
4  great job at it.  When he doesn't understand, he
5  says repeat the question.  I don't think there's
6  any miscommunication between myself and the
7  deponent.
8      Paul, you said you had five minutes.
9  Where are we with the time?
10     VIDEOGRAPHER:  I need to conclude.
11     MR. GRIMES:  Let's stop for a second.
12     VIDEOGRAPHER:  This disk is concluded.
13     5:04 p.m., going off the record.
14     (Recess taken.)
15     VIDEOGRAPHER:  One moment, please.
16     Here begins Disk 2 in the deposition of
17 Christopher Sharp.
18     5:16 p.m., back on the record.
19     MR. GRIMES:  Thank you.
20     BY MR. GRIMES:
21     Q   Mr. Sharp, so the last question I was

Page 158

1  asking or the line of questioning was in regards or
2  in reference to your completion of the photographs
3  that you said to this point you have reviewed.
4      A   Yes.
5      Q   Okay.  And so my question to you is when
6  did you notify counsel that you were complete, that
7  you had completed your review of those photographs
8  in your possession?
9      A   I don't think I actually told them I was
10 complete.
11     MS. BORJA:  Then I don't want you to
12 divulge what you did tell counsel.
13     MR. GRIMES:  He can answer the question.
14 You've advised him that he doesn't have to tell
15 what he said to counsel.
16     MS. BORJA:  And I'm instructing him not
17 to divulge what he told to counsel.
18     BY MR. GRIMES:
19     Q   Sir, were you getting ready to divulge
20 what you told counsel?
21     A   I was just going to say that I didn't

Page 159

1  realize that -- I mean, I know that there's time
2  constraints in some way.
3      Q   Right.
4      A   But I didn't really know that I was
5  supposed to be completed by today --
6      Q   Oh, okay.
7      A   -- as far as reviewing everything.
8      Q   Okay.  And in fact --
9      A   So I apologize.
10     Q   That's fine, sir.  In fact, there was
11 some other photographs -- just so you know, let me
12 clarify something.  The first rendition of photos
13 that you reviewed were individuals who were
14 believed to be in and around the clubhouse at the
15 time of your incident, so we tried to narrow that
16 number.  Remember that this was a lot less --
17     A   Yes.
18     Q   -- people on that disk than on the
19 subsequent disk?
20     A   Yes.
21     Q   So that was the first one that you

Page 160

1  looked at, and you actually testified on that one
2  on the 24th.
3      A   Yes.
4      Q   And then you got another one which was a
5  little broader, had some more people on it, and you
6  looked at that disk, correct?
7      A   Yes.
8      Q   That's the second one that you were
9  talking about earlier.  You intimated that you had
10 the first one with Mr. Smith, the second one I got
11 and I got a chance to look through that one?
12     A   Yes.
13     Q   Okay.  And then there was I think
14 another disk that was given sometime in June.  So
15 there would have been a March disk, a May disk and
16 a June disk.  Do you recall seeing three disks?
17     A   No.  I got --
18     Q   The first one?
19     A   The first one I saw with Mr. Smith.
20     Q   Uh-huh.
21     A   I only remember getting the one that

Page 161

1   has, you know, the few hundred officers on it.
2      Q   Okay.  So you don't remember getting a
3   third disk from counsel?
4      A   I don't.
5      Q   Okay.  And on your way here or any time
6   since last Friday, did you know of a fourth disk
7   that was provided by the BPD for you to look at?
8      A   No.
9      Q   So you don't even know that a fourth
10  disk exists?
11     A   No.  The only thing I know regarding the
12  CD and trying to narrow it down is that somehow
13  there's going to be some way to figure out who was
14  there more accurately.  I'm not --
15     Q   Why do you think that?
16     A   Because there's something about being
17  able to figure out when people were actually
18  working.  Some people went home earlier in the day.
19     Q   Right.  Were you aware that that first
20  disk you looked at is that disk that would be the
21  people who were working and didn't go home and

Page 162

1   would have been in the clubhouse at the time which
2   you said your incident occurred?  Did you know that
3   that's what that particular disk signified?
4      A   No.
5      Q   Oh, okay.
6      A   I don't think, no.
7      Q   Okay.  All right.
8      A   No, I didn't realize that that was just
9   like a time stamp of the people that were there.  I
10  didn't know that.
11     Q   Okay.  Because you know over 500
12  officers work Preakness?
13     A   I'm aware of that now.
14     Q   And your first disclosure of photographs
15  was like 49 or something like that?  Remember --
16     A   I don't remember the exact number, but
17  it was somewhere around there.
18     Q   Exactly.  So that would have -- in an
19  effort to make it easier for you to go through that
20  number, the 500 was reduced to what we thought was
21  a manageable number.  However, I think you came

Page 163

1   back and testified on the 24th that you couldn't
2   identify anyone from that batch of individuals.
3      A   Yes.
4      Q   In fact, you may have remembered you
5   said and I'm anticipating that I'm going to get
6   some more photographs to look at.
7      A   Yes.
8      Q   Do you remember that conversation?
9      A   I remember that, yes.
10     Q   So because of your inability to identify
11  someone in the first round, that's why you got the
12  more voluminous disclosure to say, well, let's open
13  it up some more maybe because some other people we
14  didn't know about who may have come through and
15  those kind of things?
16     A   Yes.
17     Q   And so where we stand today as far as
18  your ability to identify anyone is that you've only
19  been given two disks?
20     A   I was, well, actually given one.
21     Q   Well, reviewed.  Let's change it.  You

Page 164

1   only reviewed two disks.
2      A   Yes.
3      Q   You have no understanding that there's a
4   third or fourth disk?
5      A   No, I did not know that there was one
6   made.
7      Q   And you do understand that you weren't
8   given an unlimited time to have to identify the
9   unknown officers that accosted you; is that fair to
10  say?
11     A   I'm sorry, could --
12     Q   You were aware of the fact that you
13  didn't have an unlimited time in order to try to
14  identify the unknown individuals who you said you
15  had the incident with on May 15, 2010, you knew
16  there was a deadline?
17     A   I did not know, I did not know that
18  there was a deadline like for today.
19     Q   Right.
20     A   I've never discussed when I had to have
21  everything in, like if you know what I mean.

Page 165

1    Q   Okay.
2    A   I didn't know that. I figured that
3    there would have to be a time, but I didn't realize
4    it was by today.
5    Q   Okay. So when would you have -- just
6    taking -- just playing devil's advocate, you know,
7    in your own mind, when did you think you had to
8    complete your review or complete all of the
9    possible photographs that were disclosed by the
10   plaintiff -- I mean the defendants?
11       MS. BORJA: Including the ones disclosed
12   Friday?
13       MR. GRIMES: Yeah, all of them, when did
14   he think he had to be done.
15       MS. BORJA: Okay. He didn't know that
16   there were ones disclosed Friday, so --
17       MR. GRIMES: Can he answer the question?
18       BY MR. GRIMES:
19   Q   Sir, when did you think that your
20   process of identifying photographs had to be done?
21   A   I actually just kind of thought it would

Page 166

1    be ongoing until we figured out who it was.
2    Q   Okay. But let me just ask you --
3       MR. GRIMES: Uh-oh. Paul, the
4    background.
5       VIDEOGRAPHER: That's okay, I'll fix it.
6       BY MR. GRIMES:
7    Q   You do understand that we have a portion
8    of the lawsuit that has unidentifiable individuals
9    in it, correct?
10   A   Yes.
11   Q   And so you do know from looking at your
12   complaint and being in this lawsuit long enough to
13   know that there's two different parties, the
14   officers and then the police department?
15   A   Yes.
16   Q   You know that. Okay. And the reason
17   we've been going forward and your counsel and
18   you've been looking at photographs is because we're
19   trying to identify the officer portion?
20   A   Yes.
21   Q   Okay. And in order for us to identify

Page 167

1    the officer person, we've tried to do what's called
2    informal discovery where we've just given you
3    photographs to look at prior to any super tight
4    schedule. Okay?
5    A   Yes.
6    Q   So that first rendition of photographs
7    you looked at, probably wasn't a lot of time, just
8    do the best you can, be diligent, try to look at
9    photos. Okay?
10       MS. BORJA: Is that a question?
11   A   The first time I watched with Mr. Smith.
12   Q   Yes. And you testified when you were
13   deposed that you in fact did those things?
14   A   I looked at the pictures, yes.
15   Q   Took your time, had time to look at them
16   again if you needed to?
17   A   Yes. We looked at them a couple times.
18   Q   But you're testifying now that from that
19   point where you were with Mr. Smith, you have not
20   or you did not believe that the subsequent reviews
21   of the photographs had to be done in the same

Page 168

1    fashion or in the same time frame as your previous
2    review of photographs?
3       MS. BORJA: Objection to the form.
4    A   No, I didn't. I did not know that there
5    was a deadline.
6    Q   Okay.
7    A   I just didn't know.
8    Q   Okay. That's fine. That's fair enough.
9       So, and you said -- when did you notify
10   counsel of your completion of the review of this
11   last batch?
12   A   Well, I didn't actually realize --
13       MS. BORJA: Objection to the form.
14   Vague.
15   Q   You can answer.
16   A   I didn't actually realize I was
17   complete, but the last time we spoke probably about
18   the actual topic, I spoke to -- as far as
19   speaking --
20       MS. BORJA: Be careful. I don't want
21   you to reveal what you've told counsel, but you can

Page 169

1   say when you've spoken to counsel.
2       A   Okay.  Regarding looking at the
3   pictures, it's come up possibly even as late as
4   last week that -- regarding the pictures and
5   looking at them and --
6       MS. BORJA:  I think -- I don't want you
7   to reveal what you told counsel or what counsel has
8   told you.
9       MR. GRIMES:  Wow.  Once again for the
10  record I'm going to ask counsel to stop
11  interjecting in the middle of her witness.  You
12  cannot testify for him.  You've made your
13  objection.  He knows that he --
14      MS. BORJA:  But I can prevent waiver of
15  attorney/client privilege.  That's my job.
16      MR. GRIMES:  But you're not doing that.
17  You're coaching him on how to answer.  He's not
18  even talking about what he said.  He's trying to
19  determine when he spoke to someone to relay
20  information.  He's just talking about a date.
21      So you keep saying the same thing in

Page 170

1   anticipation and you're stopping him from
2   answering.  That is improper.
3       MS. BORJA:  I'm stopping him from
4   divulging attorney/client communications.
5       MR. GRIMES:  No, you don't know that
6   because he hasn't said anything that was even
7   remotely close to client --
8       MS. BORJA:  I don't want the testimony
9   to come out.  At that point it's too late.
10      BY MR. GRIMES:
11      Q   Mr. Sharp, do you understand that you're
12  supposed to right now be trying to think about when
13  it is you had conversation, without divulging what
14  they said to you or what you said?  I'm asking you
15  that question.  Are you aware of that?
16      A   Yes.
17      Q   Okay.  And has that been made crystal
18  clear that your counsel is instructing you not to
19  go on about the dialogue between you two?
20      A   Yes.
21      Q   Do you have any misunderstanding of what

Page 171

1   it is she's told you not to do?
2       A   No.
3       Q   Okay.
4       MR. GRIMES:  Are you fine with that,
5   counsel?
6       MS. BORJA:  As the questions come up as
7   this witness is testifying, I will continue to
8   defend him and I'll continue to protect the
9   attorney/client privilege as appropriate.
10      MR. GRIMES:  Okay.  So do that, do that,
11  but what I'm saying to you, and once again going on
12  the record for what I believe to be obstructionist
13  behavior, you complain about how long this is
14  taking and you make us repeat the same thing over
15  and over again.
16      Your client has said he's absolutely
17  crystal clear on what he's not to do.  He was just
18  in the process of trying to remember when he
19  contacted you, because obviously there's been
20  different contacts.  He's trying to get in his mind
21  which contact was for what.  He's not saying any

Page 172

1   more than trying to think about the time frame.
2   Can he think about the time frame before you
3   interject and tell him not --
4       MS. BORJA:  And he did and he answered
5   and he said last week.  You have that.
6       A   In a very -- like in a casual way, if
7   you will, I mentioned actually as recently as
8   yesterday that I had been looking at pictures.
9       BY MR. GRIMES
10      Q   Okay.  All right.  And so based on not
11  your conversation with counsel but your own
12  understanding of where you were, have you -- you
13  looked at the whole complete lot, though, correct?
14      A   Yes.
15      Q   There's no pictures you left that you
16  have to look at some other day?
17      A   No.  No, I've been through the whole
18  thing, oh, yeah.
19      Q   Very good.
20      MS. BORJA:  And could we just clarify,
21  this witness hasn't seen the ones produced on

Page 173

1   Friday. I don't want you to --
2          MR. GRIMES: He said that already.
3          MS. BORJA: -- misunderstand his
4   testimony.
5          MR. GRIMES: Ms. Borja, you said it 12
6   times. I just told him and he confirmed he's only
7   seen two disks. So it's not possible -- not only
8   has he not seen the one from Friday, he hasn't seen
9   the one from June. He's already testified to that.
10  I just don't know why you keep interjecting into
11  the record when we could move along. I get that,
12  you've objected, he's doing exactly what he's
13  supposed to do. We're not --
14         BY MR. GRIMES
15     Q   Sir, are you confused that I'm asking
16  you did you see the last two disks, one in June and
17  one in --
18     A   March.
19     Q   No, the ones I'm asking have you seen
20  are the one in March and the one in May, that's the
21  two. The ones you have not seen I think you

Page 174

1   testified was the one in June and the one that was
2   just submitted on Friday, August the 23rd. You've
3   not seen those two, correct?
4      A   I have not seen that and the only one
5   that I have received is the one that has a whole
6   bunch of officers on it.
7      Q   Okay. Very good, that was the first
8   two.
9      A   Whether that was May or June I don't
10  honestly remember, but that's the one that I've
11  seen.
12     Q   Okay. Okay.
13     A   That I have myself, and I can look at my
14  laptop.
15     Q   So when you're presented them no one,
16  you're not being told that, the date on which it's
17  been received, and then you're not looking at them
18  as they're being given to counsel, you're just kind
19  of -- you don't know what you've seen in terms
20  of -- let me give you an example. Based on your
21  understanding, you may have seen the one produced

Page 175

1   yesterday and, or Friday, and the one way back to
2   March, you have no way of determining which one you
3   received, is that, is that what you're trying to
4   express to me?
5      A   Just because you said May and June and I
6   know that it was somewhere around then when I
7   received the disk that was sent to me.
8      Q   So in other words, you're saying you
9   don't know what time counsel got it, you just know
10  what time you received the disk?
11     A   Yes, that's fair to say.
12     Q   But, but if I had to quantify and I told
13  you there was four disks floating around, you could
14  say with confidence that you've only seen two of
15  the four?
16     A   Yeah, as far as I know.
17     Q   So whatever that number is and whenever
18  they came, you know that you've only been
19  physically either been shown disks with counsel or
20  given one other disk for you to look at on your
21  own; is that fair to say?

Page 176

1      A   Yes.
2      Q   Okay. And so along with photographs,
3   counsel was given a list, and in fact if you recall
4   last time we spoke, I asked you would a list be
5   helpful for you identify folks, and I think you
6   said no, it's more helpful when you see
7   photographs. Do you still feel the same way?
8      A   Yeah, but it's more difficult than I
9   thought it would be.
10     Q   No, I understand that, but would a list
11  make it easier, like if you had a list of names
12  with no photographs, do you think that you would be
13  able to identify the individual off of a list with
14  no photographs?
15     A   Actually if I remember right, it
16  actually, I think it actually has the officer's
17  name --
18     Q   Right, but I'm saying --
19     A   -- already on the pictures.
20     Q   Right, so take away what you've been
21  looking at and just say that I gave you another

Page 177

1    document that was just a list of names, would that
2    help you in any way to identify an officer?
3        A    I would take anything that may help, but
4    I --
5        Q    I'm saying for you, what do you think,
6    do you think it would help?
7        A    I don't see how it could because I don't
8    remember names, the names.
9        Q    Okay, that's fair enough.  All right,
10   let's keep moving.  So we've dealt with the
11   photographs now.  I just want to finish up on
12   Ms. O'Neal.  So, so please describe your
13   relationship with Ms. O'Neal.  What I mean by that
14   is were you guys dating, was it a physical
15   relationship, just friends or what, what's your
16   relationship to Ms. O'Neal?
17       A    Well, I have -- she was a good friend of
18   mine for a while.  Well, a friend of mine for a
19   while.
20       Q    Uh-huh.
21       A    We were never boyfriend girlfriend.  We

Page 178

1    were physical a few occasions.
2        Q    Uh-huh.
3        A    But I never considered us to be dating.
4    I don't, I don't believe she did either.  Not like
5    as a disrespectful thing, just --
6        Q    I understand.  I understand.  Okay.  So
7    not a steady or what you would consider dating, but
8    more than platonic friends?
9        A    On a few occasions, yes.
10       Q    And you said you've known her for a
11   while.  How long have you known her?
12       A    Since the beginning of 2009.
13       Q    2009.  Okay.  And on the day you were
14   going to leave the Preakness, 2000, you know,
15   May 15, 2010, were you taking her back to your
16   house or were you taking her home?
17       MS. BORJA:  Objection.  This is to
18   embarrass and humiliate this witness.
19       Q    You can answer, sir.
20       A    If I remember right, we either stayed at
21   my place or her place.  I drove Troy home, did we

Page 179

1    go to her house?  I don't honestly remember if we
2    went to her house or my house.
3        Q    But you guys stayed together for the
4    duration of the evening, you dropped Troy off
5    first, and whether it's your house or her house,
6    you guys remained together?
7        A    I'm pretty sure we did.
8        Q    Okay.
9        A    Pretty sure.
10       Q    All right.  And you said that you began
11   to tell her about your encounter at the track.  Did
12   you elaborate as the evening went on?
13       A    I was extremely upset.
14       Q    Uh-huh.
15       A    She was trying to calm me down.
16       Q    Uh-huh.  And did she succeed in calming
17   you down?
18       A    Yeah.  I mean I think so.  I was, when I
19   say upset, I was angry at first and then I was
20   extremely just -- I'm not sure what the right word
21   is, but just very bothered by the whole thing.

Page 180

1        Q    Okay.  And you shared that with her?
2        A    Yes.
3        Q    And was it her who told you to call the
4    ACLU or call a lawyer?
5        A    No, she did not advise me to call the
6    ACLU.  At one point -- or she may have said you
7    should call a lawyer or something, but I don't
8    remember exactly what her conversation was because
9    I was really, you know, I was very upset.
10       Q    I gotcha.  I gotcha.  So I just want to
11   focus in on one thing at a time.  Is it your
12   recollection that Ms. O'Neal told you to call an
13   attorney; is that your recollection, that she told
14   you to call an attorney?
15       A    I don't -- she may have mentioned
16   something like that, but that -- I'm not sure how
17   to say it, her saying I should do,
18   call an attorney was not the why I did.
19       Q    I gotcha, I just was asking was --
20       A    She probably did at some point say
21   something like that.

Page 181

1    Q   Okay.  And how do you spell Ms. O'Neal's
2   name, Kelli, is it with a Y or an I?
3    A   I believe it's with an I.
4    Q   Uh-huh.  And how do you spell her last
5   name?
6    A   I think it's O hyphen N --
7    Q   Apostrophe.
8    A   Apostrophe, sorry.  O-N-E-A-L, I think.
9   It may be E-I-L but I think it's E-A-L.
10   Q   Okay.  And how old is Ms. O'Neal?
11   A   She is I think about a year or so
12  younger than me.
13   Q   And that's 37?
14   A   So she's 38, 38-ish.  Again, I don't
15  know actually.
16   Q   To the best of your recollection, sir.
17  I mean to the best of your knowledge.
18       Does she live in Maryland?
19   A   Yes.
20   Q   Where does she live?  Excuse me.  Where
21  does she live?

Page 182

1    A   She lives off of exit -- or I'm sorry,
2   Route 27, I think it's Monrovia.
3    Q   Monrovia.  And so when you said you
4   weren't sure whether -- Monrovia is, is it kind of
5   far from the Pimlico racetrack?  I mean it's
6   further than your house I guess?
7    A   Yeah, yeah.  She didn't live there --
8   that's where -- she lives in that area now.
9    Q   Okay.
10   A   And has now for over a year I think at
11  least.
12   Q   What's that called, Monrovia?
13   A   I believe it's Monrovia, yes, sir.
14   Q   Monrovia, Maryland?
15   A   Yes.
16   Q   Okay.  And so where did she live when
17  you guys were leaving the Preakness in 2010?
18   A   I think she was living either in Laurel
19  or New Windsor.
20   Q   New Windsor?
21   A   New Windsor, Maryland, which is up

Page 183

1   north.
2    Q   Uh-huh.  What's the second place you
3   said?
4    A   Possibly Laurel.
5    Q   Laurel, okay.
6    A   I don't exactly remember when she moved
7   from Laurel to, to New Windsor.
8    Q   Okay.  I think we're fine with
9   Ms. O'Neal.
10       Briefly you told me about your other
11  friend in the car, Troy?
12   A   Yeah.
13   Q   And how long did you know Troy?
14   A   I first met Troy kind of right when high
15  school age was kind of ending, I guess I've known
16  him since I was 18 or 19-ish, somewhere around
17  there.
18   Q   And where does Troy live?
19   A   As far as I remember, he lives in
20  Columbia.
21   Q   Columbia, okay.  Now or then?

Page 184

1    A   I think he lives there now.  I think
2   he --
3    Q   Do you know his address?
4    A   No, I don't know his address.  I think
5   it's the same place he lived then also.
6    Q   How old is Troy, about your age?
7    A   Yeah.  I think he is my exact age or I
8   mean within a school year or two.
9    Q   Uh-huh, uh-huh, okay.  And did he advise
10  you to get counsel after this incident?
11   A   No.
12   Q   Okay.  And did you tell him your whole
13  story?
14   A   Kind of, yeah, not the whole story.
15   Q   What did you leave out?
16   A   I don't remember.  I didn't -- at that
17  point I just wanted to get him home.  I was upset
18  and I couldn't tell you what I exactly told him.
19   Q   So how do you know you didn't tell him
20  the whole story then?
21   A   Because the whole story was very, was

46 (Pages 181 to 184)

Page 185

1    long and it's detailed, very detailed.
2        Q   Okay.  And so you just didn't have time
3    to go through all the details or what, why,
4    something that just happened that you said was very
5    traumatic, why did you --
6        A   I think at some point on the way home I
7    just said I don't want to talk about this, type of
8    thing.  Just wanted to drop it.
9        Q   Okay.  And in fact, just to put you back
10   on that for a second, have you ever gotten
11   counseling or any kind of psychiatric help or
12   anything to deal with the I guess stress or trauma
13   from May 15, 2010?
14       A   No.
15       Q   And have you been prescribed any
16   medication or anything to help you deal with the
17   emotional stress or anything that you had
18   encountered on May 15, 2010?
19       A   No.
20       Q   Let's, let's go to a couple things about
21   you, sir.  This will be quick, you can answer these

Page 186

1    very quickly because they're about yourself.
2            Do you have a bad temper?
3            MS. BORJA:  Objection.  Vague.  Also
4    this question is designed to humiliate and
5    embarrass this witness.
6        Q   You can answer.
7        A   I don't think so.
8        Q   Okay.  And have you lost your temper in
9    front of Joshua?
10           MS. BORJA:  Objection.  Vague.  This
11   question is also designed to embarrass and
12   humiliate this witness, also not relevant.
13       Q   You can answer.
14       A   Only if you count when the Redskins have
15   a bad game type of thing, but not like cursing him
16   out and stuff like that.
17       Q   No, not -- no, to be clear, I'm not
18   asking have you showed a bad temper to your
19   son, I'm saying in front of your son where he
20   wasn't the target or he wasn't the issue, it was
21   just where you lost your temper on something else

Page 187

1    where he was present.
2        A   I don't think I've actually lost my
3    temper like that, no.
4        Q   Okay.  Sir, let me ask you something, I
5    guess this will clarify a lot of stuff and maybe it
6    will limit some questions.  You do recall your
7    divorce proceedings; is that fair to say?
8        A   Yes.
9        Q   And I don't want to put words in your
10   mouth, but would you describe that process as a
11   friendly process between your ex-wife and you?
12       A   No.
13       Q   Okay.  So it was, it was, it was a
14   little difficult in terms of the issues that were
15   addressed in open court between your wife and you;
16   is that fair to say?
17           MS. BORJA:  Objection.  Vague, also
18   designed to humiliate and embarrass this witness,
19   completely irrelevant to any factual issues in
20   dispute.
21       A   It was one of the most difficult times

Page 188

1    of my life.
2        Q   And in fact at that time in open court
3    you accused her of using crack cocaine; is that
4    fair to say?
5        A   I don't think --
6            MS. BORJA:  Objection.  Lack of
7    relevance, designed to embarrass and humiliate this
8    witness.
9        Q   You can answer.
10       A   I think my attorney did.
11       Q   Well, but it was based on information
12   you gave him, correct?
13       A   No, it was not.
14       Q   So you didn't inform that she had been
15   arrested?
16           MS. BORJA:  Objection to the extent
17   you're asking for attorney/client communications,
18   you're asking what he told his lawyer.
19           MR. GRIMES:  No, her lawyer.
20           MS. BORJA:  Oh, what he told her lawyer?
21           MR. GRIMES:  Yes.  This is about her

Page 189

1    case in terms of --
2        BY MR. GRIMES
3        Q   Did you -- did your -- I apologize.
4        In the proceedings an allegation was
5    made against your ex-wife --
6        A   Yes.
7        Q   -- about her conviction for crack
8    cocaine.
9        A   Okay, I didn't realize it was crack
10   cocaine. I knew it was cocaine, I didn't know it
11   was crack cocaine.
12       Q   Okay. Sir --
13       A   I'll tell you, my attorney is the one
14   that told me she was arrested, so I didn't tell
15   him.
16       Q   And you -- and did you or did you not,
17   and I'm just talking about your behavior, did you
18   object or say anything in court yourself, not your
19   counsel said, not what you told your attorney,
20   which you know you have a right to tell me because
21   it's your privilege, not Ms. Borja's, that the

Page 190

1    mother of your child in open court was going to be
2    accused of using crack cocaine, did you stop that
3    testimony from coming in at the hearing?
4        A   No.
5        Q   Okay. And in fact she said some very
6    disfavorable things about you at the hearing; is
7    that correct?
8        A   Yes.
9        Q   One of those disfavorable things was
10   talking about your dependency on oxycodone and
11   other painkillers; do you remember that?
12       MS. BORJA: Objection. Leading. Also
13   objection, this line of questioning is designed to
14   humiliate and embarrass the witness.
15       Q   You can answer the question, sir.
16       A   I remember her saying that, yes.
17       Q   Okay. And in fact it got to the point
18   where the judge ordered both you and your wife to
19   take a hair follicle test so he could be
20   comfortable with the different allegations that
21   were going around as to --

Page 191

1        A   Yes.
2        Q   Okay. And so at some point the results
3    for the test came back, and I'll ask you now for
4    you to clarify on your own, have you ever used
5    drugs?
6        MS. BORJA: Objection. Vague, also lack
7    of relevance and this line of questioning is
8    designed to do nothing but embarrass and humiliate
9    this witness, and we're going to take this up
10   before the judge because this is outrageous.
11       MR. GRIMES: The objection has been
12   noted. You've said the same thing three or four
13   times and that's fine, the record is clear.
14       Q   Sir, you can answer the question; have
15   you ever done drugs?
16       A   I don't know if I feel comfortable
17   answering that. This is going to affect my whole
18   life.
19       Q   This is a deposition, sir, you brought a
20   lawsuit. Just so you understand what's going on
21   here. Other than knowing you from this lawsuit,

Page 192

1    the Baltimore Police Department has no reason to
2    talk to Mr. Christopher Sharp. Other than you
3    affirmatively deciding that you wanted to sue for
4    an incident that you claim happened to you, we have
5    no other reason to be here, sir.
6        Part of the obligation you have is to
7    prove your case, and part of the obligation you
8    have is we have to take your word and we have to
9    mount a defense. We get to ask you these
10   questions. At some point if we go to court your
11   counsel will object and they may not be admissible,
12   they may not come in, but this process we're
13   required and I'm obligated, just like she is to
14   zealously represent her client, I have to represent
15   my client, and so I have to ask you several
16   questions that may seem uncomfortable, but it's the
17   nature of this process.
18       At any time you are aware you can
19   dismiss your lawsuit, did you know that?
20       A   Yes, I am aware of that.
21       Q   Okay. So if you feel that this is

Page 193

1  intrusive or something is going on that you no
2  longer want to participate in, you have the right
3  to voluntarily say I don't want to do this anymore.
4       MS. BORJA: Counsel, you've made it
5  clear, you're instructing this witness because
6  you're trying to intimidate him to drop his lawsuit
7  and that is outrageous that you would instruct this
8  witness that his option --
9       MR. GRIMES: Wait a minute.
10       MS. BORJA: -- is to either --
11       MR. GRIMES: Wait a minute.
12       MS. BORJA: -- answer your questions
13  about personal drug use at any time in the history
14  of his life, or to drop his suit. That type of
15  threat is unprofessional and it is outrageous. I
16  cannot believe you are threatening this witness
17  that he needs to drop his lawsuit in order to avoid
18  your completely inappropriate questions.
19       MR. GRIMES: Ms. Borja, Ms. Borja, stop
20  it, stop it. You're embarrassing yourself.
21  There's a record. I clearly did nothing of the

Page 194

1  sort. I said to Mr. Sharp is he aware of the fact
2  that he has the right to dismiss his lawsuit. With
3  his counsel present, he has two attorneys here and
4  we have a stenographer and a video taking exactly
5  what I said. It's almost -- you should be --
6  you're talking about how offensive you feel. I
7  don't even know what words to say to you right now.
8  The record is going, he clearly understands what I
9  just said to him and by no means did I ever tell
10  him or threaten him. I'm explaining the process.
11       He said that he feels uncomfortable
12  answering these questions; however, the rules of
13  deposition and rules of discovery, which I thought
14  you would have went over with him prior to now, are
15  that I get to ask questions and get information
16  about what he is.
17       MS. BORJA: You don't get to embarrass,
18  you don't get to humiliate --
19       MR. GRIMES: You get to object.
20       MS. BORJA: You don't get to -- no,
21  you're telling what you get to do, and I'm telling

Page 195

1  you what you don't get to do.
2       MR. GRIMES: Counsel, you're
3  inappropriate. I'm not arguing with you.
4       MS. BORJA: You do not get to embarrass
5  or humiliate a witness.
6       MR. GRIMES: You're right.
7       MS. BORJA: You don't get to do that.
8       MR. GRIMES: You're right, you're right,
9  that's why you're objecting. Point well made,
10  you're absolutely correct.
11       BY MR. GRIMES
12   Q   Mr. Sharp, this is part of the process
13  so the questions I have to ask you are part of the,
14  this dynamic. So I apologize if you're feeling
15  uncomfortable. I would assume having your life
16  examined is uncomfortable to a certain extent.
17  What I'm saying to you is this is my obligation,
18  and by the court rules you are obligated to answer
19  honestly and to the best of your ability. That's
20  just, that's the game and that's why you have an
21  attorney here to instruct you on the legal issues

Page 196

1  and make sure your rights are protected. So I'm
2  just giving you an understanding of what's going
3  on. But unfortunately, based on the rules of the
4  court, you don't get to opt out and say I feel a
5  little uncomfortable and say I'm not going to
6  answer it. The rules don't contemplate that. So
7  I'm telling you now that I have to ask these
8  questions, you're obligated to answer unless your
9  counsel instructs you not to, and then she will
10  have to indicate to a judge why she made that, or
11  gave you that instruction. That will be outside of
12  you probably. Okay?
13       So at the end of the day sir I have to
14  ask you, have you used drugs? You can ask counsel,
15  chose not to answer or whatever, but I have to ask
16  the question.
17       MS. BORJA: You've been given a number
18  of instructions by this attorney, including what he
19  believes he has to ask you. He does not have to
20  ask you about whether you've ever used drugs. He
21  could ask you --

Page 197

1    Q   Sir, in open court under oath, in the
2  process of going through your marital dispute or
3  dissolution of your marriage, in open court for the
4  public to see, wasn't it determined that you used
5  drugs?
6        MS. BORJA: Objection. Relevance.
7    Q   You can answer the question.
8        MS. BORJA: Also continuing objection.
9  This is nothing but pure harassment.
10   A   It was determined that I was under
11  doctor's care and was taking painkillers, yes.
12   Q   And that's it, that is the only drugs
13  you were taking, was painkillers? That's what
14  you're saying today in court -- I mean under oath?
15   A   I'm not sure how to answer this
16  question.
17       MS. BORJA: You can answer the question
18  completely and truthfully and we will address this
19  with the judge.
20       MR. GRIMES: Yes, completely and
21  truthfully.

Page 198

1        MS. BORJA: But feel free to give
2  complete and truthful, honest testimony today and
3  we will take it up with the judge.
4    A   Okay. Okay, what was the question
5  again?
6    Q   The question was did you use drugs, sir?
7    A   Yes, I have.
8    Q   Okay. And other than prescribed drugs,
9  is there any other drugs you used?
10   A   Well, I don't consider that drugs, yes.
11   Q   You don't consider what drugs,
12  prescribed?
13   A   What my doctors gave me, I mean not like
14  drugs drugs.
15   Q   I understand that. But let's set that
16  aside for a second. Other than what your doctor
17  gave you, you are aware that people get addicted to
18  drugs?
19   A   Yes.
20   Q   But other than the drugs that doctors
21  gave you, did you do any other drugs?

Page 199

1    A   Yes.
2        MS. BORJA: Objection. Designed to
3  humiliate and embarrass this witness.
4    Q   What drugs were they?
5        MS. BORJA: Same objection.
6    A   Marijuana.
7    Q   Thank you, sir. All right. And do you
8  smoke marijuana often?
9        MS. BORJA: Objection. Designed to
10  humiliate and embarrass this witness and has
11  nothing to do with the issues of this case.
12   A   No, I'm not a regular marijuana smoker.
13   Q   And when you say you're not a regular
14  marijuana smoker, meaning you do it infrequently or
15  occasionally? Or what are you trying to convey
16  when you say not a regular marijuana smoker?
17       MS. BORJA: Same objection.
18   A   It mean I have smoked marijuana before.
19  I don't know the exact date and time the last time
20  I smoked it.
21   Q   That's not significant in terms of

Page 200

1  smoking marijuana, it doesn't, it doesn't, it
2  doesn't evoke a kind of memory to well, I smoked
3  yesterday or I smoked ten years ago, I mean you
4  don't, you have no understanding of how many times
5  you smoked marijuana?
6        MS. BORJA: Objection. Argumentative.
7    A   Well, when I was a lot younger I used to
8  smoke marijuana --
9    Q   We're talking about, not younger --
10   A   -- sort of a regular basis.
11   Q   We're not talking about younger, we're
12  talking about recently. I mean you just got a
13  divorce in '07, so we're not talking about younger,
14  we're talking about --
15   A   It was five years ago.
16   Q   Yeah, but it's not younger. I mean it's
17  in your 30s, correct?
18   A   Yeah.
19   Q   Okay. So it's not, you're not talking
20  about your adolescence, you're talking about in
21  your 30s, correct?

Page 201

1    A    I suppose so, yes.
2    Q    What do you mean suppose, either you did
3  or you didn't.
4    A    No, I have smoked marijuana.
5    Q    Okay.  In your 30s?
6    A    Yes.
7    Q    Okay.  How about alcohol, would you, how
8  you classify yourself -- this is your own
9  perception, not someone telling you, your own
10  perception are you an alcoholic, are you a problem
11  drinker, are you an occasional drinker, how would
12  you classify yourself?
13       MS. BORJA:  Objection.  Designed to
14  harass and embarrass this witness.
15    Q    You can answer.
16    A    Occasional drinker.  I sometimes enjoy a
17  port after dinner.
18    Q    Uh-huh.
19    A    Have a glass of wine at dinner,
20  sometimes a couple beers with buddies.  But I
21  don't, but I mean I'm by no means drinking every

Page 202

1  day.
2    Q    And you've never been classified as an
3  alcoholic or had a drinking problem?
4    A    No one ever classified me as an
5  alcoholic.
6    Q    No, I'm saying by you, if you've ever
7  considered --
8    A    I've never considered myself an
9  alcoholic.
10    Q    Okay.  All right.  And it's fair to say
11  that you could say, you would say that alcohol
12  hasn't affected you in a negative way on your job
13  per se; is that fair to say?
14       MS. BORJA:  Objection to the form.  Also
15  objection, this is harassing and humiliating this
16  witness.
17    Q    You can answer.
18    A    Alcohol has not affected my job.
19    Q    Has it affected your relationship in
20  terms of your former marriage or anything?
21       MS. BORJA:  Objection.

Page 203

1    A    Absolutely not.
2    Q    Has it caused you to miss any time from
3  school or in your educational endeavors has alcohol
4  interfered with your obtaining an education?
5    A    I don't believe so at all.
6    Q    Okay.  How about the same, you know, you
7  mentioned about your prescription drugs.  Has
8  prescription drugs affected your ability to do any
9  of the jobs that you can remember?
10       MS. BORJA:  Objection.  Lack --
11    A    No, I don't think so.
12       MS. BORJA:  You have to let me finish --
13    Q    How about your school?
14       MS. BORJA:  -- before you finish.
15    Q    How about your school, has prescription
16  drugs in any way affected your ability to get
17  through your educational process?
18       MS. BORJA:  Objection.  Lack of
19  relevance, also designed to embarrass and humiliate
20  this witness.
21    A    I'm not sure if I took prescription

Page 204

1  drugs when I was in school.  I don't think so.  I
2  mean it definitely did not affect school.
3    Q    That's what I was going to say, whether
4  it affected you or not, and those things will stick
5  out in terms of if you missed a certain amount of
6  time because of drug use or those kinds of things,
7  that's what I'm talking about.
8    A    No.
9    Q    Okay.  And so your recollection is no,
10  the medication of any kind of any drugs never
11  affected your ability to complete your studies?
12       MS. BORJA:  Same objection.
13    A    No, I certainly don't think it hindered
14  me.  I don't even think I took prescription drugs
15  then.
16    Q    So you're saying that you never did
17  prescription drugs while you were in school?
18    A    I mean, I think I hurt my shoulder once,
19  it's possible when I went to the ER, but I mean no,
20  it did not affect my schooling.
21    Q    Okay.  And so would you say that the

Page 205

1  injuries that you sustained and, you know, the
2  reasons why you were given the drug led to a
3  dependency on, on painkillers?
4      MS. BORJA: Objection. Leading, lack of
5  relevance to this case, and this is designed to
6  embarrass and humiliate this witness and unduly
7  protract this deposition.
8      Q   You can answer, sir.
9      A   I'm sorry, can you repeat that or --
10     MR. GRIMES: Can you read it back, just
11 to make sure it's exactly the same question?
12     (The reporter read the record as requested.)
13     MS. BORJA: Same objection.
14     BY MR. GRIMES
15     Q   You can answer.
16     A   In some regard, yeah, because over time
17 your body gets used to it.
18     Q   So do you remember the shoulder injury
19 being kind of the start or the end, like is that
20 the injury that kind of changed the dynamic or is
21 that -- where does that shoulder injury fall in --

Page 206

1      A   It was when I actually injured my back.
2      Q   Your back? Okay.
3      A   That's when I had to get the lumbar
4  epidurals and all the trigger point injections,
5  that was actually very brutal.
6      Q   In other words, you were given the lower
7  doses of painkillers first and the epidural was
8  kind of because those other painkillers weren't
9  working and then you had the epidural?
10     A   They weren't working that well. You
11 know, so they would do trigger point injections I
12 think every three months, did it a couple few
13 times, lower lumbar epidural.
14     Q   So did you go through a program or some
15 kind of process to wean out your system, or how did
16 you, how did you, you know, break the dependency on
17 the painkillers?
18     MS. BORJA: Objection. Relevance,
19 6 o'clock at night, designed to --
20     MR. GRIMES: Ma'am --
21     MS. BORJA: -- harass and embarrass this

Page 207

1  witness.
2      MR. GRIMES: Ma'am, once again you are
3  so way improper. Your time frame and giving the
4  time in your objection, you've got to know that's
5  improper. Make your objection and let me move on.
6  I didn't ask you for the time.
7      MS. BORJA: Your scolding me is
8  improper. Move on.
9      MR. GRIMES: Then stop giving a time.
10     BY MR. GRIMES
11     Q   Sir, do you remember the question?
12     A   What did they do when I --
13     Q   When you, when you realized that you had
14 a dependency at the time you were taking
15 painkillers, what did you do or what process did
16 you do to wean yourself off, if you did any?
17     MS. BORJA: Objection. Lack of
18 relevance. This is designed to harass and burden
19 this witness.
20     Q   You can answer.
21     A   I researched what to do, the best way to

Page 208

1  do it, and --
2      Q   And what was that, sir?
3      A   That was to take the drug and
4  basically -- I'm not exactly sure how it works.
5      Q   Do you know the name of the drug?
6      A   Something with opiates where it blocks
7  the opiates, but at the same time it, it makes you
8  I guess not go through withdrawal basically.
9      Q   Uh-huh. Do you know what the name of
10 the drug was by any chance?
11     A   Suboxone.
12     Q   Suboxone. And which one of the doctors
13 you mentioned earlier, did those doctors give you
14 the prescription or was it another --
15     A   No.
16     Q   Which doctor prescribed that? Suboxone.
17     (Pause in the proceedings.)
18     A   I know I went to a place, I don't know
19 who -- where was that? Down in Baltimore
20 somewhere. I don't think I actually -- I think you
21 saw a doctor the first time and then you'd have to

Page 209

1    go there and they'd take your temperature and all
2    that, and then after a couple days they give you a
3    smaller dose, and after a couple more days a
4    smaller dose, after a couple more days.
5        Q   So there was a program you initiated but
6    you, after you did your research, you then went to
7    this place that put you on a program that stepped
8    you down over time; is what you're describing?
9        A   Yes.
10       Q   So there was a program.  Do you remember
11   what the program was called or where --
12       A   I really don't remember what that
13   program is called.
14       Q   How about where it was located?
15       A   It was in Baltimore, kind of by a
16   hospital.
17       Q   Baltimore City, city proper?  Baltimore
18   City?
19       A   Yeah, I think it was actually in the
20   city, yeah.
21       Q   Okay.  And while you may not recall as

Page 210

1    you sit here, do you have records at home to
2    signify that you went to this particular place?
3        A   No, I don't think so.
4        Q   But they gave, they did give you
5    medicine though?
6        A   Yes.
7        Q   So there should be a record of you at
8    this particular place, correct?
9        A   I think it was all confidential somehow.
10       Q   But they still had to give you records
11   to take medication though, right?  I mean you
12   didn't go in there and give a different name or
13   alias, you had to tell them who you were?
14       A   No, no, they may have, I mean I'm sure
15   they have a record somewhere, but it's supposed to
16   be confidential.
17       Q   Okay.
18       A   I mean all that I think was supposed to
19   be confidential.
20       Q   And that's why you chose the location,
21   because you wanted it to be confidential, that's

Page 211

1    why you chose this particular program?
2        MS. BORJA:  Objection to the form.
3        Q   You can answer.
4        MS. BORJA:  Leading, also designed to
5    harass and humiliate this witness and unduly
6    protract this deposition.
7        Q   You can answer.
8        A   I didn't specifically choose it for that
9    reason, no, they just -- that was what they did.
10       Q   Okay.
11       A   And I'm not ashamed of that in any way.
12       Q   You shouldn't be.  That's why I'm just
13   asking you just questions about it.  I didn't ask
14   you to be ashamed.
15           And when did you complete that process,
16   Mr. Sharp, if you recall?
17       MS. BORJA:  Objection.  Lack of
18   relevance.
19       Q   You can answer.
20       A   That place, I don't remember.  I really
21   don't.

Page 212

1        Q   After your divorce?
2        A   Yeah, I mean around that time.
3        Q   Okay.  Right before the Preakness?
4        A   Before Preakness?
5        Q   Yeah, right before the Preakness, May
6    15, 2010, was it a week before that, was it a day
7    before that, was it on that day?
8        A   I don't think so, no.
9        Q   Are you sure?
10       A   I think it was before then.
11       Q   Okay.
12       A   I mean I'm just -- I don't think it was
13   then.
14       Q   What makes you think it wasn't?  Is
15   there some --
16       A   Because I think it was -- because I
17   wasn't, I don't think I was living in Owings Mills
18   then.
19       Q   Was Josh visiting you at that time?  I
20   mean trying to use landmark in your life.  Was that
21   the time in which you were in the middle of your

Page 213

1  visitation with Joshua?
2      A   Yeah, I still had Josh, still saw him.
3      Q   So you knew that it was -- it's after
4  the divorce, it's in that time when you're living
5  alone kind of with Josh; is that fair to say?
6      A   No, I didn't live alone then.
7      Q   No, I'm saying -- I'm trying to get
8  chronology of what significant things happened in
9  your life. One obviously is your divorce is
10  significant, right?
11     A   Yes.
12     Q   And can you say it happened after,
13  sometime after your divorce, 2005?
14     A   I think that's when it was. Wait a
15  second, I'm sorry, I wasn't living with Diane. I
16  can't give you an exact time, I really truly don't
17  remember. It could have been before the divorce.
18     Q   Okay.
19     A   Before the proceedings and stuff when we
20  were separated.
21     Q   Okay.

Page 214

1      A   Because I moved back to Columbia then
2  and I lived there until a little over two years
3  ago.
4      Q   So, so when you're in that program and
5  you're trying to detox or trying to get that other
6  substance out of your system, is it advisable to do
7  other drugs?
8          MS. BORJA: Objection to form, lack of
9  foundation, also designed to embarrass and
10  humiliate the witness and unduly protract the
11  deposition.
12     Q   You can answer.
13     A   Advisable to do other drugs?
14     Q   Meaning that when they gave you whatever
15  they gave you when you first came the first day,
16  they said Mr. Sharp, here's the things you need to
17  do. Here's this medicine, this is what this
18  medicine does and these are the things we need you
19  to do to, you know, go through the program,
20  whatever that was. And what I'm asking you was was
21  one of the prohibitions that you couldn't do other

Page 215

1  drugs while you were trying to get these particular
2  drugs out of your system?
3      A   I think that was probably -- I'm sure
4  that was something that you were supposed to do,
5  yeah.
6      Q   And to the best of your recollection,
7  did you follow that instruction, did you not do
8  other drugs while you were trying to get those
9  drugs out of your system?
10     A   Yes.
11     Q   Okay. This is a little easier. No more
12  drugs questions.
13     A   That was really, really hurtful.
14     Q   What was hurtful?
15     A   Just the way you're coming at me. It
16  doesn't have anything to do with what happened that
17  day, nothing.
18         MR. GRIMES: Okay. Okay.
19         MS. BORJA: Do you want to take a break?
20         (Pause in the proceedings.)
21         THE WITNESS: Yeah, actually I would

Page 216

1  like to take a break.
2          MS. BORJA: Okay.
3          VIDEOGRAPHER: 6:04 p.m., going off the
4  record.
5          (Recess taken.)
6          VIDEOGRAPHER: One moment, please.
7  6:19 p.m., back on the record.
8          BY MR. GRIMES
9      Q   Mr. Sharp, we took a little break there
10  and at any time did you discuss your testimony or
11  anything in regards to this deposition with your
12  counsel?
13     A   I'm sorry, what?
14     Q   At any time during the break that we
15  just took did you discuss any of your testimony or
16  anything pertaining to this deposition with your
17  counsel?
18     A   I was asked if I was okay.
19     Q   Okay. But other than that, nothing
20  substantive?
21     A   Nothing else, no.

54 (Pages 213 to 216)

1    Q   Thank you.  You mentioned, sir, if you
2  recall when you encountered Ms. O'Neal at the
3  bottom of the stairs and she was suggesting that
4  you make a report of the officer, did you ever make
5  a report then?
6    A   No, she didn't say I should make a
7  report of the officer.  She asked if I should file
8  a complaint.
9    Q   Okay.  So did you make a complaint about
10  that officer with anyone on that day?
11   A   No.  She was talking about calling, I
12  guess it's Internal Affairs that you call.
13   Q   Okay.
14   A   So I didn't know that you could call at
15  the time.
16   Q   Uh-huh.
17   A   But that's what she was talking about.
18   Q   So she wasn't talking about a report
19  then?
20   A   No.
21   Q   She was stating how to contact the

1  police department in regards to making a formal
2  complaint?
3    A   Yes.  I was very anxious to get out of
4  there.
5    Q   Okay.  And did you at any time make a
6  complaint with Pimlico racetrack?
7    A   No.
8    Q   Okay.  Let's talk about the, just a
9  couple things on the video footage.  You said
10  predominantly the video footage was of your son; is
11  that a fair rendition?
12   A   A lot of them were, yes.
13   Q   And of those videos that were of your
14  son, did you post any of those on social media?
15   A   No.
16   Q   Okay.  And did you e-mail or send any of
17  those to any family members, friends?
18   A   I don't think so, no.
19   Q   Okay.  And you still have a phone,
20  correct?
21   A   Yes, although I may be upgrading it

1  soon.
2    Q   Okay.  Just to advise you, you can't
3  turn it in, you have to make sure you keep it in
4  your possession, okay?
5    A   Oh, okay.  Thank you, I didn't know
6  that.
7    Q   All right.  I want to talk a little bit
8  about, do you recall the ACLU video that you made
9  that was posted on the website?
10   A   Yes.  Yes.
11   Q   Okay.  And just a couple quick questions
12  about that video.  Do you know, did your attorney
13  shoot that video?  Meaning that was behind the
14  camera, was that one of your attorneys shooting
15  that video?
16   A   I don't know.  I think Meredith is --
17  I'm not sure what her title is.  No, she's not an
18  attorney.
19   Q   So was it a videographer in terms of --
20  was it a professional or just a --
21   A   No, it was Meredith from the ACLU.

1    Q   Meredith from the ACLU, okay, and did
2  you rehearse for the video or just turned it on and
3  say hey, talk.
4    A   Basically, yeah, that's basically the
5  way it went.  I did not rehearse.
6    Q   So there was no times where you stopped
7  and did a part over or there was no break in the --
8    A   I think in the very beginning we had to
9  start over again, I don't remember.  Actually if I
10  remember right, she was very happy that it went
11  pretty smooth.
12   Q   Okay.  So do you remember why you had to
13  start over in the beginning?
14   A   I think I was just kind of fumbling my
15  words and that type of stuff.
16   Q   Okay.  And it's fair to say that the
17  words or that the comments made during that time
18  were all your words and not someone else's?
19   A   Yes.
20   Q   Okay.  And you're pretty comfortable
21  that the description of what happened, for instance

Page 221

1  when the sergeant came to you after you had talked
2  to the officers and I think you mentioned he
3  allayed your fears and those kind of things, is
4  that still your understanding of how things
5  progressed?
6     A   Yes.
7     Q   Okay.  And it's still your recollection
8  that during that conversation the request was for,
9  to get your phone for evidence?
10    A   That's how it was ultimately sold, was
11  that he needed it for evidence and it would be
12  downloaded onto a laptop.
13    Q   Question.  How was he able to, based on
14  your previous, you know, kind of rejections with
15  the other officer, what, what specifically did he
16  do that, you know, comforted you or however you
17  would describe the feeling you had when the second
18  officer approached you?
19    A   He was just, he just seemed to be
20  understanding.
21    Q   Give me an example, like what, what,

Page 222

1  what did he say?
2     A   His demeanor was very different than the
3  others as far as, you know, he wasn't like in my
4  face.  He didn't -- he wasn't like intimidating.
5     Q   So the other officers were in your face?
6     A   I don't mean like in my face, but they
7  were, they were somewhat aggressive towards me.
8     Q   Let me give you an example.  Do you
9  remember the altercation or at least the
10 conversation that you and the gentleman had earlier
11 that day, the gentleman that Anna hit in the back
12 of the head?
13    A   Not word for word.
14    Q   No, no, not what he said, I said you
15 remember the exchange though?
16    A   I remember him -- yes, that, yes, he was
17 in my face.
18    Q   I'm using that as an example.  Would you
19 characterize that exchange as in your face?
20    A   The one with the police officers?
21    Q   No, the one with the gentleman.

Page 223

1     A   Yeah, he was definitely in my face.
2     Q   So using that as maybe a baseline, would
3  you say that the officer was in your face like
4  that, or was it a lesser degree?  Like use that as
5  your baseline.
6     A   It was, it was a lesser degree than
7  that.  It wasn't like a couple, a manager and
8  umpire arguing and turning their hat around like
9  that, it wasn't like that.
10    Q   So, so on the scale just using that
11 encounter you had with the gentleman as a ten,
12 where would you rank the encounter with the officer
13 using that as the top?
14    A   With officer number 2?
15    Q   Officer number 1, let's just talk about
16 the ones that you said were in your face.
17    A   Well, he was the most, he was the most
18 aggressive.
19    Q   Right.  So using the gentleman, unknown
20 gentleman as a ten, where does officer 1 rank in
21 that as you go down, one being the least amount?

Page 224

1     A   Eight, seven, eight.
2     Q   An eight?
3     A   Yeah.
4     Q   Okay.  So, but officer 1 is the one who
5  kept leaving and --
6     A   He's the one that initially came up to
7  me and started telling me you gotta get the
8  phone -- you shouldn't have done that, that's what
9  you get for taping, and that type of stuff, yes.
10    Q   So he actually said something, he said
11 you shouldn't have taped him?
12    A   That's what you get for taping,
13 something, you know, something very close to those
14 exact words.
15    Q   Did he say anything about wiretapping or
16 you broke a law or anything like that?
17    A   I don't think he said anything about
18 wiretapping.
19    Q   Did he tell you you broke the law?
20    A   He said I was not -- what did he say
21 exactly?  If you give me a second --

56 (Pages 221 to 224)

Page 225

1    Q   Take your time.

2    A   -- I'll try to think about what he said.

3    Q   Uh-huh.

4    A   He said it's evidence, you have to give,

5    you have to give your phone.  I disagreed with him.

6    He said, you know, I just heard you say that you

7    got it, you got it, that's evidence now, that's

8    evidence.  You have to, you have to give it to us.

9    And I said I don't think I do, it's my phone,

10   and --

11   Q   So did he get in your face prior to

12   saying this to him, or did he get in your face

13   after you told him it's your phone?

14   A   Just from the very beginning he came at

15   me very quickly.

16   Q   Okay.

17   A   And I kept saying I don't think I have

18   to give you my phone, I just don't think I have to

19   give it to you.  And he said well, that's evidence,

20   you know, something along the lines of that's what

21   you get for taping it.

Page 226

1    Q   Did he ever threaten -- I'm sorry?

2    A   I kept basically disagreeing with him,

3    this is my personal property.

4    Q   Uh-huh.

5    A   Other officers were kind of, kind of

6    around and then that's when, not exactly right then

7    but officer number 2 came up and he --

8    Q   I thought you said officer 3 was also, I

9    thought you said it was two officers that kind of

10   told you about giving up the phone and then officer

11   2 --

12   A   Well, officer 3 is the one that detained

13   me that I had to stay, I had to stay with.

14   Q   Okay.  So did he come up later after

15   officer 2 came to approach you or something?

16   A   I can't tell you exactly when he came.

17   Honestly it was a lot going on.

18   Q   Did officer 1, during the time he was in

19   your face, did he ever threaten you with arrest,

20   did he ever say -- when you were refusing to give

21   him the phone, did he say I'm going to lock you up?

Page 227

1    A   I don't remember those words coming out

2    of his mouth, no.

3    Q   And do you remember him saying you stay

4    right here, you can't go or anything to that

5    effect?

6    A   I'm not sure which one told me that.

7    Q   Let's just focus on 1 so that way we can

8    keep it in order.  Just think about what your

9    encounter was with officer 1, did he ever say it?

10   A   I can't remember if he said it or not.

11   I do -- well, we're talking about officer number 1,

12   so no, I can't remember yes or no.

13   Q   But at some point when you refused --

14   you never acquiesced and gave him the phone, you

15   can say that for sure, right?

16   A   I did not feel I needed to give him my

17   phone.

18   Q   And so once he got in your face, there

19   was nothing that happened, after that, like he

20   didn't try to take it out of your hand or

21   nothing -- it didn't escalate after that?

Page 228

1    A   I mean I was holding my phone pretty

2    tight and I was like I'm not going to give you my

3    phone and --

4    Q   You struggled with the phone?

5    A   For me to say he tried to grab it out of

6    my hand would not be accurate.  But I did feel like

7    I should hold my phone as tight as I could because

8    he was, he was being pretty aggressive with me.

9    Q   Well, let's be, let's be real clear

10   because I want to understand what you're saying.

11   At some point he's in your face and you're having

12   this banter back and forth about whether you should

13   give your phone or not.

14   A   Yes.

15   Q   And at some point you feel the urge to

16   grip your phone tightly?

17   A   Yes.

18   Q   So what I'm asking you now is to think

19   about what changes from when he's in your face,

20   does he swipe at your phone, try to grab your

21   phone, what, what makes you grab your phone tighter

Page 229

1  in that exchange?
2      A   I don't remember the exact reason why I
3  felt I had to do that. I just knew -- I mean there
4  were more police officers at that point and I was
5  becoming afraid and worried and didn't quite
6  understand what the big deal was, and what was
7  going on and why this guy was really treating me
8  really poorly.
9      Q   Okay. But, but you do recall -- you
10  don't recall him trying to snatch the phone out of
11  your hand; is that fair to say?
12      A   I can't say that he did.
13      Q   Okay. So now we're finished with that
14  encounter, officer 2 comes up, and then give me the
15  best of your recollection, you know, what that
16  dialogue was like.
17      A   He could tell I was upset, nervous and
18  all that. And he basically spoke just with a
19  normal voice, said look, you know, I understand,
20  you know, what happened, you know -- I think he
21  even said, you know, I have kids also or something

Page 230

1  like that. He said look, that's evidence, we
2  have -- I have -- it is evidence, we have to make a
3  copy of it. I need to put it on the laptop, the
4  other officer or someone has a laptop, we can
5  download it on there. I hesitated and said I don't
6  think I have to do that type of thing. And he said
7  well, look, it is evidence, I need to get on the
8  computer. I need you to stay with this officer,
9  he's going to watch you, and I'll be back.
10      Q   Why do you say the officer wanted to
11  watch you, what do you mean by that?
12      A   Because he didn't want me to leave. He
13  took my ID at some point.
14      Q   He took your ID and your phone?
15      A   He took my ID and he said he wanted to
16  get my information.
17      Q   Okay.
18      A   I don't remember if he gave it back to
19  me then or gave it back to me a little bit later,
20  but he took out a notebook and wrote down my
21  information from my license. Actually, no, he did

Page 231

1  give it back to me I believe before he came back.
2      Q   Okay.
3      A   Told me I needed to stay with officer
4  number 3.
5      Q   Did he say it like I'll be right back,
6  stay here, or did he say, you know, did he threaten
7  you with arrest, or was there something else that
8  you thought was going to happen based on anything
9  that he conveyed to you that if you didn't stay
10  about him in other words that you were going to be
11  locked up or something like that?
12          MS. BORJA:  Objection to the form.
13  Leading.
14      Q   You can answer.
15      A   I don't, I don't know -- all I can tell
16  you is I felt very intimidated in that I was not
17  allowed to leave.
18      Q   I got that from officer 1, but now we're
19  transitioning into the second portion where there's
20  another person that comes on the scene that is not
21  as in your face or whatever, and you're

Page 232

1  communicating with this person enough to know he
2  has kids and whatever, other things you talked
3  with. So I'm just talking about at that point does
4  officer 2 leave you with the impression that he's
5  going to lock you up or something bad is going to
6  happen to you while he goes to copy the video?
7          MS. BORJA:  Objection to the form.
8  Leading.
9      Q   You can answer.
10      A   He -- no, he did not tell me he was
11  going to arrest me.
12      Q   Did he mention anything about
13  wiretapping act or any other legal-sounding reason
14  why he was doing something with your phone?
15          MS. BORJA:  Objection to form. Vague.
16      Q   You can answer.
17      A   Only that I had to give it to him
18  because it was evidence.
19      Q   Evidence, right, but I'm saying there
20  was no other legal reason or something else to say
21  well, Mr. Sharp, not only is it evidence, but

Page 233

1    you're in violation of XYZ or whatever.
2          MS. BORJA: Objection to form.
3       A    I really, I can't recall the whole
4    conversation.
5       Q    Okay.
6       A    The only, as far as the legal terms go,
7    it was evidence and basically I had to give it to
8    them. I think it was officer 1 that said or we can
9    just take your phone and you'll get it back in
10   about a year or so.
11      Q    So officer 1 then added something -- was
12   this prior to officer 2 coming or after officer 2
13   already had your phone?
14      A    Kind of I guess right around the time
15   that I started to speak to officer 2. And he was,
16   I mean he came across as a really genuine guy, I
17   mean a really -- it makes me feel like --
18      Q    So what did he say --
19      A    I can't believe I trusted him because he
20   really sold me on it, you know.
21      Q    So what did he say when he gave you your

Page 234

1    phone back? Did he say something mean or say
2    something that would have alerted you that
3    something bad had happened?
4       A    He wanted to double-check if he had my
5    information right. That was base -- I mean that
6    was basically it. I mean I said can I go or
7    something like that, and he said yeah, and I just
8    went. I didn't, you know --
9       Q    So I'm going to ask you a question. I
10   want you to listen to what I'm asking you because
11   this is not meant to be a tricky question. So tell
12   me if you understand my question.
13         Based on his behavior, his conduct and
14   his speech to you when you left, as you sit and
15   think about it now, is it possible that he didn't
16   even know that he erased your phone, just your
17   perception in terms of how he came across in giving
18   your phone back then, it could have been an
19   accident in terms of erasing the phone?
20      MS. BORJA: Objection. Lack of
21   foundation.

Page 235

1       Q    You can answer the question.
2       A    I think he knew exactly what he did.
3       Q    But how would you, you know, in terms
4    of -- you didn't know to check your phone, I know
5    you said you wanted to get out of there and you
6    said he was pretty cordial at least compared to the
7    other officers.
8          Was there anything to indicate that he
9    was upset with you when he returned, or that he was
10   mad about what he had seen on your video, anything
11   that you perceived?
12      A    No. Like I said, he acted like he was
13   very concerned for me.
14      Q    So he didn't say hey, you shouldn't have
15   took this stuff on here, or make some comment as
16   far as the change of his behavior, like once I knew
17   what was on the video, did he get angry with you or
18   something like that?
19      MS. BORJA: Objection to the form of the
20   question, compound, leading.
21      Q    You can answer.

Page 236

1       A    I didn't actually see him go to the
2    laptop and what he did with the phone.
3       Q    Uh-huh.
4       A    I'm not even sure he viewed the whole
5    video I made. He was gone I mean for enough time
6    to I'm sure -- I mean I know enough about cell
7    phones now, didn't know as much then as far as
8    downloading to YouTube and stuff, because it's not
9    really my thing.
10      Q    Uh-huh.
11      A    But the amount of time he was gone, it
12   seemed like he had enough time to download it onto
13   the laptop, which I thought he had done. He came
14   back. I kind of had a heads up from officer number
15   3 that the movies or the film or videos would be
16   erased because he told me that.
17      Q    So you're saying officer 3 -- let's back
18   up to officer 3 for a second. What other
19   conversations with officer 3 prior to this
20   admission or at least this comment that what
21   officer 2 is going to do, what was your interaction

Page 237

1   with officer 3, what did he say to you?
2        A   Officer 3 really became involved as far
3   as I remember when -- I don't really remember him
4   until or at least having interaction with him until
5   I was told to stay with him.
6        Q   So he's not one of the officers who said
7   give the phone for evidence, he comes in later on?
8        A   Again, there were a lot of officers
9   there, and to be able to pinpoint exactly where he
10  was at what time and where he was standing compared
11  to me --
12       Q   No, I'm just saying his comment.  Not
13  where he physically was.  I'm saying you've now
14  recited a few people, even though there were other
15  officers, there were a few people who spoke to you,
16  so I'm just trying to get you to focus on the ones
17  who actually said something to you like officer 1
18  and officer 2 and trying to determine what officer
19  3, if anything, said to you about giving up your
20  phone.
21       A   After officer 2 left, I asked officer

Page 238

1   number 3 basically what was going to happen to me.
2   I was really really nervous.  And we talked for a
3   second.  He didn't really want to talk to me, but I
4   think he could tell I was really distressed and I
5   said, you know, I didn't do anything wrong, I just
6   want to go home, this and that.  And he said
7   they'll probably just erase it and give you your
8   phone back.
9        Q   So would you classify his demeanor and
10  at least his conversation to you as somewhat trying
11  to be soothing in terms of talking to get you to
12  calm down?
13       A   Yes.
14       Q   So he wasn't, he wasn't the one who was
15  making you feel intimidated or incarcerated or
16  whatever you were feeling at the time, it wasn't
17  based on officer 3's behavior; is that fair to say?
18       MS. BORJA:  Objection to the form.
19  Leading.
20       Q   You can answer.
21       A   I mean he -- I mean I knew I had to stay

Page 239

1   with him, I couldn't leave.
2        Q   But you said officer 2 told you to stay
3   with him, that wasn't -- officer 3 didn't say that
4   to you?
5        A   Officer 3 did not say that to me.
6        Q   And so the only exchange you had --
7   first of all, the exchange was initiated by you,
8   you asked him the question what's going to happen?
9        A   Yes.
10       Q   He didn't say anything to you before
11  that?
12       A   No, I don't think so.
13       Q   Okay.  And when he responded to you, you
14  said he told you what he thought was going to
15  happen and that you were going to get your phone
16  back?
17       A   Yes.
18       Q   And then the conversation stopped with
19  him and you just waited, or what happened then?
20       A   Pretty much at that point I just said I
21  just want to get out of here, I just want to go

Page 240

1   home.  And I got -- I just -- when he mentioned the
2   fact that it would be erased, it made me more
3   nervous and I decided I better not really say a
4   whole lot more to him because at this point if
5   they're going to erase my video, then I'm not sure
6   what else they're going to do to me.
7        Q   Okay.  So I want to ask a quick question
8   about -- I just want you to focus on officer number
9   3.  Why are you suing officer number 3 based on
10  what you just told me about his involvement?
11       A   Because he detained me.
12       Q   He detained you?  I thought you said --
13  he didn't tell you you couldn't leave though, did
14  he?
15       A   He was there to make sure I didn't
16  leave.
17       Q   But I'm saying officer 2 told you you
18  couldn't leave, you didn't try to leave, so officer
19  3 never said to you hey, Mr. Sharp, you know you
20  can't leave or --
21       A   Technically no, he did not, I didn't ask

1   him if I could leave and he did not tell me that I
2   could not leave.
3       Q   Okay.  So that's the communication with
4   officer 3.  And then now you mentioned for this
5   deposition a possible officer 4, someone walking by
6   that you may have gotten your attention to get
7   Ms. O'Neil's attention.
8       A   Oh, right, yes.
9       Q   Do you have a recollection of what that
10  person looked like, what that officer -- stature,
11  was it male, female, African American, Caucasian,
12  Asian?
13      A   I don't remember.
14      Q   Okay.  And so based on the alleged
15  comments from officer number 3, you were put on
16  notice that your phone videos may be erased?
17      A   Yes.
18      Q   And so when did you on your own see in
19  fact your videos were erased, where were you in the
20  process of leaving the track?
21      A   I think I first looked when I was kind

1   of going down the stairs.
2       Q   So the time which you explained earlier
3   when you saw Ms. O'Neal, you were looking at your
4   phone and walking down the steps?
5       A   Kind of something -- yes, that's
6   pretty -- I think, I mean -- when did I first look
7   at it?  Yeah, it had to have been, must have been
8   then, and then I remember looking again when I got
9   outside.
10      Q   Uh-huh.
11      A   And that's when I got really upset.
12      Q   So when you looked at it the first time
13  you didn't know that the videos were gone?  I'm
14  talking about the first time you were on the steps.
15      A   I had started to go, I think if I
16  remember right, I started going to my phone and
17  then that's when I had the conversation with the
18  officer down the steps.
19      Q   Uh-huh.
20      A   That's a good question.  I wonder if I
21  actually showed him that they weren't there

1   anymore.
2       Q   That's exactly what I'm trying to
3   determine, whether you had an opportunity to tell
4   him hey, by the way, you guys just erased my video.
5   Do you recall any exchange like that?
6       A   That's what the complaint was about that
7   we talked to him about.
8       Q   Right, that's what I'm saying.  I didn't
9   know whether the complaint was they detained you or
10  the complaint was your video, you didn't say.
11      A   The Preakness, the whole thing to be
12  honest with you, I mean the way I was -- the way
13  they detained me and erased my video.
14      Q   That's what I'm saying.  I thought you
15  said that Ms. O'Neal was doing most of the talking
16  on that one because you just wanted to get out of
17  there, so you didn't really speak too much with the
18  officer.  Is that not correct?
19      A   No, I mean I spoke to him, but you're
20  right, she initiated the conversation with him
21  before I was even there.

1       Q   Right.
2       A   And then when I was coming down the
3   stairs she got me involved in the conversation.
4       Q   Right, but at that point she had no idea
5   about the video piece because she wasn't there for,
6   you know, your discovery of the video being erased,
7   correct, so she couldn't have told the officer that
8   ahead of you coming down the stairs?
9       A   I guess not, no.
10      Q   Okay.  All right.  And it's your
11  independent recollection that you may have -- well,
12  I won't say independent recollection.  To the best
13  of your knowledge you may have mentioned this to
14  the officer about the video recording being missed?
15      A   Yes.
16      Q   And the amount of time that you were
17  detained, those two things?
18      A   Yes.
19      Q   Okay.  And did you at any time mention
20  how many officers were involved?
21      A   I don't think so.

Page 245

1    Q   Okay.  And again, we went over this
2  before, I want to make sure I understand it
3  correctly.  The only person when you finally did
4  make your complaint when you were in the presence
5  of Mr. Smith was for the one officer, was for
6  officer number 2, correct?
7        MS. BORJA:  Objection to the form,
8  leading, also to the extent it mischaracterizes the
9  complaint in this action.
10   A   Could I ask you to repeat that?  I
11 didn't follow it.
12   Q   Yeah.  I'm not asking about the
13 complaint, okay, I'm talking about your complaint
14 to AID when you called BPD to complain about what
15 happened to you.
16   A   Yes.
17   Q   And then subsequently you and Mr. Smith
18 went down to look at photographs.  I'm talking
19 about that.
20   A   Right, okay.
21   Q   Not your lawsuit complaint.  During that

Page 246

1  complaint you basically focused on the behavior of
2  officer number 2, correct?
3    A   Yes, I talked -- he was the only one
4  whose name I knew.
5    Q   Okay.
6    A   I thought his name was Sergeant Beasley
7  or something like that.
8    Q   In fact, let me do something real quick.
9  I'm going to show you a photograph, Mr. Sharp.  And
10 there's no tricks involved here.  You see the
11 gentleman's there, Derek Beasley.
12   A   Okay.
13   Q   And I'm certifying for you on the record
14 that this is the only Beasley in the Baltimore
15 Police Department and he is not a sergeant.
16   A   Okay.
17   Q   I'm giving you the opportunity to look
18 at the photograph and see if in fact this gentleman
19 seems to be the person we've been referring to as
20 officer number 2.
21       (Pause for photograph review.)

Page 247

1    A   He has that kind of face, but I can't
2  tell you for sure.  He does have facial hair but I
3  don't remember the beard.  If you're asking me to
4  say unequivocably that that is him, I can't tell
5  you that.
6    Q   Okay.  But again, just so the record is
7  clear, this is an Officer Beasley, but I just want
8  to make sure, you know, we covered that area, that
9  that's a name that you said on a number of
10 occasions --
11   A   Yes, which is very -- well.
12   Q   So based on as you sit here today using
13 your best efforts to try to recall what the
14 gentleman looked like, it's your testimony or at
15 least statement that you can't identify this
16 gentleman as officer number 2 as described in your
17 complaint or your declaration?
18       MS. BORJA:  Counsel, are you
19 representing that he was at the Preakness that day?
20       MR. GRIMES:  I'm not representing
21 anything other than the fact this is the only

Page 248

1  Officer Beasley in the police department.
2        MS. BORJA:  I just want to know what
3  this representation depicts and if this was an
4  officer at the Preakness that day.
5        MR. GRIMES:  I didn't say that, no.
6        MS. BORJA:  Okay.
7    A   Again, I can't tell you that was
8  definitely him.
9    Q   Okay.  Fair enough.
10       MR. GRIMES:  I'm going to mark this as
11 Defendant Exhibit 4.
12       (Defense Exhibit 4 marked.)
13       BY MR. GRIMES
14   Q   Okay.  So we've now talked about all
15 three officers.  I think -- let me ask the
16 question.  Is there any more or any other
17 recollection you have of an officer, male or
18 female, that had made any more comments to you,
19 verbal comments to you in regards to you
20 relinquishing your phone?
21   A   Again, I mean there were officers there.

Page 249

1  Who exactly spoke and said what, I really would be
2  guessing. I don't really, I don't know. I mean
3  there were more than three police officers.
4    Q   No, I'm just saying that spoke to you.
5  To the best of your recollection, what you told me
6  now and testified to, your understanding of the
7  individuals that you encountered were the three
8  individuals you described?
9    A   Yeah. I mean, like I said, there were
10 other officers there. And exactly who I spoke to
11 at what time, I don't know. I mean there were
12 times when I was kind of just looking around at who
13 was there and saying I don't know what I did wrong,
14 I don't know what I did wrong.
15   Q   And you were saying that to other
16 officers?
17   A   Whoever was there around me at the time,
18 yes.
19   Q   And do you recall any of those officers
20 saying anything back to you?
21   A   Again, not specifically, no.

Page 250

1    Q   Okay. That's fair enough.
2    MR. GRIMES: Excuse me for a second.
3    (Pause in the proceedings.)
4    MR. GRIMES: Richard, let's go off the
5  record for a second.
6    (Discussion off the record.)
7    VIDEOGRAPHER: 6:51 p.m., going off the
8  record.
9    (Recess taken.)
10   VIDEOGRAPHER: One moment, please.
11 7:07 p.m., back on the record.
12   BY MR. GRIMES
13   Q   Mr. Sharp, a couple final questions for
14 you, so it may be a little scattered because I took
15 some from different sections, so just try to bear
16 with me and listen to the question as best you can
17 and answer as completely as possible. I want to
18 spend a couple more minutes on Ms. O'Neal. Do you
19 recall about the last time we spoke I asked you if
20 you had Ms. O'Neal's contact information, do you
21 recall that?

Page 251

1    A   Yes.
2    Q   I think your response was something to
3  the effect you don't remember off the top of your
4  head, but you could get it to me.
5    A   In my phone.
6    Q   In your phone, yes. And at some point
7  or at least when I was asking you that question,
8  was it your understanding that Ms. O'Neal was
9  represented by counsel, your counsel by the way?
10   A   No.
11   Q   Okay. And at some point did you
12 actually, let me ask you if you recall this, do you
13 recall me asking Mr. Smith, your counsel, to, you
14 know, get the information from you and to provide
15 it to me?
16   A   I think you said you would get it later
17 or something like that.
18   Q   And was it your understanding that
19 Mr. Smith was supposed to get it to me or you were
20 supposed to get it to me, how did you think I was
21 supposed to get the information?

Page 252

1    A   I really didn't think about how you
2  would get it, to be honest with you.
3    Q   Okay, that's fair, But did you do your
4  part in terms of did you give the information you
5  had to counsel?
6    A   I guess at some point I must have.
7    Q   Just think about it, take your time,
8  just think about it. Do you recall giving the
9  information to counsel?
10   A   Yes, I did give them her phone number,
11 but that was not too long ago actually.
12   Q   So from April 24th, 2012 to last week,
13 is that roughly when you gave the number?
14   A   I think it was before last week. A few
15 weeks ago maybe.
16   Q   But what you do know is that it wasn't
17 in April; is that fair to say?
18   A   Yes, as far as I can remember it was not
19 then.
20   Q   Was it in May?
21   MS. BORJA: I have a continuing line of

Page 253

1   objection to you asking about his communications
2   with counsel.
3       MR. GRIMES:  Noted.
4       Q   Was it in May?
5       A   I don't, I don't believe so, no.
6       Q   Was it in June?
7       A   June, no, I don't think so.
8       Q   Was it in July?
9       A   July, depending on the date, it's
10  possible.
11      Q   Okay.
12      A   Somewhere --
13      Q   Late July?
14      A   Maybe late July, early August, sometime
15  maybe around then.
16      Q   Okay.  And all you provided was the
17  phone number and no address?
18      A   Just the phone number.
19      Q   Okay.  And did you personally call
20  Ms. O'Neal and let her know that we had asked about
21  her in the deposition?

Page 254

1       A   No, I don't think so.  No, I didn't call
2   her and tell her.
3       Q   So have you had any communication with
4   her from the April 24th deposition that we had, you
5   and I, to now?
6       A   Yes.  I saw her at this point five, six
7   weeks ago, something like that.
8       Q   What was the occasion on which you saw
9   her?
10      A   She just came over, I think we watched a
11  movie or TV type of thing.
12      Q   Do you recall during your last
13  deposition making a comment that, something to the
14  effect of good luck trying to get in touch with
15  her?
16      A   Yeah.
17      Q   Okay.  But you just said that she came
18  over to your house to watch movies and you were
19  able to get in contact with her?
20      A   She called me.
21      Q   Okay.  And do you recall when you called

Page 255

1   her, what the time frame would have been?
2       A   I think that was, again, I think five or
3   six weeks ago.  I think I saw her the same day she
4   called me.
5       Q   So in August maybe, early August?
6       A   Early August, sometime around then.  No,
7   no, it wasn't -- I'm trying to figure when I was
8   here.  Again, later July maybe.
9       Q   Okay.  And during that time when you got
10  a chance to reconnect with her, did you share with
11  her about the litigation?
12      A   Only in a very kind of general way.
13      Q   Like what?
14      A   She asked me how things were going and
15  said things are going, still going on.
16      Q   At that time remember -- I'm sorry, were
17  you finished?
18      A   No, that was basically it, like things
19  are still moving along slowly.
20      Q   And do you recall when we talked about
21  her last you mentioned that you were unable to get

Page 256

1   her to assist you in looking at photographs and
2   those kind of things; do you recall that?
3       A   Right, I never had her assist me.
4       Q   But when you got reconnected with her,
5   did you take the opportunity to ask her to assist
6   you with identifying anyone that may have been
7   involved in the incident?
8       A   No.
9       Q   And why not?
10      A   Frankly I just, I don't feel comfortable
11  discussing anything serious or about the case with
12  anyone that I know.  I just don't want, I don't
13  want anyone to be kind of dragged into it if you
14  know what I mean.
15      Q   Yeah, I do, but I mean she's kind of the
16  only eyewitness you identified.  Unless you're
17  changing that, I think she was the only one you
18  said had some familiarity with what went on,
19  correct?
20      A   Yeah, but I gave her kind of the regular
21  answer.  I do get asked occasionally how things are

Page 257

1   going.
2   Q   Uh-huh.
3   A   Because people know about.
4   Q   Uh-huh.
5   A   And I just say it's still going on and
6   the people try to ask me more questions, kind of
7   make a joke out of it.
8   Q   Okay.
9   A   I like you too much to tell you anything
10  type of thing.
11  Q   So you're able to at least joke about it
12  to a certain extent?
13  A   Well, I wouldn't -- I try to joke about
14  it. As my dad would say lots of times you laugh
15  when you'd rather cry.
16  Q   Okay. But, but in terms of trying to
17  accomplish this task that you've been working at
18  for some time, meaning looking at these videos, did
19  you have a disk at that time, the second disk that
20  you've been looking at when she came over?
21  A   Yes, I did, yes.

Page 258

1   Q   And the conversation never came up that
2   hey, by the way, you know, this is dragging on, I
3   still have to look at these disks, I'm still trying
4   to identify officers; you never mentioned that at
5   all to her?
6   A   I never mentioned it to her. She
7   actually asked me about identifying --
8   Q   Uh-huh.
9   A   -- and I told her again, you know, I
10  like you too much, I can't, I can't discuss this
11  with anybody type of thing.
12  Q   So she was trying to volunteer to help
13  you identify them, and you told her no, I just
14  don't want to share it with anyone?
15  A   I mean she, you know, she said I might
16  be able to help you --
17  Q   Right.
18  A   -- I might be able to remember and I
19  said to her, you know, I can't do that, I just
20  cannot do that, and that was basically the end of
21  the discussion because she, she didn't pry any

Page 259

1   longer. I think she could tell I was pretty
2   serious.
3   Q   Serious about her not helping?
4   A   Or anyone for that matter.
5   Q   Okay. Let's move off of Ms. O'Neal and
6   just talk about you. And let's talk about you
7   mentioned a little bit about the emotional trauma
8   and you made some comments. As succinctly as you
9   can, tell me about the kind of things that are
10  different about you now than, you know, if you had
11  to describe yourself prior to the incident. What,
12  what emotional traumas are you complaining of as we
13  speak?
14  A   Well, it's been, it still is extremely
15  trying. If I want to give my personal feelings and
16  how it affects me, I feel like basically more salt
17  is being added to my wound, and I'm very troubled
18  by just kind of some things that have been going
19  on, and just basically having a really hard time
20  now trusting the police. It's still humiliating
21  when I think about it. You know, just asking, I

Page 260

1   just want to go home. When the officer number 1
2   came up to me, when I asked him what was going on
3   after officer number 2 left and he said I'll tell
4   you what's going on if you shut up and don't talk,
5   and he started to speak and I said something like I
6   didn't do that, and he said I told you to shut up
7   and he just turned around and slowly walked away,
8   and I'm like saying to this guy okay, I won't talk,
9   I won't talk. I won't say anything, I won't speak,
10  I won't say anything. And he just walked like
11  very, like kind of with his chin up in the air kind
12  of thing with his hands behind his back like he
13  couldn't hear me.
14  Q   This is officer, officer 1?
15  A   Yeah. He seemed to really enjoy picking
16  on me and making me suffer.
17  Q   Okay. And so how does that affect --
18  you said being able to trust the police, like for
19  example if you had an intruder in your home would
20  you call the police?
21  A   That's a good question. I suppose I

Page 261

1    would, yes.
2        Q   So you don't distrust all police, you
3    just, you're speaking about the encounter you had
4    with these particular --
5        A   I think --
6        MS. BORJA: Objection to the form.
7        A   I think it has basically ruined my
8    perception of the police. I thought I could trust
9    them and I thought that they were basically on your
10   side and they were there to be the ones to fix the
11   problems, not create them.
12       Q   Uh-huh.
13       A   I don't know if I can be honest and
14   just -- if I was in a time of need, if I could
15   truly trust them. I don't know if I could ever
16   truly trust a police officer again.
17       Q   So let me just ask you, just, just to
18   clarify my own understanding. So when you see acts
19   of bravery and valor of police officers like the
20   9-11 events or something where police officers are
21   really doing good things and helping, that makes

Page 262

1    you -- how do you feel about police at that, when
2    you're seeing those acts of bravery?
3        A   I guess it depends on the act of bravery
4    and what your definition of bravery is.
5        Q   Well, I mean whatever your definition
6    is, anything that you would deem to be brave. Do
7    you appreciate that and say that person put their
8    life on the line for that person they didn't know
9    from Adam?
10       A   Of course I appreciate it.
11       Q   So it's fair to say that you can
12   distinguish between good deeds and bad deeds?
13       MS. BORJA: Objection to form, vague,
14   overly broad.
15       A   I'm not sure I can do that.
16       Q   You can't tell the difference between
17   good deeds and bad deeds?
18       MS. BORJA: Objection to form, vague,
19   overly broad.
20       A   I'm not sure if that good deed, if that
21   officer is truly a good person, you know, I just

Page 263

1    don't know anymore.
2        Q   I want you to make sure you listen to my
3    question because you're right, he's a stranger,
4    there's no way I would expect you to know if the
5    person is a good person. I'm just asking you based
6    on your perception when you see a good deed, can
7    you identify that's a good deed, if there's a case
8    that talks about excessive force where someone is
9    beating a citizen, you can say that's a bad deed,
10   can you distinguish the difference between the two?
11       MS. BORJA: Objection to the form,
12   vague, overly broad.
13       A   If someone did something outstanding,
14   yeah, of course.
15       Q   So, so being that, out of, and I told
16   you the number was somewhere in the 500s, the
17   officers that were at Preakness, and you
18   encountered three basically out of 500 based on
19   your testimony.
20       A   A few.
21       Q   Some of the ones that really had

Page 264

1    interaction with you, not the ones you just passed,
2    right, is that fair enough, fair to say three were
3    the ones who --
4        A   Yes.
5        Q   -- you encountered. So out of those
6    three individuals, you don't as you sit here today
7    have anything necessarily bad to say about the
8    other folks that you didn't encounter, do you?
9        MS. BORJA: Objection to the form,
10   vague, overly broad.
11       Q   You can answer.
12       A   The thing that troubles me the most --
13       Q   Are you answering my question?
14       A   Yeah.
15       Q   Okay.
16       A   Is that as far as having something
17   against them, is what you're saying, is they all
18   work together. They -- it's not like -- not one of
19   them said wait, we shouldn't do this to this guy,
20   he didn't do anything wrong. They all just went
21   along with it.

Page 265

1    Q    Are you talking about the other 400-some
2  officers?
3    A    Not all 400, they weren't all in the
4  clubhouse, but out of the ones that were around and
5  knew what was going on, not one of them, not one of
6  them stood up and said we shouldn't do this, this
7  is wrong.
8    Q    How would you know they knew what was
9  going on is what I'm trying to understand?  Because
10 you were preoccupied, wouldn't you agree?
11   A    They all knew they were trying to get my
12 phone from me.
13   Q    How did they know that, Mr. Sharp?
14   A    Because I kept saying I don't think you
15 can take my phone.
16   Q    So your understanding is that everyone
17 overheard you saying that, so they knew what was
18 going on?
19   A    Not all of the 400 officers obviously,
20 but there was more than three officers that knew
21 what was going on.

Page 266

1    Q    Okay.
2    A    That's what I'm saying.
3    Q    Okay.  And so you mentioned about
4  obviously your distrust for officers.  Are you
5  losing sleep, are there any other symptoms or
6  things that you would say you would attribute to
7  the incident that you didn't experience before that
8  you've experienced since the incident?
9    A    For quite a while I spent more nights
10 not at home than at home because I was afraid that
11 frankly something bad was going to happen to me.
12   Q    Be specific.  What does that mean,
13 something bad is going to happen to you?
14   A    I thought it was possible that I might
15 get killed.
16   Q    Killed by who?
17   A    By officers or someone associated with
18 them somehow.
19   Q    And you thought you would be killed?
20   A    I was terrified.
21   Q    I understand, that's what I'm trying to

Page 267

1  understand.  Based on your encounter on May 15,
2  2010 it was your belief that you could have
3  possibly been killed?
4    A    At that point I wasn't -- I was very
5  worried and very scared.
6    Q    Uh-huh.
7    A    So it did cross my mind that this,
8  something -- they may want you to shut up and go
9  away, they don't want you to get them in trouble,
10 this and that.
11   Q    So at that time you lived in Owings
12 Mills, correct?
13   A    Yes.
14   Q    Or were you living in --
15   A    Owings Mills.
16   Q    -- Columbia?
17   A    Owings Mills barely, but yes.
18   Q    But I thought you said, wasn't it 800
19 Moon --
20   A    8524.
21   Q    Isn't that Howard County?

Page 268

1    A    Yeah, but I had moved, I had moved to --
2  I had moved there right about the same time, I mean
3  literally I moved into Owings Mills about a week or
4  so after that.
5    Q    Take your time and think about it
6  because --
7    A    That was 2009?
8    Q    Yeah, because you would have, you would
9  have had made complaints to the Baltimore Police
10 Department in giving your address as Howard County.
11 So just take your time.
12   A    Let me think when I actually moved in
13 there.  2009, 2000 -- no, I was living in Columbia
14 at the time.  By the time I moved to Owings Mills,
15 that's when things were kind of starting to heat up
16 with the lawsuit and that made me nervous because,
17 you know, we were starting to try to, you know --
18 there was officers involved, at that point I didn't
19 know what they were going to do.  I just had no
20 idea.
21   Q    Okay.  So let's just make sure we're

Page 269

1   distinguishing.  Were you concerned about your
2   welfare of being killed at the Howard County
3   address, or did that happen subsequently after the
4   lawsuit was filed and it was the Owings Mills
5   address?
6       A   No, it happened in Columbia also,
7   absolutely.
8       Q   And at any time did you notify the
9   Howard County Police that you had a concern about
10  your well-being or safety?
11      A   No.
12      Q   And did you notify any federal agency or
13  any other agency about your concerns about --
14      A   Absolutely not.
15      Q   And did you divulge it to anyone that
16  could have been of assistance or giving you safe
17  harbor that you were afraid that you were going to
18  be possibly murdered by police?
19      A   I was afraid of going to anyone like
20  that to tell them my concerns.
21      Q   Okay.  As we sit here today, do you

Page 270

1   still have the same concerns that you may be
2   murdered by the police?
3       A   I still have concerns in some regard,
4   absolutely, yes.
5       Q   And to this day have you done
6   anything --
7       A   But when you say murdered by the police,
8   I don't mean the police department put me on the
9   number one most wanted list.
10      Q   Okay.
11      A   I mean people who are somehow associated
12  with this event that happened.
13      Q   So just clarify for me, are you meaning
14  passerbys or --
15      A   The officers that were involved in the
16  event that happened that day.
17      Q   Uh-huh.
18      A   That is why I have the concern I do
19  today.
20      Q   But are you concerned about the officers
21  that were involved, or are you concerned about

Page 271

1   their family members?  I'm not understanding these
2   --
3       A   I'm concerned about them and possible
4   associates, yes, whoever that may be.
5       Q   Okay.  So you said something about not
6   staying at home.  When did you start staying --
7   when did you return to your home?  If there was a
8   period you weren't staying home because of your
9   concern, when did that end?
10          MS. BORJA:  Objection to the form,
11  vague.
12      Q   You can answer.
13      A   I wasn't, I wasn't keeping notes.  I
14  mean it depended on different things obviously.
15      Q   Okay.  Did anyone stay with you or did
16  you recall doing anything different in terms of
17  purchase a gun or do anything for self-help for
18  your protection?
19      A   No, I did not purchase a gun.  I did
20  pick up a couple video cameras, well, fake video
21  cameras.

Page 272

1       Q   Uh-huh.
2       A   They stick on the wall.
3       Q   Uh-huh.
4       A   But that was really -- I'm not going to
5   go out and buy a gun for any reason.
6       Q   Okay, fair enough.  So besides the
7   concern about possibly being killed by someone
8   affiliated with the police department, you know,
9   being upset about it, were there any other
10  symptoms, any other things you can think of,
11  because I want you to be as complete as possible,
12  how this event affected you?
13      A   I'm not sure how I can sum up being
14  humiliated gracefully or anything like that, it's
15  very humiliating when I look back at it and like I
16  said, just crying out that I'm not going to talk.
17  I'm an adult and I have a kid and I'm sitting here
18  crying out that I'm not going to speak.
19      Q   So --
20      A   This guy is the one supposed to be the
21  one looking out for us.

Page 273

1    Q   I see you still getting upset to this
2   day.  So is it your testimony that from May 15th,
3   2010 to as we sit here on August 27th, 2012, you
4   feel the same way as you felt immediately after the
5   incident, or do you feel different?
6    A   No, I feel a bit different.  I mean.
7    Q   Explain how you feel.
8    A   I think that the emotions, emotions are
9   a strange thing, and at first I was angry about
10  what happened and afraid and very, very confused
11  about the whole thing, and it became less anger and
12  more just I can't believe what those guys made me
13  go through.
14       I just always think about my kid and
15  like just thinking about, I mean I'm his father and
16  I'm sitting here like crying out that I'm not going
17  to talk.  I won't talk, even though I didn't do
18  anything wrong, I'm going to let you sit here and
19  you're going to tell me to shut up and I'm going to
20  tell you that's okay.  What is that?
21   Q   So, so with all those things being said

Page 274

1   and all the different emotions you feel, do you
2   believe that the resolution of this lawsuit, let's
3   just say you got a certain amount of money, would
4   that amount of money make you feel better?
5    A   I don't know.  I mean to be honest with
6   you, I wanted them to apologize to me and try to
7   get my videos back, that was it, and I'm sitting
8   here with you.
9    Q   Right.
10   A   I just want an apology.  It wasn't about
11  the money.
12   Q   Let me ask you this.
13       MS. BORJA:  Are you done with your
14  answer?
15   A   It just wasn't --
16   Q   Along those lines, in fact when you sat
17  down with Mr. Smith and I think it was Sergeant
18  Ellis or something like that?
19   A   Yes.
20   Q   Well, let ask you, was she polite?
21   A   I thought Sergeant Ellis was a very nice

Page 275

1   lady.
2    Q   Was she helpful?
3    A   Yes.
4    Q   And she called you in fact back to say
5   hey, Mr. Sharp, remember you gotta bring me the
6   phone and, you know, you guys had exchanges about
7   trying to put forth an effort to see if there was
8   any way to retrieve your videos; is that fair to
9   say?
10   A   Yeah, they were going to try to see if
11  the videos were on the phone.
12   Q   And in fact, in fact she went so far as
13  to try to put a photo array to see if you could
14  identify the individual who, you know, did what you
15  claimed so they could face whatever process the
16  department had to offer; is that correct?
17   A   I did see a photo array, yes.
18   Q   And in fact she asked you whether you
19  could identify the people, she gave you
20  Mr. Beasley's name and his information; is that
21  correct?

Page 276

1    A   I don't know.
2    Q   Because that's the only person they knew
3   of at the time, remember, that was the person --
4    A   I don't think she gave me -- what do you
5   mean by information?
6    Q   Meaning that when you said Officer
7   Beasley, they then went and looked for, if there
8   was an Officer Beasley or Sergeant Beasley in the
9   department and she came back and notified you and
10  counsel that the only Officer Beasley they had was
11  this person, and they were going to show you a
12  number of photographs so you could pick out Officer
13  Beasley out of the number of photographs; do you
14  remember that process?
15   A   Yes.
16   Q   Because you weren't talking about
17  anybody else at that time, you thought that you
18  knew names; is that fair to say?
19   A   Yep.
20   Q   Okay.  So she did go about trying to at
21  least address your issues and that's someone from

Page 277

1 the Baltimore Police Department, correct?
2        MS. BORJA: Objection to the form,
3 vague.
4     A   Yes, Sergeant Ellis was actually I
5 thought very nice.
6     Q   Okay. And in fact, when she came back
7 with the information that she had given your phone
8 to cyber crimes, she said unfortunately I have to
9 inform you that they don't see anything on your
10 phone, there's nothing more they can do?
11    A   Yeah, and she also told me they didn't
12 have some type of, whatever they use to get stuff
13 off of phones, the, I guess the latest and greatest
14 technology to do that, and the cost. I don't
15 remember exactly what she told me, but it was, you
16 know, she said it cost X amount of dollars, that
17 type of thing.
18    Q   All right. So at this point you haven't
19 received any medical attention for some of the
20 things you're experiencing. At one point you would
21 have been okay with an apology and an attempt to

Page 278

1 get your videos back, and I think we've just
2 covered the information, at least you know there
3 was an attempt to get your video back. I don't
4 know -- let me, let me ask you a question.
5        Did Sergeant Ellis ever, you know,
6 apologize -- actually she can't apologize for
7 someone's behavior about what transpired, I mean
8 did she seem apologetic about your having to go
9 through that?
10        MS. BORJA: Objection to the form,
11 vague.
12    Q   Or doing whatever you complained about?
13    A   I don't think she apologized to me.
14    Q   Okay, that's fair.
15    A   No, I don't think she actually
16 apologized.
17    Q   Okay. So, so other than the things that
18 you've now gone over in terms of things that you
19 experienced, is there anything -- has any of the
20 things you described affected your ability to hold
21 a job?

Page 279

1     A   No. I don't think so.
2     Q   Okay. Spend quality time with Joshua?
3     A   That's a good question. I was nervous
4 to have him in the condo for a little while. I
5 basically just told myself I have to get on with my
6 life because, you know, I just have to, you know.
7     Q   What did you think would happen?
8     A   Well, it still could happen to be honest
9 with you.
10    Q   Well, okay. Let's do it this way,
11 because I understand you're a work in progress, but
12 when did you make a significant change and say I'm
13 now getting on with my life, I have to get on with
14 my life, when did that happen?
15    A   Maybe about a year ago or so. I just
16 realized that -- let me get, make it clear to you.
17 I told myself I just needed to forget about this
18 and get it out of my mind and all that. I can tell
19 myself that. It doesn't mean that I can do it all
20 the time. I think about this often. I replay the
21 events in my head all the time and part of that is

Page 280

1 because I'm trying to remember, there's times I'm
2 just trying to remember a face so I could identify
3 them and other times where it just kind of comes
4 out of nowhere. And it gets me upset. I mean I
5 know I'm a man and all that, but it gets me upset.
6     Q   That's fine. So when you say upset, do
7 you mean you cry or you just get upset or you get
8 sad or --
9     A   I have cried, yeah, I have.
10    Q   So do you still cry about the incident
11 now, I mean like two years later?
12    A   Yeah, I do actually.
13    Q   And what happens when you have those
14 episodes, what transpires?
15    A   I just start, I just start thinking
16 about it and start thinking about my kid and how
17 those guys treated me, and I should have stood up
18 for myself more and it's not a good example, not
19 standing up for yourself, especially when you
20 believe that you're right. I feel like a sucker.
21 I feel like I got completely set up by officer

Page 281

```
1   number 2. I believed him and he was blatantly
2   lying to my face, and I consider myself a pretty
3   smart guy, and --
4      Q  I was going to ask you about the crying,
5   do you cry in public? When you say you could think
6   about it any time, could you say be at the movies
7   and just start crying because you thought about the
8   incident?
9      A  Normally it happens to be honest with
10  you when I'm driving, when I'm by myself.
11     Q  Alone, okay. It's not, it's not just,
12  it's when you're cooking or doing something at your
13  business, it's more about when you're reflecting on
14  the incident by yourself?
15     A  Yeah, well, I have to be in a different
16  mind-set. If I am fortunate enough to get a
17  catering job, you have to go in there with a
18  completely different mind-set. It's just almost
19  like a football game in some ways.
20     Q  Right. Are you able to do that? Can
21  you change your mind-set like if you got a
```

Page 282

```
1   contract, you mentioned earlier about some
2   contracts you have pending, are you going to be
3   able to change and put your game face on and
4   produce those contracts?
5      A  I'll let you know.
6      Q  What do you think?
7         MS. BORJA: Objection, calls for
8   speculation.
9      A  I mean I really don't, don't know. I
10  I'm trying to give you the right answer. I don't
11  know how to sum up my feelings.
12     Q  Well, let me just ask you this: Any job
13  you had, whether it be the crisis center or any job
14  where you had to control the kitchen -- because you
15  were in charge of the crisis center, correct?
16     A  The kitchen.
17     Q  Kitchen, yeah. So just use that as an
18  example, you were able to go there and put your
19  game face on because you did it, correct?
20     A  Yeah. I worked by myself there.
21     Q  No, I understand, but I'm saying you
```

Page 283

```
1   still had obligations in terms of you had to be
2   focused on the many things you had to accomplish?
3      A  To be honest, it did affect me for a
4   while at work, it did. That's gotten a bit better.
5      Q  Okay.
6      A  You know, again, I don't want this to be
7   something that defines my life.
8      Q  Okay.
9      A  Because I just don't. I don't want to,
10  I don't want to be a victim, that type of thing. I
11  just -- I'm not sure how else to answer the
12  question.
13     Q  If you've completed your answer, then
14  that's fine.
15        So other than -- now, we talked about
16  the emotional distress, there's some other damages
17  you asked in your complaint like the policy be
18  changed and other things against the officer. Is
19  there anything else you want to tell me about how
20  those forms of relief affect you or affect your
21  life, or is there any other comments you want to
```

Page 284

```
1   make in regards to the lawsuit?
2         MS. BORJA: Objection to the form,
3   vague, overly broad.
4      Q  You can answer.
5      A  I think policy is important that it gets
6   changed. I think that times are different now than
7   even five or ten years ago, especially with phones.
8   They all have cameras. Most of them have video
9   recording now, and I do think it's important that
10  everyone is kind of on the same page.
11     Q  So if that policy was changed, would
12  that change your understanding of what's going on
13  in the lawsuit?
14        MS. BORJA: Objection to the form,
15  vague, also objection to the extent you're asking
16  the witness to draw a legal conclusion.
17     Q  You can answer.
18     A  You're asking does it make me feel
19  better?
20     Q  I'm stating a fact and asking knowing
21  the fact, knowing that a policy was promulgated
```

**EXHIBIT 1-F**

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MARYLAND

3

CHRISTOPHER SHARP,          *
4                                   *
            Plaintiff            *
5                                   *        Civil Action
      v.                         *
6                                   *        No. 11-cv-02888-BEL
BALTIMORE CITY POLICE       *
7  DEPARTMENT, et al.,          *
                                    *
8           Defendants          *

9                    * * * * * * * * *

10            Pursuant to Notice, the deposition of

11  WILLIE H. COLEMAN was taken on Thursday, March 21,

12  2013, commencing at 11:30 a.m., at the offices of

13  the American Civil Liberties Union of Maryland,

14  3600 Clipper Mill Road, Suite 350, Baltimore,

15  Maryland 21211, before Richard D. Baker, Jr.,

16  Notary Public.

17

18

19

20

21  Reported by:  Richard D. Baker, Jr.


            Alpha Reporting Company - 443-309-5199

16

```
 1      A     Yes, sir.
 2      Q     Okay.  Do their T-shirts say anything?
 3      A     SAFE.
 4      Q     Okay.  So we've got the regular Jockey
 5   Club security employees, WCs, and SAFE Management.
 6      A     And you have the WCs who wear white
 7   shirts.
 8      Q     Okay.
 9      A     They take all of the food stands in the
10   infield and in the plant, corporate village,
11   clubhouse turn, top of the stretch.
12      Q     Okay.
13      A     Turfside Terrace.  White shirt, black
14   pants.
15      Q     Are they collared shirts?
16      A     White shirt just like what I have on,
17   what you have on.  It wouldn't have any -- it's
18   just a plain white shirt.
19      Q     Do some of them wear baseball caps?
20      A     All of them wear baseball caps.
21      Q     And what do the hats say?
```

17

```
 1      A     Some says event staff, some says
 2   security, special security.
 3      Q     Okay.  And they carry radios?
 4      A     Yes.  The supervisors have radios.
 5      Q     The WCs in the white shirts?
 6      A     Yes, sir.
 7      Q     Do any of them carry batons?
 8      A     No, sir.
 9      Q     Service weapons?
10      A     No, sir.
11      Q     So we've got -- we added another
12   category of WCs.  Who else provides security?
13      A     SAFE.  That would be all.
14      Q     Okay.  And then the BPD, right?
15      A     Yes, sir.
16      Q     What do they wear on the day of the
17   Preakness?
18      A     Who?
19      Q     The BPD officers.
20      A     It all depends.  I'm really not -- I
21   really couldn't answer that.  But some of them wear
```

18

```
 1   uniforms, some of them wear -- but I'm really not
 2   familiar with what all of them would wear.
 3      Q     Well, what does the uniform look like?
 4      A     It would be a white shirt, a badge,
 5   Baltimore City Police on it.
 6      Q     Or sometimes they have the navy shirt?
 7            MR. GRIMES:  Objection.
 8      Q     Go ahead.
 9            MR. GRIMES:  You can answer.
10      A     I really don't recall a navy shirt.
11      Q     Who's responsible for the police that
12   are on staff that day?
13      A     Well, Sergeant Vinci more or less is the
14   head, but who he have and who's his point, that
15   kind of like is different than I handle.  I don't
16   handle that.
17      Q     So to make sure I understand, I know
18   some officers who work the Preakness are working as
19   overtime, and then some officers are detailed.
20   Does Sergeant Vinci have responsibility for just
21   one of those two groups or both?
```

19

```
 1      A     I really don't know.
 2      Q     Okay.  So you just -- to make sure I
 3   understand, do you divide it so it's Sergeant Vinci
 4   has the BPD officers, and you take everyone else
 5   that provide security?
 6      A     Yes, sir.
 7      Q     So there's no one who you're responsible
 8   for who wears a police type uniform aside from the
 9   tan and brown uniform that the MJC security guards
10   wear?
11      A     That's correct.  The National Guard,
12   they used to come.  I forgot.  The National Guard
13   used to come from Fort Meade, but due to the fact
14   that they had -- they was on special detail this
15   past Preakness, so they haven't been there this
16   past Preakness.  But the National Guard also have a
17   detail.
18      Q     Would the National Guard have been at
19   the Preakness back in 2010?
20      A     I'm not sure.
21      Q     But they've been there before?
```

20

```
 1      A    Yes, sir.
 2      Q    When they are there, do you remember
 3 what uniform they would wear?
 4      A    Yes, sir, their National Guard uniform.
 5      Q    Could you describe it for me?
 6      A    It's just a soldier's uniform.  That's
 7 about the best I can answer it.
 8      Q    Okay.  But would it look like a police
 9 uniform?
10      A    No.  It would look like the military.
11      Q    So just to make sure -- now that we've
12 added another group, I want to make sure there's
13 nobody you're responsible for that wears a police
14 type uniform.
15      A    No, sir.
16      Q    And aside from the people you supervise
17 and the BPD officers that Sergeant Vinci
18 supervises, is anyone else responsible for security
19 officers or people providing security at the
20 Preakness?
21      A    No, sir, that I'm aware of.
```

21

```
 1      Q    So if someone were to see people in
 2 police uniforms at the Preakness, it's a fair bet
 3 that they'd be seeing BPD officers?
 4          MR. GRIMES:   Objection.  You can answer.
 5          MR. KEANE:   You can answer.  The
 6 question is if somebody saw somebody at the
 7 Preakness who was wearing a police uniform, would
 8 you assume they would be Baltimore police officers.
 9      A    Yes, sir.
10          MR. GRIMES:   Objection to the phrasing
11 of it.  Is that your question?
12          MR. SMITH:   Why don't we try it again.
13      Q    Let me try it this way.  If you saw
14 someone wearing what looked to be a police uniform
15 at the Preakness, would you think it's someone
16 working for anyone else other than the BPD?
17          MR. GRIMES:   Objection.
18      A    No, sir.
19          MR. SMITH:   It's on the record.  Okay.
20      Q    And then to jump back to the WCs, your
21 team, I think I asked you about the company,
```

22

```
 1 Coleman Security.  Do you remember about when the
 2 company was started?
 3      A    I went to Freestate in 1980, so it was
 4 probably started in '80 -- the best answer I could
 5 tell you is I don't know.  But if I had to give you
 6 an answer, it would probably be '83.
 7      Q    Okay.  And since you can probably do a
 8 better job of it than I can, so we have it on the
 9 transcript, would you just describe what Freestate
10 is?
11      A    Freestate was a harness track where, you
12 know, the horses pull the two wheels.
13      Q    Sure.  There's the one down in P.G.
14      A    Well, it's in P.G. now, but at this time
15 Laurel, it was at Laurel.  Where they have the car
16 dealer there, Car Max, that was Freestate in those
17 days.
18      Q    Oh, yeah, I remember that.
19          I'm going to ask you to take a look at a
20 couple documents just to see if you can help me
21 figure a few things out.  They may not be documents
```

23

```
 1 you look at all the time, but I just want to see if
 2 you might know what they are.  If you don't, just
 3 let me know.  So the first is -- we'll mark it
 4 Exhibit Coleman 1.
 5          (Coleman Exhibit 1 marked.)
 6      Q    And, Major Coleman, you can see this
 7 document, it's a landscape or sideways oriented,
 8 and the top of the document says Racetrack Payroll
 9 Account, Inc., Payroll Time Sheet.  Do you see
10 that?
11      A    Yes, sir.
12      Q    And you can see in the bottom left-hand
13 corner, the first page is marked MJC 000111.  And
14 then if you were to look, the last page has the
15 same stamping but ends in 127.  Do you have the
16 same document I do?
17      A    Yes, sir.
18      Q    Okay.  So this is what looks to be an
19 accounting record.  Have you ever seen this
20 document before?
21      A    Yes, sir.
```

# EXHIBIT 1-G

1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MARYLAND

3

4    CHRISTOPHER SHARP,          *
                                 *
5                 Plaintiff      *
                                 *       Civil Action
6         v.                     *
                                 *       No. 11-cv-02888-BEL
7    BALTIMORE CITY POLICE       *
     DEPARTMENT, et al.,         *
8                                *
                  Defendants     *
9
                      * * * * * * * * *
10

11               Pursuant to Notice, the deposition of

12   ROBERT GARY VINCI was taken on Thursday, March 21,

13   2013, commencing at 10:00 a.m., at the offices of

14   the American Civil Liberties Union of Maryland,

15   3600 Clipper Mill Road, Suite 350, Baltimore,

16   Maryland 21211, before Richard D. Baker, Jr.,

17   Notary Public.

18

19

20

21   Reported by:  Richard D. Baker, Jr.


              Alpha Reporting Company - 443-309-5199

12

14

1    A    Right.
2    Q    Are there any other companies that
3    provide services or any other police agencies or
4    law enforcement agencies that maybe come in as
5    off-duty or anything?
6    A    No, not that I -- I have personally.  I
7    bring in some retirees that work with me that day
8    because I can't take everything on.  But they're
9    just retirees and some active.
10   Q    Do you mean retired Baltimore Police
11   Department?
12   A    Uh-huh.  Yes.
13   Q    And you said some active duty?
14   A    Yes.
15   Q    If you wanted to, would Major Coleman be
16   the right person to ask to get the full set of who
17   comes in to provide security?
18   A    I would think so, yes, other than what I
19   run, and mine is the movement of the money.
20   Q    Who else would be -- if you wanted to
21   know who else provides security services aside from

1    security.  That's all they do.
2    Q    So they watch out for events?
3    A    If they're on the floor.
4    Q    Okay.  And if saw an incident, you know,
5    of people start fighting, what would they do?
6    A    Call for me or call for the police
7    because that's who's in the building.
8    Q    And what do they wear during the day?
9    A    The Maryland Jockey Club people would be
10   in a brown shirt, dark brown parts, should have a
11   stripe on it.
12   Q    Do they wear neck ties?
13   A    I'm not sure.  It's hot so probably not.
14   Q    How about hats?
15   A    It would be a dark hat.
16   Q    Do they have any badges or --
17   A    They'll have a badge, yes.
18   Q    Patches on the shoulder?
19   A    Patches on the shoulder.
20   Q    How about did they -- I take it they
21   carry radios?

13

15

1    Major Coleman, is there anyone else you'd ask?
2    A    No.  Just those, the ones that I
3    mentioned.
4    Q    Okay.  Let me try that question again.
5    It's a good example of an unclear question.
6         If you wanted to know who else provides
7    security services, aside from Major Coleman who you
8    could ask, is there anyone else you'd ask?
9    A    No.  Just him, he's in charge.
10   Q    Okay.  So why don't we start with the
11   Jockey Club employees who were there on the day of
12   the Preakness.  Do you work directly with them?
13   A    No.  Major Coleman deploys them.
14   Q    Do you see them during the day?
15   A    Yes.
16   Q    Okay.  Just from seeing them and having
17   I imagine a general familiarity with how things
18   operate at the event, what are some of the
19   responsibilities of the Jockey Club people to
20   provide security that day?
21   A    I'm not following your -- they do

1    A    Yes.
2    Q    Is there anything else on their belt?
3    A    Not that I can think of.
4    Q    Okay.  All right.  And how about the
5    SAFE Management employees, did they do anything
6    different from the Jockey Club people?
7    A    Mainly in the building they're at the
8    doors, acting as ushers.
9    Q    So did they take tickets?
10   A    Yeah.  They would check tickets for
11   people going in and out.
12   Q    What do they wear?
13   A    It's either a red or a yellow shirt.  I
14   can't remember.
15   Q    Is it a polo shift?
16   A    It's a T-shirt.
17   Q    Does it say SAFE on it?
18   A    Yes.
19   Q    And is that on the front or the back?
20   A    I think it's on the back.
21   Q    Okay.  Do they wear hats?

16

1    A    I believe they do.
2    Q    How about is there a standard pant that
3  they wear?
4    A    I'm not sure. I'm not sure on that.
5    Q    Okay. Aside from being ushers and
6  taking tickets, are they anywhere else in the
7  building normally?
8    A    No, that's about it.
9    Q    The BPD officers that report to you,
10  what do they wear during the day?
11    A    They wear their uniform.
12    Q    And is it a blue or white shirt?
13    A    Well, now it's a blue shirt. I'm not
14  sure what it was two years ago.
15    Q    Okay. How about do they wear hats?
16    A    They're supposed to, yes.
17    Q    Okay. Do most of them do that?
18    A    I'd say probably 50 percent do, some
19  don't.
20    Q    And they've got the dark pants?
21    A    Yes.

17

1    Q    Do they have radios and do they carry
2  batons?
3    A    Yes.
4    Q    Do they carry their service weapons?
5    A    Yes.
6    Q    Is that across the board, they all have
7  batons and service weapons?
8    A    It's their standard uniform.
9    Q    You said corrections officers, and just
10  to make sure, you mean the Maryland Department of
11  Public Safety and Corrections?
12    A    Right.
13    Q    And they report to Major Coleman?
14    A    Right.
15    Q    And what is their job during the day?
16    A    You have to ask Major Coleman because I
17  don't get into their job that day. I'm busy
18  enough.
19    Q    Do you see them around during the day?
20    A    Yes.
21    Q    What do they wear?

18

1    A    It's usually a dark pair of pants, white
2  shirt, from what I remember.
3    Q    Did they have --
4    A    White shirt, no, that's no more. They
5  would wear their yellow or red T-shirt.
6    Q    A T-shirt?
7    A    Yeah, T-shirt. They would have dark
8  pants on.
9    Q    So dark pants. Would it be like uniform
10  pants with a stripe?
11    A    No, just standard black or blue pants.
12    Q    Like dress pants?
13    A    Right.
14    Q    Would they wear -- and you said a
15  T-shirt on top?
16    A    Right.
17    Q    Did the T-shirt have any markings on it?
18    A    I really can't remember on that one.
19    Q    And knowing that Major Coleman is a
20  better person to ask, I'll just ask you a few more
21  questions to see what you remember. Did they wear

19

1  hats?
2    A    They're given a hat, yes.
3    Q    Is it a baseball style cap?
4    A    Yes.
5    Q    Do you remember if it has anything
6  written on it?
7    A    No, I can't -- I don't remember.
8    Q    Do they carry radios?
9    A    Not all of them. There's a limited
10  amount of radios, usually the supervisors.
11    Q    And when you say supervisors, are these
12  supervisors from the department of corrections, or
13  Jockey Club supervisors?
14    A    The Jockey Club would have them and
15  certain ones from the corrections would have them.
16    Q    Okay. And do they ever carry batons or
17  service weapons?
18    A    No.
19    Q    Okay. And just to make sure, knowing
20  again Major Coleman would be a good person to ask,
21  is there anyone else that you remember who provides

22

1   security that you can think of?
2        A    No, no one else.
3        Q    Okay.  I'd like to now give you a
4   document to look at.  We'll mark it as Exhibit 1.
5   And I just have some questions about terms that are
6   used in here.
7        A    Okay.
8             (Vinci Exhibit 1 marked.)
9        Q    So we've marked this document as Vinci
10  Exhibit 1.  And you can see in the bottom right
11  corner it's got a Bates stamp on it, MJC 000033,
12  and you can see if you look at the last page it
13  runs until MJC 89.  Do you have all those pages?
14       A    Yes.
15       Q    And you see at the top the document says
16  Final, Preakness Day, 2010.  Does this document
17  look familiar, Mr. Vinci?
18       A    Yes.
19       Q    Can you tell me what it is, please?
20       A    Actually it's an itinerary of what goes
21  on during the day.

1   responsibilities in here.
2        A    Uh-huh.
3        Q    So this is a document you're familiar
4   with?
5        A    Yes.
6             MR. KEANE:  Remember to let him finish.
7             THE WITNESS:  Okay.
8             MR. KEANE:  And also no uh-huhs.
9             THE WITNESS:  Okay.
10            MR. SMITH:  Thank you.
11            BY MR. SMITH:
12       Q    Starting right on the first page, which
13  is Bates 33, if you look about -- start at the
14  first page.  If you look about two-thirds of the
15  way down, do you see the name Tom Atkinson
16  underlined on the left-hand side?
17       A    Page 33, Tom Atkinson.  Okay.
18       Q    Who's Mr. Atkinson?
19       A    He's one of the facility people.
20       Q    And does he report to Major Coleman?
21       A    No.

21

1        Q    Okay.  Who prepares this itinerary?
2        A    It gets updated every year I think by
3   Danelle Adams.
4        Q    Is it Mr. Adams?
5        A    Ms. Adams.  She's one of the employees
6   there that we send this to.  Actually it could be
7   Kathy Bouck.  Either one was doing them.
8        Q    Kathy --
9        A    Bouck.
10       Q    Would you mind spelling her name?
11       A    B-A-U --
12            MR. KEANE:  B-O-U-C-K.
13       A    Yeah, that's what it is.  And I'm
14  thinking really I think it's her who updates it
15  now.
16       Q    Do you review this plan every year?
17       A    This comes, this generally comes out
18  three days before Preakness.
19       Q    I see your name a fair amount.
20       A    Uh-huh.
21       Q    I take it you've got a lot of

23

1        Q    What generally does he do?
2        A    He does facilities works, repairs, gets
3   things done.
4        Q    If you could turn to the second page,
5   which is Bates 34.  You can see maybe just a
6   quarter to a third of the way down there's an
7   underline that says SAFE/Tom Atkinson/facilities.
8   And then it has a number of numbered paragraphs.
9   Do you see that?
10       A    Yes.
11       Q    So would SAFE Management employees and
12  Mr. Atkinson work together on some of the
13  facilities things?
14       A    It looks like it, yes.
15       Q    All right.  And if we could skip to
16  page 4, which is marked Bates 36.  Are you there?
17       A    Yeah.
18       Q    Okay.  And if you look about
19  three-quarters of the page down, do you see how
20  there's some bold underlined, employee entrance
21  number 1, employee entrance number 2, and so on?

24

```
 1      A    Yes.
 2      Q    If you look at the one marked employee
 3 entrance number 1, and then it says, parentheses,
 4 next to Rogers main gate, and then the first term
 5 after that is Security, WCs.  Do you see that?
 6      A    Uh-huh.
 7      Q    Do you know what that term means?
 8      A    That's Willie Coleman's people.  That's
 9 what WC is, Willie Coleman.  DOC, people from the
10 prisons coming in.
11      Q    So that would refer to the corrections
12 officers?
13      A    Right.
14      Q    Then we see SAFE again.  And then it
15 says Saint Brigid's.  Is that the church in Canton?
16      A    Yes.
17      Q    Do you know what they do during the day?
18      A    They would be on the doors, okay, to
19 also help people in and out and check tickets.
20      Q    I'd like to ask you, it says employee
21 entrance number 2 in the next paragraph.  Do you
```

25

```
 1 see that?
 2      A    Uh-huh.
 3      Q    And it says security.  Where is on the
 4 property employee entrance number 2?
 5      A    I would think it would be the security
 6 office door.
 7      Q    And where is that on the property?
 8      A    It's just inside or just at the Hayward
 9 gate.
10      Q    Okay.  If you could turn to the next
11 page, MJC 37, do you see right in the middle of the
12 page one of the bolded entries is BCFD contacts?
13      A    That's Baltimore City Fire Department.
14      Q    Okay.  So there's a number of fire
15 department firefighters that are there during the
16 day?
17      A    Yes.
18      Q    Do they wear uniforms?
19      A    Yes.
20      Q    What do those uniforms look like?
21      A    White shirt I think.  Tie if they're
```

26

```
 1 wearing them.  I think they have dark pants.
 2      Q    Okay.  And then if you look at the very
 3 last line of the same page, do you see where it
 4 says Incident Management Team?
 5      A    Yes.
 6      Q    Do you know what that is?
 7      A    That's -- over on the Pimlico Road side
 8 there's a tent, and each department puts a person
 9 in there.  Police, fire, National Guard, et~cetera,
10 they all have a command center.  They're all there
11 at once.
12      Q    So you said that's outside the fence?
13      A    That's on the other side by Pimlico Road
14 is where their tent is.
15      Q    If you look on the next page, page 6,
16 which is Bates 38, and you go two-thirds of the way
17 down, right below the row for WBAL, do you see the
18 next line is security/Vinci/Lishia?
19      A    Scott Lishia.
20      Q    And who's that?
21      A    He was a senior management, but he's no
```

27

```
 1 longer with us.
 2      Q    What did he do when he was with --
 3      A    He coordinated a lot of the meetings.
 4      Q    And it says securities right before your
 5 name in that line.  Is there a group of people that
 6 that refers to?
 7      A    Just in general.
 8      Q    So who would be doing the tasks that
 9 follow the entry there?
10      A    I would.
11      Q    There's some handwriting on this
12 document.  Do you see that?
13      A    That's mine.
14      Q    That's yours.  So this would have been
15 your copy?
16      A    Yes.
17      Q    If you wouldn't mind turning the page to
18 page 7, Bates 39.  Do you see up at the top, the
19 very first new row that's marked parking Preakness
20 rate check?
21      A    Yes.
```

28

```
1        Q     And you see it says in the second line
2   of that WC, and then parentheses, Coleman Security
3   parks here.  So this is Major Coleman or Willie
4   Coleman, right?
5        A     Yes.
6        Q     And then it says Coleman Security.  Does
7   he own -- I think there's a company called Coleman
8   Security Services?
9        A     Yes.
10       Q     Do you know, do they contract with the
11  Jockey Club to provide some of this service?
12       A     Yes.
13       Q     So he works for the Jockey Club and then
14  he also owns a company that contracts with the
15  Jockey Club?
16       A     Yes.
17       Q     And he'd probably be a good person to
18  ask about their operations?
19       A     Right.
20       Q     If you wouldn't mind going all the way
21  to the bottom of that same page, and you see how
```

29

```
1   the last entry is souvenirs/All Pro Sales
2   locations?
3        A     Yes.
4        Q     And if you go down to the fourth line,
5   do you see where the line starts with lobby, across
6   from elevator, and then in parentheses it says
7   CH 1?
8        A     1, 2, 3, 4.  Okay.
9        Q     Do you see that, Mr. Vinci?
10       A     Uh-huh.
11       Q     What does CH 1 stand for?
12       A     Clubhouse 1, I believe.
13       Q     That's the first floor of the clubhouse?
14       A     Yes.
15       Q     Do you see there's some handwriting?  It
16  may be hard to read on your copy.
17       A     I got it, yes.
18       Q     And it says -- is that --
19       A     It's nine overtime police officers.
20       Q     There's a star.  Is that referring to
21  all the souvenir stands?
```

30

```
1        A     We don't staff all of them, no.  These
2   are -- the ones that get staffed with the overtime
3   are the ones that are on the infield.
4        Q     They need a little more attention?
5        A     A little more attention.
6        Q     Okay.  If you wouldn't mind turning to
7   page 10, which is Bates 42.  And if you'll look at
8   the very last entry on the page, the one that's
9   marked security, do you see that, Mr. Vinci?
10       A     Yes.
11       Q     And it says Pimlico payroll, BP dot and
12  BPDs begin to report.
13             BP dot, what does that stand for?
14       A     It's Baltimore City Police Department
15  overtime.
16       Q     And then BPDs, what does that mean?
17       A     Those are the people that are detailed
18  to the track.
19       Q     So they begin showing up, and it says
20  bulk report 6:00 to 8:00 a.m., and they all have to
21  be there by 8:00 a.m.; is that right?
```

31

```
1        A     Yes.
2        Q     Where do they check in?
3        A     They check in in my office which
4   Lieutenant Blair takes over.
5        Q     So your office becomes that security
6   office in the grandstand?
7        A     Yes.
8        Q     Okay.  Do they take all your candy that
9   you hide in there?
10       A     I can't even get in there.
11       Q     Moving ahead three more pages to
12  page 13, which is stamped Bates 45, are you there,
13  Mr. Vinci?
14       A     Yes.
15       Q     And again we'll go toward the bottom of
16  the page, and you see the paragraph with the bold
17  and underlined heading, security/WC guards report?
18  Do you see that?
19       A     Yes.
20       Q     And then it says supervisors begin
21  placement, Coleman select guards for most important
```